```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,      ) CRIMINAL NO. 22-00048JMS-WRP
 4                                   )
              Plaintiff,             ) Honolulu, Hawaii
 5                                   ) February 28, 2023
         vs.                         )
 6                                   )
      (1) KEITH MITSUYOSHI KANESHIRO,) [120] DEFENDANT SHERI J.
 7    (2) DENNIS KUNIYUKI MITSUNAGA,)   TANAKA'S MOTION FOR PARTIAL
      (3) TERRI ANN OTANI,           )  DISMISSAL OF FIRST
 8    (4) AARON SHUNICHI FUJII,      )  SUPERSEDING INDICTMENT
      (5) CHAD MICHAEL MCDONALD,     )  BASED ON STATUTE OF
 9    (6) SHERI JEAN TANAKA,         )  LIMITATIONS
                                     ) [132], [140], [143], [148] &
10            Defendants.            )  [149] NOTICES OF JOINDER
      _____)

11

12                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
13                 UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For the Government:        ANDREW CHIANG, ESQ.
                                 Office of the United States Attorney
16                               Southern District of California
                                 800 Front Street, Room 6293
17                               San Diego, California  92101

18
      For Defendant (1)          BIRNEY B. BERVAR, ESQ. (By phone)
19    Keith Mitsuyoshi           Bervar & Jones
      Kaneshiro:                 1100 Alakea Street, 20th Floor
20                               Honolulu, Hawaii  96813

21
      For Defendant (2)          NINA MARINO, ESQ.
22    Dennis Kuniyuki            Kaplan Marino
      Mitsunaga:                 1546 N. Fairfax Avenue
23                               Los Angeles, California  90046

24                               JOHN M. SCHUM, ESQ.
                                 Law Office of John Schum
25                               P.O. Box 1241
                                 Honolulu, Hawaii  96807
```

```
 1    APPEARANCES CONT'D:

 2    For Defendant (3)        DORIS LUM, ESQ.
      Terri Ann Otani:         Law Office of Doris Lum, LLLC
 3                             1001 Bishop Street, Suite 710
                               Honolulu, Hawaii  96813
 4

 5    For Defendant (4)        ANDREW M. KENNEDY, ESQ.
      Aaron Shunichi Fujii:    Schlueter, Kwiat & Kennedy LLLP
 6                             75-167 Kalani Street, Suite 201
                               Kailua-Kona, Hawaii  96740
 7

 8    For Defendant (5)        THOMAS M. OTAKE, ESQ.
      Chad Michael McDonald:   Thomas M. Otake AAL, ALC
 9                             851 Fort Street Mall, Suite 400
                               Honolulu, Hawaii  96813
10

11    For Defendant (6)        MARK MERMELSTEIN, ESQ.
      Sheri Jean Tanaka:       ANDREW S. COWAN, ESQ. (By phone)
12                             Holmes, Taylor, Athey, Cowan,
                               Mermelstein & Jones LLP
13                             811 Wilshire Blvd., Ste. 1460
                               Los Angeles, California  90017
14
                               CRYSTAL GAIL K. GLENDON, ESQ.
15                             Law Office of Crystal Glendon, LLLC
                               1130 N. Nimitz Hwy., Ste. B-299
16                             Honolulu, Hawaii  96817

17

18

19

20    Official Court          Cynthia Fazio, RMR, CRR, CRC
      Reporter:                United States District Court
21                             300 Ala Moana Blvd., C-270
                               Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1    TUESDAY, FEBRUARY 28, 2023                    10:13 A.M.

 2              THE COURTROOM MANAGER:  Criminal Number

 3    22-00048JMS-WRP, United States of America versus Keith

 4    Kaneshiro, et al.

 5              This case has been called for hearing on Defendant

 6    Sheri J. Tanaka's Motion for Partial Dismissal of First

 7    Superseding Indictment Based on Statute of Limitations, and

 8    defendants numbers one through five notice of joinder.

 9              Counsel, please make your appearance for the record.

10              MR. CHIANG:  Good morning, Your Honor.  Andrew Chiang

11    here for the United States.

12              THE COURT:  Okay.

13              MR. MERMELSTEIN:  Good morning, Your Honor.  Mark

14    Mermelstein here.  My partner Andy Cowan is on -- appearing

15    telephonically, and Ms. Tanaka is present beside me out of

16    custody.

17              THE COURT:  All right.  Thank you.

18              MS. MARINO:  Good morning, Your Honor.  Nina Marino

19    before the Court.  Present with me is Mr. Mitsunaga.

20              THE COURT:  All right.  And I see Mr. Schum is back

21    there.  Okay.

22              MS. MARINO:  And Mr. Schum is with me, yes.

23              THE COURT:  Okay.

24              MR. OTAKE:  Good morning, Your Honor.  Thomas Otake on

25    behalf of Chad McDonald, who is present.
```

```
1              THE COURT:  All right.  Thank you.

2              MS. LUM:  And good morning, Your Honor.  Doris Lum on

3   behalf of Terri Ann Otani standing here to my left.

4              THE COURT:  All right.  Thank you.

5              MR. KENNEDY:  Andrew Kennedy on behalf of Aaron Fujii,

6   who is present.  Good morning, Your Honor.

7              THE COURT:  All right.

8              DEFENDANT KANESHIRO:  Good morning, Your Honor --

9              MR. BERVAR:  Good morning, Your Honor -- go ahead.

10             THE COURT:  Go ahead, Mr. Bervar.

11             MR. BERVAR:  Good morning, Your Honor.  Birney Bervar

12  on behalf of Keith Kaneshiro, who is present in person.  Thank

13  you for allowing me to appear by telephone.

14             THE COURT:  All right.  Thank you.  All right.  So you

15  folks can be seated.

16             MR. MERMELSTEIN:  Your Honor, Ms. Glendon is here as

17  well.

18             THE COURT:  All right.  Thank you.  You can be seated.

19             For those on the phone to hear you, we need to use the

20  mic system.  So if you want to stay seated, that's fine, just

21  make sure you speak into the microphone so those on the phone

22  can hear you, otherwise they won't be able to pick up what you

23  say.  Okay?

24             All right.  So I suspect we should just start with

25  Count 1.  Mr. Mermelstein?
```

     1          MR. MERMELSTEIN:  Thank you, Your Honor.  The
     2     podium --
     3          THE COURT:  Yeah, you can come to the lectern if you
     4     want, that's fine.
     5          MR. MERMELSTEIN:  Thank you, Your Honor.  So, I think
     6     there are essentially two points of law which I think are
     7     fairly unremarkable.  When you have a statute -- when you have
     8     a conspiracy with multiple objects, you need to analyze statute
     9     of limitations with respect to each object separately.  And it
    10     needs to be satisfied with respect to each object separately.
    11     That's the *Yates* case, Supreme Court case.
    12          THE COURT:  Yeah, I know the background law, so you
    13     don't really need to go there.
    14          MR. MERMELSTEIN:  Okay.  I think the second point,
    15     Your Honor, which I'm sure you're also well aware of, is that
    16     when the first has been achieved, when the conspiratorial
    17     object has been achieved, the statute starts to run.
    18          As we apply that to -- as we apply that to Count 1,
    19     the focus here then is on 666.  The government in their papers
    20     separate off in their -- in the first superseding -- first
    21     superseding indictment, that is divided into very clearly at
    22     least three conspiratorial objectives.  There are two
    23     objectives related to a violation of 666, one objective with
    24     respect to a violation of 1343, 1346.
    25          Setting aside for a moment the issue of 1343, 1346,

1    whether that is two conspiratorial objectives or one, and

2    whether the statute has run with respect to opening an

3    investigation, I think the place to start is really on the 666.

4    The second and third conspiratorial objectives analyzing the

5    statute --

6            THE COURT:  Objects.

7            MR. MERMELSTEIN:  Objects.

8            THE COURT:  Don't confuse the word objective with

9    object.

10           MR. MERMELSTEIN:  Object.  Fair -- fair point, Your

11   Honor.

12           So looking at the conspiratorial objects two and

13   three, as it relates to violations of 666, the law is clear

14   that you need to separately analyze the statute with respect to

15   666.

16           THE COURT:  Okay.  But I look at the indictment to

17   determine the scope of the purpose.  The objective, I-V-E, not

18   the object, but the objective of the conspiracy, right?  I look

19   at the indictment to determine the scope of that.

20           MR. MERMELSTEIN:  Yes.

21           THE COURT:  Right?  And it seems to me the scope of

22   the conspiracy is an allegation that all of the defendants,

23   other than Mr. Kaneshiro, paid campaign contributions to

24   Mr. Kaneshiro's campaign in return for the prosecution -- well,

25   opening an investigation and prosecution of, we'll talk about

    1    that later I suspect, of LJM.  And overt acts 1 through 47 all

    2    fall outside the statute of limitations, clearly, the five-year

    3    statute of limitations, but 48 through 52 talk about the

    4    efforts by Mr. Kaneshiro to keep that case alive based on a

    5    Motion to Dismiss.

    6          And so why isn't that the scope of the conspiracy that

    7    I take into account that the objective of the conspiracy had

    8    not been satisfied and that there were overt acts within the

    9    five-year period?

    10         MR. MERMELSTEIN:  Because the objective of that

    11    conspiracy, that conspiratorial object number two and three,

    12    was to violate 666.  So --

    13         THE COURT:  No, that's the object of the conspiracy.

    14    See, that's why I'm saying there's a difference between object

    15    and objective.  The objective is, what are they trying to get

    16    out of or what are the goals of the conspiracy.  What's the

    17    mission of the conspiracy.

    18         MR. MERMELSTEIN:  Yes.

    19         THE COURT:  Right?  And you're trying to tether that

    20    to the exact elements of the offense and say you can't go

    21    outside of that.  And I just don't see the law accepting that.

    22         MR. MERMELSTEIN:  Well, it seems to me you have to

    23    look at the -- in order to determine -- the first step is

    24    determining whether the object has been -- I'm not sure if it's

    25    object or objective in this sentence -- but whether the

1  objective has been achieved in order to --

2         THE COURT:  Right, and it seems to me under the -- the

3  language in the indictment, the objective had not been

4  achieved.

5         MR. MERMELSTEIN:  But if the objective is to violate

6  666 --

7         THE COURT:  That's the object.

8         MR. MERMELSTEIN:  Well, it seems to me as alleged by

9  the government there are three -- at least three objects.

10        THE COURT:  Right.  Two 666s and the honest services

11 wire fraud.

12        MR. MERMELSTEIN:  And so the question is whether that

13 object -- those objects have been achieved for purposes of

14 statute of limitations.

15        THE COURT:  See, I think you're reading the law too

16 narrowly in my view, Mr. Mermelstein.  I think it's broader

17 than that.  You look at what the purpose of the conspiracy is.

18 And, you know, what I found inter -- I spent a lot of time on

19 this motion.  I find it very interesting.

20        MR. MERMELSTEIN:  Good.

21        THE COURT:  Factually, legally, it's just sort of, you

22 know, interesting to work on.

23        But you cite cases, and I took a hard look at this,

24 that say 666 conspiracy does not require a quid pro quo.  But

25 there are cases, as the government says correctly, that

 1   although it's not required, a 666 conspiracy or 666 substantive

 2   offense often does involve a quid pro quo agreement.

 3            MR. MERMELSTEIN:  Well, the question --

 4            THE COURT:  And so that -- and that's what the

 5   government has alleged here is a quid pro quo agreement.

 6   They're not saying it ended when Mr. Kaneshiro had the intent

 7   to accept the campaign contributions in return for doing

 8   something.

 9            MS. MARINO:  Well, I guess --

10            THE COURT:  They go on and say, And he did something.

11            MR. MERMELSTEIN:  No, I -- the question then

12   ultimately is whether the government is going to be bound to

13   that at trial.  Meaning --

14            THE COURT:  Well, that may be.

15            MR. MERMELSTEIN:  But meaning that --

16            THE COURT:  That may be.

17            MR. MERMELSTEIN:  Meaning that --

18            THE COURT:  Yeah.

19            MR. MERMELSTEIN:  Meaning that if we get to trial and

20   the government proves up that there was a -- there was a

21   payment, something of value was paid to Mr. Kaneshiro and it

22   was done corruptly, but that nothing was received in exchange

23   for that.  That would be, if we were talking about substantive

24   offenses --

25            THE COURT:  Then I think you win on the statute of

1    limitations defense, right?  If that's all they can prove.  I

2    think you win on the statute of limitations.  And maybe even

3    under Rule 29 at that point, right?  Because if they don't

4    prove that larger conspiracy that has been alleged, then they

5    are going to fall outside the statute of limitations.  If they

6    can't prove that ultimately.

7              MR. MERMELSTEIN:  And ultimately --

8              THE COURT:  Seems to me that's a question for the

9    jury, right?

10             MR. MERMELSTEIN:  Well, then ultimately the question

11   is what are the -- I suppose what are the elements, what are

12   the jury instructions of this 666, which is embedded within the

13   larger honest services fraud charge, what are the -- is the

14   jury given instructions.  Because when I look at what the --

15   the conspiracy to violate 666 instructions would look like, I'm

16   not sure it asks for whether the government has proved up the

17   full scope of the conspiracy they've alleged.  When I look at

18   the 666 instructions, I think it would make room for the

19   possibility of if the government proved up -- if the government

20   proved up a corrupt payment, I worry that those -- the

21   instructions would allow for a conviction.

22             THE COURT:  I'm not going to settle the instructions

23   here right now.

24             MR. MERMELSTEIN:  I understand.

25             THE COURT:  I mean --

1          MR. MERMELSTEIN:  But that's -- that's the larger

2     issue, I think, where the rubber meets the road with respect to

3     this issue.

4          THE COURT:  I understand that point.  I get that

5     point.  But honestly, I'm not sure you don't win on Rule 29 if

6     that were to be the case.  I mean I don't know what evidence

7     will come out obviously.  But I mean if the government can't

8     show the quid pro quo here, then what happened, just off the

9     top of my head, I'm thinking that those overt acts that

10    occurred after that aren't going to help them on the statute of

11    limitations, which obviously you can raise as a defense at

12    trial, right?  I mean there's no question about that.

13         MR. MERMELSTEIN:  Yes.  And I guess the question is

14    whether on these facts, given these allegations we should have

15    to go to trial on the 666 when -- when the conspiratorial

16    agreement that the government has alleged is far broader than

17    what would be necessary for -- for a 666 violation and where

18    the government can't show any overt acts in furtherance of the

19    666 portion of -- of this.  They haven't alleged it and we're

20    identifying the issue right now.

21         THE COURT:  Okay.  I understand your argument.  I

22    understand.

23         MR. MERMELSTEIN:  So, then as we move to the first --

24    the conspiratorial -- conspiratorial object number one of

25    the -- of Count 1, which is the "open an investigation," the

1    question there, and I think it's the Supreme Court law that we

2    need to analyze the object, each object separately for statute

3    of limitations purposes.

4              THE COURT:  I mean the question before me is, is that

5    two objects or one, right?  That's the question I have to

6    answer.

7              MR. MERMELSTEIN:  Right.  And I would say -- I don't

8    see any reason why we would say that's one.  It seems to me the

9    same way that when we look at Count 1, 1343 versus 666, we

10   recognize there are multiple objects there.  The government has

11   pled it as multiple objects.  So there's no question about it

12   there.

13             THE COURT:  Two different statutory sections.

14             MR. MERMELSTEIN:  Yes.  But here the issue is

15   whether -- I guess maybe the way to do it is to look at

16   ultimately what -- what would be the -- what would be the jury

17   instructions and what happens in a situation where the

18   government proves up an agreement in exchange -- a payment in

19   exchange for -- to open an investigation, but doesn't prove up

20   payment in exchange for a prosecution.  That is in 2012, 2013,

21   payments; yeah, I'm going to open up an investigation.  But

22   they can't prove up the larger payment in exchange for a

23   prosecution.

24             Well, I -- I assume the conclusion at that point would

25   be that there is a statute problem because --

1          THE COURT:  So kind of getting back to the same issue

2    in Count 1 that we just --

3          MR. MERMELSTEIN:  Yeah, I think it -- I think it -- I

4    think it's virtually the same issue.  And my point would be, if

5    we recognize that issue down the road, it's the same issue

6    because what we're really saying is there are two

7    conspiratorial objects embedded within the 1343 allegation in

8    Count 1.  One is to open up an investigation; one is to

9    prosecute it.  And whether we recognize it now and dismiss the

10   "open an investigation" now or we recognize it later on and we

11   deal with it later on, there really is no way that the jury

12   could convict on payment in exchange for "open an

13   investigation."

14          And so if we recognize that the jury cannot convict on

15   that, then there's no point in having a trial on that.

16          THE COURT:  Okay.

17          MR. MERMELSTEIN:  And that's how I back into how you

18   define what the objects are.  I come from a place of the jury's

19   got to agree on the objects with unanimity, and the object has

20   to -- has to --

21          THE COURT:  Unless I look at that as one object and

22   they've got to prove they opened and prosecuted.  Both.

23          MR. MERMELSTEIN:  Well, if it -- if it truly --

24          THE COURT:  I mean it's in the conjunctive.  I know

25   this rule you can plead in the conjunctive and prove in the

1    dysjunctive, but that typically is a statutory rule, not an

2    object rule, and they've pled both as a group, as an entity.

3          MR. MERMELSTEIN:  If that is the case.  And I'm sort

4    of perhaps used to pleading where if the government says A or

5    B -- A and B happened, if they prove up A or they prove up B,

6    meaning they prove up payment in exchange for A or B or both,

7    then they would have --

8          THE COURT:  Well, let's hear from the government when

9    it's their turn on this and then you'll have rebuttal and we'll

10   see --

11         MR. MERMELSTEIN:  Okay.

12         THE COURT:  -- where they stand on it.  Because, you

13   know, I think that's maybe the crux of this second issue on

14   Count 1.

15         MR. MERMELSTEIN:  That's --

16         THE COURT:  I'm going to break up, by the way, Count 1

17   and Count 2.  So --

18         MR. MERMELSTEIN:  Okay.  So I would reserve on Count 2

19   then.

20         THE COURT:  We'll come back to argument on Count 2.

21         MR. MERMELSTEIN:  Okay.

22         THE COURT:  Okay.

23         MR. MERMELSTEIN:  I guess --

24         THE COURT:  And I'll give you rebuttal on Count 1 as

25   well.  Okay.

1          MR. MERMELSTEIN:  I -- to come back to the 666

2     portion, I do think that we have a Third Circuit case in --

3          THE COURT:  That case is so distinguishable.  It

4     really is.  I mean it's about the scope of the conspiracy.

5     They even say, if the government alleged it was a broader

6     conspiracy, we would go along with that.  But they didn't.  So

7     it's really -- you know, the scope -- it's interesting because

8     when you look at the scope of the conspiracy, the cases are

9     pretty clear you look at the indictment.  When you go beyond

10    that, for instance, what we're going to look at with Count 2,

11    you can look at facts outside the indictment because the

12    government has no obligation to plead affirmatively anything to

13    rebut an affirmative defense, right, which is what the statute

14    of limitations is.

15         MR. MERMELSTEIN:  I think then the question is what

16    portion of the indictment do you look at when you have -- when

17    you have multiple charges, multiple objects, the question is

18    what portion of the indictment you look at.

19         THE COURT:  Okay.

20         MR. MERMELSTEIN:  And what the government has done is

21    they have, by mushing together the 1343 and the 666 in one

22    count, they're basically making the argument that the quo that

23    would be necessary for a 1343 conspiracy, that somehow that

24    gets credited when we look at the 666.  And I think the

25    directive from the Supreme Court is, No, you got to look at

1   these things separately.  And even if the government put them

2   together, you got to look at them separately.  And so when we

3   have this larger indictment, we got to look at the portion of

4   the indictment that is relevant to the 666.

5               THE COURT:  Okay.  I understand.  Okay.  Thank you.

6               MR. MERMELSTEIN:  Thank you.

7               THE COURT:  Mr. Bervar, anything on your end?

8               MR. BERVAR:  No, Your Honor, nothing to add.

9               THE COURT:  Ms. Marino?

10              MS. MARINO:  No, thanks.  Thank you, Your Honor.

11              THE COURT:  All right.  Ms. Glendon, anything from

12  Ms. Lum?

13              MS. LUM:  No, Your Honor.

14              THE COURT:  I'm sorry, for -- I'm sorry, Ms. Lum,

15  anything?

16              MS. LUM:  No, Your Honor.

17              THE COURT:  Okay.  Mr. Kennedy?

18              MR. KENNEDY:  Nothing, Your Honor.

19              THE COURT:  And, Mr. Otake, I missed you.  Where are

20  you?  Okay.  Anything?

21              MR. OTAKE:  No.

22              THE COURT:  You're good.  Okay.

23              MR. CHIANG:  Thank you, Your Honor.  And I'll try to

24  keep the remarks short on the Count 1 issue.

25              You know, I think the Court is correct that we have to

 1    look at the scope of the conspiracy, the scope of the

 2    agreement.  And the agreement in this case as we allege is

 3    quite clear.  It was to bribe the elected prosecutor of

 4    Honolulu in order to get him to prosecute the victim in this

 5    case, Laura Mau.  And I think that they have looked at the

 6    indictment certainly very carefully but also very technically,

 7    and they've, I think, tried to merge together an object with

 8    the objective.  And I think here you have to look at the

 9    objective, which is the whole scope, the whole breadth of the

10    conspiracy.  And I think -- I just want to make a couple of

11    points about the *Bornman* case which they have leaned heavily

12    on.

13         You know, the conspiracy in that case, as alleged by

14    the government in that case, was really between the two corrupt

15    officials.  It was not -- it did not involve the people who

16    were paying them the bribes.  And so there was an agreement

17    between two corrupt officials to come together and agree to

18    solicit and accept bribes with the intent to be influenced.

19    There was nothing about that agreement that says anything about

20    what they would do to the people -- for the people who would

21    pay the bribes.

22         So I think that case is quite distinguishable.  It's a

23    very, very narrow conspiracy.  And so therefore the overt acts

24    in that case really could not fit into the scope of the

25    conspiracy and that's why they could not extend the life of the

1   conspiracy as they do in this case.

2           Now, I know the Court has, you know, indicated that it

3   was interested in the honest services fraud conspiracy, whether

4   or not there's two objects or one.  And, you know, I'll address

5   that for the Court.

6           You know, clearly the main -- the main object that we

7   tried to make clear in the indictment was it was to prosecute

8   LJM in this case.  Okay.  That -- that was the -- that was the

9   end goal.  It was to have her prosecuted in exchange for bribes

10  bereft of probable cause.  We do use the word "investigate" in

11  there, but we really mean that as part of the same objective,

12  part of the same thing.

13          You know, I think most people who are familiar with

14  the legal system know that when there is a prosecution, there's

15  usually an investigation that is a lead-up to it, or there's

16  supposed to be, and then when there's an active prosecution

17  going on, the investigation doesn't stop, it continues.  It

18  continues, evidence continues to be collected.  And so what we

19  tried to portray in our indictment is really just one object,

20  really it's to prosecute the victim in this case and there is

21  an investigative component to it that is ongoing at the same

22  time.

23          And with that I'd like to, you know, close my remarks

24  and I'm happy to answer any question the Court has, but that's

25  all I have on Count 1.

 1          THE COURT:  All right.  Any rebuttal before we move to

 2    Count 2?  Brief rebuttal.

 3          MR. MERMELSTEIN:  Yeah, brief rebuttal, Your Honor.  I

 4    mean what I hear, I think, essentially is the government

 5    conceding that payment in exchange for opening an investigation

 6    is not a separately actionable object that they would seek a

 7    conviction on and which is tantamount to an admission that it

 8    can be struck from the indictment if it's not a separate

 9    objective.  And the understanding is that the government is

10    going to prove up the larger object of payment in exchange for

11    "open an investigation and prosecute Ms. Mau," then that's

12    fine.  If that's -- if that's the rule -- the rules of the road

13    that we're proceeding on, and in order to ultimately secure a

14    conviction, the government is agreeing that they need to prove

15    up -- they need to prove up the prosecution part of that, and

16    the "open an investigation" is essentially irrelevant because

17    it's just something that necessarily occurred if there was a

18    prosecution, then I guess that's fine.  If that's -- if

19    that's --

20          THE COURT:  I mean that is sort of what you're saying,

21    right?  I mean you're almost admitting that the investigation

22    part is almost superfluous.  It's subsumed, in your view,

23    within the prosecute part; is that fair?

24          MR. CHIANG:  We would agree with that.  We don't agree

25    that it needs to be struck though because I think, you know, I

1   think the -- the --

2          THE COURT:  Well, I'm not -- I'm not really asking if

3   you agree it needs to be struck I guess.  I'm just -- you do

4   see it as subsumed within the prosecution.

5          MR. CHIANG:  That's how we see it, Your Honor.

6          THE COURT:  All right.

7          MR. MERMELSTEIN:  Moving on then to Count 2.

8          THE COURT:  Okay.  Hold on a second.  Let me get

9   prepared for that.  Let me make some comments on Count 2 first.

10          MR. MERMELSTEIN:  Oh, sure.

11          THE COURT:  You can stay there.  You can stay there if

12   you wish.

13          I've actually spent a huge amount of time on Count 2,

14   more time I suspect than any of you have because this is a lot

15   more complex than it appears at first blush.  That's why I put

16   out the EO yesterday asking you to review some of these cases.

17          But a couple questions I have, and I want to figure

18   out, are, what were the exact terms of LJM's release conditions

19   before the December 2015 change, and then what were the terms

20   of release conditions after.  So I want to make sure we're on

21   the same page and working from the same book, if you will, on

22   that.  So maybe we can start with some sort of fact agreements

23   if we can here.  Might be useful.

24          So as I understand, both of you agree -- and tell me

25   if I'm wrong on this, either of you, and we can have a back and

```
 1    forth on this -- as far as the conditions that were in place
 2    before the 2015 change -- let me ask a question also.
 3            I just noticed yesterday when I was reviewing your
 4    Exhibit 1, the judge who made those changes and put LJM on her
 5    own recognizance, that judge won't be a witness in this case,
 6    will she, in any way?
 7            MR. CHIANG:  Your Honor, I'm not prepared to answer
 8    that right now.
 9            THE COURT:  Well, that's my sister-in-law.  Just so
10    everyone knows.
11            MR. CHIANG:  Well, in that case then I think that --
12    that answers the question.
13            MR. OTAKE:  I mean my thought is that she would not be
14    just --
15            THE COURT:  No, I don't think she would be either.
16    It's just a piece of paper.
17            MR. OTAKE:  Eventually the relevant judge of course
18    was Judge Nakasone.
19            THE COURT:  Judge Nakasone.  Right.
20            MR. OTAKE:  Right.
21            THE COURT:  Right.  I mean I can't see Judge Ahn's
22    testimony being relevant, it's just what she did that's
23    relevant.  But if anyone disagrees you can file a motion, I'm
24    happy to hear it, you know, but she's retired now but --
25            MR. MERMELSTEIN:  I think at first blush, Your Honor,
```

1    that sounds accurate to me.

2              THE COURT:  Okay.

3              MR. MERMELSTEIN:  There's a court order and the court

4    order stands on its own --

5              THE COURT:  Right.

6              MR. MERMELSTEIN:  -- as an order.

7              THE COURT:  It's just -- it's the fact of the court

8    order, not the thought behind it or anything else that really

9    matters to --

10             MR. MERMELSTEIN:  Correct.

11             THE COURT:  -- to this prosecution.

12             Okay.  So, going back though to before that date, as I

13   understand it there was an arrest warrant issued as opposed to

14   someone coming and actually arresting her, she

15   self-surrendered.  I assume she went through a processing, like

16   everyone does, a booking process when you self-surrender, and

17   she paid eventually, I don't know how this works exactly, but a

18   $20,000 bond.

19             MR. MERMELSTEIN:  That's my understanding, Your Honor.

20   She paid a $20,000 cash -- cash bond.

21             THE COURT:  Cash bond?  So she posted that, it wasn't

22   through any sort of third party?

23             MR. MERMELSTEIN:  That's -- I'm working of the --

24   essentially off the docket in that state case.

25             THE COURT:  But that's your understanding?

1          MR. CHIANG:  That's correct, she posted that.

2          THE COURT:  Okay.  And then I assume there were other

3    restrictions.

4          MR. CHIANG:  There were.

5          THE COURT:  And can you folks help me with what those

6    may have been?

7          MR. CHIANG:  Yeah, I can share that with the Court and

8    if Mr. Mermelstein has any disagreements, I'm sure he can

9    apprise the Court.

10          THE COURT:  Okay.

11          MR. CHIANG:  But when LJM was arraigned, she was put

12    on the standard conditions of pretrial release.  In addition to

13    the $20,000 cash bail, she was ordered to make all her court

14    appearances.  She was ordered that she could not leave the

15    state of Hawaii without approval from the court.  She was

16    ordered to not commit any new local, state and federal crimes.

17          THE COURT:  That hardly seems a restriction --

18          MR. CHIANG:  Sure.  But those were -- those were the

19    conditions.  And at her initial appearance or at the

20    arraignment, the judge also ordered her to dispose of any

21    firearms that she has.  So those are the conditions that we're

22    working with pre the 2015 change.

23          THE COURT:  And then she was subject to the state

24    equivalent of Pretrial Services, is that --

25          MR. CHIANG:  You know, we looked through the -- we

 1    looked through the discovery and there was no -- there was no

 2    requirement for her to --

 3            THE COURT:  Report or anything.  Okay.  All right.

 4            MR. MERMELSTEIN:  I don't have any reason to disagree

 5    with any of that at this point.

 6            THE COURT:  Okay.  And then looking at then, once she

 7    was placed on her own recognizance, my understanding is, and,

 8    again, tell me if either of you think I'm wrong on this, the

 9    only restrictions imposed are pursuant to law, and that's HRS

10    804-7.4, which contains three requirements.  One is you comply

11    with the law.  Again, that kind of doesn't make any difference

12    because everyone presumably has that condition from time of

13    birth on.  Second, you appear for all court proceedings unless

14    your counsel tells you it's been waived.  And third, you not

15    travel outside the state unless approved by the court.  And

16    those are statutory requirements.

17            MR. CHIANG:  That's correct, Your Honor.  And those

18    are the -- those are the conditions that remained in place up

19    until --

20            THE COURT:  Okay.

21            MR. CHIANG:  -- the time that the case was dismissed.

22            MR. MERMELSTEIN:  I'm not clear on that.

23            THE COURT:  I have a copy of that HRS if you want,

24    Mr. Mermelstein.  Have you seen that?  I mean have you -- it's

25    pretty clear to me those are the conditions that apply if

1    you're on your own recognizance by law.

2           MR. MERMELSTEIN:  I would defer to the Court on that.

3           THE COURT:  Okay.

4           MR. MERMELSTEIN:  I mean I'm looking at a court order.

5           THE COURT:  No, no, it's a statute though.  It's a

6    statute that says if you're on your own recognizance, here's

7    the conditions that apply to you by law.

8           MR. OTAKE:  I'm sorry, what statute was that, Your

9    Honor?

10           THE COURT:  804-7.4.

11           MR. OTAKE:  Seven --

12           THE COURT:  Let me see if I have a copy.

13           Well, I don't think I do.  Can you print out some

14    copies?

15           Let me see if we can print out some copies I can get

16    you.  Yeah, you can look on Mr. Otake's phone as well.

17           Here, I found it.  Let me just read it into the

18    record, what it says, okay?

19           Says:  Any person released on bail, recognizance,

20    supervised release, or conditional release shall be released

21    subject to the following conditions:

22           One, the person shall not commit a federal, state, or

23    local offense during the period of release.

24           Two, the person shall appear for all court hearings

25    unless notified by the person's attorney that the person's

1    appearance is not required.

2            And three, the person shall remain in the state of

3    Hawaii unless approval is obtained from a court of competent

4    jurisdiction to leave the jurisdiction of the state.

5            That's -- that's the statute that I pulled up at

6    least.

7            MR. MERMELSTEIN:  The only other statute that I had

8    thought bore on the issue was 804-7.1, which is conditions of

9    release on bail, recognizance, or supervised release.  And what

10   it says is:  Upon the defendant's release on bail,

11   recognizance, or supervised release, the court may enter an

12   order.  And one of those things the court has the discretion to

13   enter is number eight, requiring a defendant to remain in the

14   jurisdiction in which the charges are pending, unless approval

15   is obtained from a court of competent jurisdiction to leave the

16   jurisdiction of the court.

17           THE COURT:  Well, that seems inconsistent, doesn't it,

18   with --

19           MR. MERMELSTEIN:  And that's why I hesitate.

20           THE COURT:  Okay.  Okay.

21           MR. MERMELSTEIN:  What I would note on the docket is

22   that prior to 2015 there was a request by Ms. Mau to travel.

23   So the 2014 Christmas is in between these two events.

24           THE COURT:  Okay.

25           MR. MERMELSTEIN:  And she asked for permission to

1    travel to California between December 20th and 28th of 2014,

2    and that was granted.  After 2015, after this February of 2015,

3    or March of 2015 new order that didn't impose, at least

4    explicitly, any travel restrictions, I don't see any requests

5    by her to travel.

6            THE COURT:  Okay.

7            MR. MERMELSTEIN:  Or permission to travel.

8            THE COURT:  Okay.  I appreciate it.  I think I'm

9    pretty confident when I look at 804-7.4, it says "shall be

10   released subject to the following conditions."  I don't know

11   what to do exactly with that, but that's where we are with a

12   general agreement, I think, as to where things stand before and

13   after that -- that 2015.

14           Mr. Otake, you're making faces.

15           MR. OTAKE:  I would just push back a little on that,

16   Your Honor.  When I was looking at this issue after you

17   notified us yesterday and, you know, in -- in practice in state

18   court here through the years, 804-7.1, you know, you go to your

19   arraignment, they issue the standard orders of bail which

20   include what 804-7.4 requires, and then in the future, if ROR

21   is granted and there's no set terms, then I think 804-7.1

22   allows the court to basically -- you know, it says may enter

23   any of these orders.  And if the court doesn't impose those

24   travel restrictions, which, you know, again, I'm not -- not

25   that this is worth any evidentiary value, but in my experience

 1    there, one of the benefits of ROR is you don't have those

 2    restrictions of travel through the years -- I mean throughout

 3    the case.  And so at least in practice I think 804-7.1 has been

 4    viewed as --

 5            THE COURT:  Yeah, and it may be practice is different

 6    than what the statute kind of reads.  That could be, too.

 7            MR. OTAKE:  But if -- and if you look, I mean I would

 8    agree that, you know, 804-7.4 is probably inconsistent with

 9    804-7.1.  And I think in this case under these circumstances

10    804-7.1 because -- at least in the court order by Judge Ahn,

11    there was no terms under 804-7.1 that she imposed.  So, in

12    other words, we take the position that she was not on restraint

13    from travel.

14            THE COURT:  All right.  Okay.  Honestly, I think it's

15    not going to make a difference to me at the end.  But -- but I

16    understand everyone's position.  Let me put it that way.

17            Did you have something you want to say?

18            MR. CHIANG:  Just one factual point, Your Honor.  I'm

19    not sure this makes a difference.  But on May 13, 2017, which

20    is very close to the limitations period, she did ask the court

21    to travel for business to Japan.  So, it's fairly clear to us

22    that the conditions prohibiting her from travel without the

23    court's approval was still in place all the way through 2017.

24            THE COURT:  Okay.

25            MR. MERMELSTEIN:  I do stand corrected, Your Honor.

1      There is a docket entry that reflects that.

2              THE COURT:  All right.  So let me just -- see, there's

3      a difference though.  I don't think these are necessarily

4      inconsistent because -- and this gets into the weeds.  I'm not

5      sure we need to go there, but what 804-7.1 Sub (8) says, is:

6      The court can order the defendant to remain in the jurisdiction

7      of the judicial circuit in which the charges are pending.  That

8      means essentially remain on Oahu.  Remain on the Big Island.

9              MR. MERMELSTEIN:  I see.

10             THE COURT:  You see?  Whereas 804-7.4 is that you got

11     to stay in the state.  It's the state of Hawaii, not the

12     judicial district.

13             So, I think what it is, is 804-7.1 allows the court to

14     narrow further the condition in 7-4 -- 7.4.  Okay?  All right.

15             So the other thing I just wanted to say that -- before

16     you folks argue, and I can give you some law on this, I have

17     it, is the other thing I looked at is what are the rules for a

18     statute of limitations, and I'm not sure this was in the

19     briefing, what are the rules on the statute of limitations for

20     a criminal conspiracy where an overt act is not required?

21             And every circuit that I looked at, other than the

22     Ninth Circuit, seems to have a rule that you don't look at

23     whether there's an overt act in the last five years.  The Ninth

24     Circuit strongly suggests you do look at whether there's an

25     overt act in the last nine years.  Now, these are all Ninth

1    Circuit cases.  And they came before in 1913 the Supreme Court

2    in *United States versus Nash* said in a Sherman Act case there's

3    no requirement for an overt act.  And I think these Ninth

4    Circuit cases were Sherman Act cases, conspiracy cases.

5            In 1994 the Supreme Court said in a 846 prosecution

6    there's no requirement for an overt act.  Sort of applying *Nash*

7    in a different context.  And that opened the door, I think, to

8    courts realizing there is no overt act requirement in a number

9    of statutes that -- outside of 371, including 241.

10           So, you know, there's maybe a little bit of an open

11   question as to what that law is, but it does sort of raise an

12   issue as to, you know, what is the focus on Count 2 because in

13   a lot of circuits they suggest you don't look at an overt act

14   in the last five years, you look to see if the conspiracy has

15   been, one, accomplished or, two, abandoned.  Otherwise the

16   conspiracy goes on.  Whereas the Ninth Circuit has said you

17   look at that and whether there's an overt act in the last five

18   years.

19           Now, obviously we're in the --

20           MR. MERMELSTEIN:  I like the Ninth Circuit rule

21   better.

22           THE COURT:  We're in the Ninth Circuit.  I mean I get

23   that.  I'm not suggesting that -- I am suggesting I'm not sure

24   en banc how the Ninth Circuit would look at this today.  Sort

25   of it's -- I think it's a question whether those cases are

1    correct or not, but they are the law right now, I believe, to

2    say an overt act is required in the last five years.

3         So I just wanted to lay that out because I've done

4    this research and looked at that and, you know, how that plays

5    out we'll get to.  But that's something I just wanted to lay

6    out.

7         MR. MERMELSTEIN:  I think that's very helpful

8    background, Your Honor.  I think the place to start with

9    Count 2, I'm hoping we can agree that there are at least two

10   conspiratorial objects.  One related to the right to file a

11   lawsuit and we will be back here --

12        THE COURT:  Later.

13        MR. MERMELSTEIN:  -- some point.  If we can get a

14   briefing schedule on that, that would be helpful.

15        THE COURT:  Remind me, let's talk about that at the

16   end of this hearing, a briefing schedule and a date.  We can

17   work on people's calendars and see if we can find a date for

18   that.

19        MR. MERMELSTEIN:  Thank you.  And a reply brief, Your

20   Honor.

21        THE COURT:  I'm not sure about that.  I'm not sure

22   your reply brief was that helpful on this one.

23        MR. MERMELSTEIN:  Okay.  The -- as it relates to the

24   Fourth Amendment, so the conspiratorial object of the Fourth

25   Amendment, I think the first question is, what is the -- what

1    is the seizure we're talking about, what is the Fourth

2    Amendment violation we're talking about.

3           THE COURT:  And that's why I did want to talk about

4    the difference between before February 2015 and after 20 --

5    because I think you could reach a different result.

6           MR. MERMELSTEIN:  Absolutely.  But the challenge --

7           THE COURT:  Before and after that date.

8           MR. MERMELSTEIN:  But the challenge, Your Honor, is

9    that the indictment doesn't actually reference a particular

10   seizure.

11          THE COURT:  See, this is where I think you're wrong.

12   I don't think it has to.  You're asking them to essentially

13   defend a statute of limitations defense by allegations.  I

14   think -- that's why I asked these questions.  I think I can

15   look at this evidence and -- that's -- that's not in dispute.

16          MR. MERMELSTEIN:  What -- what I'm asking them to do

17   and what I think is important is that if the government is

18   going to lay out a conspiracy to -- to deprive Ms. Mau of her

19   Fourth Amendment rights, the onus should be on the government

20   to identify the Fourth Amendment right that folks conspired to

21   allegedly deprive her of.  What is the Fourth Amendment right

22   we're talking about here?

23          THE COURT:  Well, it's what I just went through.  It's

24   pretty obvious to me what they're talking about.

25          MR. MERMELSTEIN:  Well, then the question is whether

          1    we're talking about -- because it seems to me we have to -- if

          2    we understand the restrictions that we're talking about, then

          3    we can look at the restrictions she was subject to and see if

          4    any of them are legally cognizable under --

          5              THE COURT:  Which I have done.  I've spent

          6    considerable amount of time doing, looking at case law and

          7    doing that --

          8              MR. MERMELSTEIN:  Okay.

          9              THE COURT:  -- when you folks didn't.  That's kind of

         10    the homework I've been doing.

         11              MR. MERMELSTEIN:  Well, I appreciate you -- you doing

         12    the homework, Your Honor.  I guess my point would be, if we

         13    look at the restrictions she was subject to in -- after June of

         14    2017.

         15              THE COURT:  Oh, the statute date.  Okay.

         16              MR. MERMELSTEIN:  The statute date.

         17              THE COURT:  Yeah.

         18              MR. MERMELSTEIN:  Under the law --

         19              THE COURT:  She's on her own recognizance, no doubt

         20    about that.

         21              MR. MERMELSTEIN:  She's under her own recognizance.  I

         22    take the Court's point that there may have been some limited

         23    travel restrictions, though she was able to apply successfully

         24    to travel outside the state on a couple of occasions.  So we

         25    know that those are liberally granted.  So at most the

1    restriction that we're talking about here from a travel point

2    of view is a paperwork issue where she needs to submit some

3    papers to apply to travel.

4         Under the relevant authority, I think the cases that

5    Your Honor has provided, that -- those do not rise to the level

6    of a -- a legally cognizable Fourth Amendment restraint.

7         THE COURT:  Well, I mean the Ninth Circuit has left

8    that question open, right?  I mean in a footnote they say we're

9    not going to decide whether -- in the first case I cited -- let

10   me just pull up these cases.

11        In *Karam* it was a misdemeanor, right, and it was the

12   exact same conditions we have here.  And I pulled up the

13   California statute and compared it to the Hawaii statute.

14   They're pretty similar, right?  The conditions are pretty

15   similar.  And the court found no seizure.

16        What -- what *Yousefian,* Y-O-U-S-E-F-I-A-N, said in

17   Footnote 6 is, we're leaving this question open as to whether

18   *Karam* applies in a felony prosecution.

19        One of the reasons I included *Santana*, in addition to

20   it's a lengthy discussion, it includes, you know, a number of

21   other cases and just sort of useful, I think, one of the

22   reasons I put in *Santana* is because *Santana* says in part,

23   quote, whether they were seized -- the two, in that case

24   plaintiffs, in a 1983 case -- depends not on the charges filed

25   against them but on the restrictions they faced as a result.

1    And I tend to think that's right.  That the misdemeanor felony

2    dichotomy probably doesn't make much of a difference in my

3    view.  But it is an undecided question and the Ninth Circuit

4    said that in Footnote 6, that it's undecided in the Ninth

5    Circuit.

6            MR. MERMELSTEIN:  Technically I think that's right,

7    but I think we have Ninth Circuit authority in *Karam* that lays

8    out certain things that we know were not sufficient to be a

9    restriction.

10           THE COURT:  Right.

11           MR. MERMELSTEIN:  And the only question is whether if

12   we add in this one additional factor, which is that it's a

13   felony complaint versus a misdemeanor complaint, do we think

14   that that marginal additional restraint, if you can call it a

15   restraint, is actually something that matters to us for

16   purposes of the Fourth Amendment.

17           THE COURT:  Right.

18           MR. MERMELSTEIN:  And certainly *Santana*, the Eastern

19   District case that Your Honor helpfully provided, suggests

20   that -- that that is not a distinction with a difference.  That

21   whether it's a felony or a misdemeanor, you have to look at the

22   restraints.  And so if *Santana* was Ninth Circuit law, I think

23   we would all agree that there's no question here.

24           The fact that *Santana* is a district court case, I

25   think you look at the reasoning behind it.  And the reasoning

1   behind it is accurate, that you have to look at the

2   restrictions.  And there's nothing about the restrictions that

3   were placed on Ms. Mau in 2017 that would rise to the level of

4   a Fourth Amendment --

5          THE COURT:  Yeah, and, you know, it's interesting

6   because Justice Ginsburg's concurrence in *Albright* that gives

7   rise to a lot of this discussion, right, around -- around the

8   circuits, and the circuits -- there is just no consistency

9   nationally --

10         MR. MERMELSTEIN:  Correct.

11         THE COURT:  -- right, on this.  I mean I'm saying some

12  circuits agree with other circuits, but there's just a lot of

13  sort of different views as to that concurrence and how to treat

14  it.  But it's interesting that when she said, you know, someone

15  facing serious charges, I think that's the term she used, and

16  somehow that's turning into a debate over misdemeanor versus

17  felony, I'm not sure that's what that means as opposed to, you

18  know, a traffic citation, you know, is not a serious charge.

19  But the courts have sort of somehow found this distinction

20  between misdemeanor or felony potentially to be relevant.  I'm

21  not sure that it is that relevant.  I mean Justice Ginsburg

22  says why it could be, because there are some sort of

23  intangibles that are present with a felony -- pending felony

24  charge that may not apply to a less serious charge, I suppose.

25  But anyways, I'm just talking and taking your time up.

1           MR. MERMELSTEIN:  It's your time, Your Honor.

2           THE COURT:  Yeah.

3           MR. MERMELSTEIN:  I guess in addition to that, I would

4    look at the *Bielanski* case that Your Honor pointed us to, the

5    Seventh Circuit case, which seems to point to essentially a

6    difference between a detention, an actual in-custody detention,

7    which everyone would recognize is a Fourth Amendment issue, and

8    a prosecution which -- and what I think -- I think there is a

9    line that is drawn there.  When you're talking about a

10   prosecution, when you're talking about the ability to sue the

11   state or a state actor, that we look at -- the state gets to

12   decide if it's merely a tort, if it's malicious prosecution,

13   the state gets to decide the means and manner in which the

14   state or the state actor is sued.  And it's only certain

15   constitutional deprivations where essentially the federal

16   government has stepped in and said, For these limited

17   constitutional deprivations, such as the Fourth Amendment,

18   we're going to effectively trump any state restriction on

19   sovereign immunity, any state barriers.

20           And so there is this line that's drawn between a

21   malicious prosecution and a restraint on someone's liberty such

22   as by a deprivation.  And I think what the case law does

23   support is that when there are allegations of some sort of

24   improper prosecution, that as a general rule those allegations,

25   merely the fact of the prosecution, those allegations -- and a

1    defendant who has to suffer facing those allegations does not

2    have a Fourth Amendment -- does not have a claim for violation

3    of Fourth Amendment rights.  That person has a claim for

4    malicious prosecution.  And that, I think, is the through line

5    that harmonizes a lot of these issues and intentions that you

6    see in the case law.

7            THE COURT:  Okay.

8            MR. MERMELSTEIN:  So I guess to -- to -- I would say

9    if we're looking at the two -- I suppose it's hard to know at

10   this point if we're looking at the -- if we're in agreement

11   that it's the 2017, it's the deprivations of liberty or the

12   situation that Ms. Mau faced after June of 2017 that matter,

13   and I think that's right, I think it's those deprivations that

14   matter.

15           THE COURT:  Well -- well, you're talking about --

16   though as this was a substantive offense.  This is a conspiracy

17   charge, right?  And so I'm not looking just at whether there

18   were restrictions, it's whether there was a conspiracy in

19   place, right, to violate her Fourth Amendment rights.

20           MR. MERMELSTEIN:  And -- but under the Ninth Circuit

21   laws, as Your Honor has articulated it, there would need to be

22   some sort of overt act in furtherance of that.

23           THE COURT:  In a five-year period.

24           MR. MERMELSTEIN:  Right.

25           THE COURT:  Right.

```
 1            MR. MERMELSTEIN:  And certainly there's nothing
 2    alleged in the complaint with respect to that.  The only
 3    insight we have from the government is frankly in opposition to
 4    the bill of particulars motion that we brought.  I don't know
 5    if that counts for these purposes.  I would submit that the
 6    information supplied in that opposition probably does not
 7    count.  But even then, when we look at the -- or even if we
 8    look outside the four corners of the indictment and we look at
 9    what we've been examining this morning, the actual deprivation
10    she suffered, I don't see anything there.
11            THE COURT:  Okay.  Let me -- I want to hear from the
12    government.  I'll give you a fair chance for rebuttal, but let
13    me hear first -- Mr. Bervar, anything on your end?
14            MR. BERVAR:  No, Your Honor.  Thank you.
15            THE COURT:  Ms. Marino?
16            MS. MARINO:  No thank you.
17            THE COURT:  Ms. Lum?
18            MS. LUM:  No, Your Honor.
19            THE COURT:  Mr. Kennedy?
20            MR. KENNEDY:  Nothing further, Your Honor.
21            THE COURT:  Mr. Otake?
22            MR. OTAKE:  No, Your Honor.
23            THE COURT:  Okay.  So, you know, there's two
24    questions, right, that are sort of interrelated here, which is
25    the question of whether or not there's a seizure or not,
```

1    whether these, you know, conditions ever rose to that, and then

2    the statute of limitations issue.

3            MR. CHIANG:  Thank you, Your Honor.  You know, I think

4    I'd like to confine my remarks in two parts.  First, I'd like

5    to try to persuade the Court that the sort of routine

6    conditions of pretrial release, when a person is released on

7    their own recognizance do constitute Fourth Amendment seizures.

8            THE COURT:  So you're saying after -- after February

9    2015?

10           MR. CHIANG:  Correct.

11           THE COURT:  Okay.

12           MR. CHIANG:  Correct.  And we think that's supported

13    in the law, it's supported in *Karam*, and it's supported in --

14           THE COURT:  Wait, how is -- how is it supported in

15    *Karam?*

16           MR. CHIANG:  Well, so let's get to -- if you look at

17    *Karam* --

18           THE COURT:  Those conditions were exactly the same,

19    right?

20           MR. CHIANG:  Those conditions are the same.  But *Karam*

21    itself thought that the difference in the charge was very

22    important.

23           THE COURT:  Well, we don't know that.  *Karam* said

24    there's a difference because of the charge.

25           MR. CHIANG:  Well, I think --

1          THE COURT:  They make some statements that if it was a

2     felony there may be more severe conditions.  I'm not sure where

3     that comes from.  Maybe just a view that if you have a felony

4     there's typically more restrictions in place.

5          MR. CHIANG:  Well, I think --

6          THE COURT:  But the restrictions are identical.  Isn't

7     that -- isn't that what the Fourth Amendment is about, are

8     those liberty restrictions.

9          MR. CHIANG:  I think if you look at the way that

10    *Karam* -- so *Karam* analyzed cases from four different circuits,

11    the Second, Third, Fifth and Sixth.  And those cases in some

12    ways are different with our case and in some ways similar.

13         But if I could focus the Court's attention to the way

14    that *Karam* analyzed the Second Circuit case of *Murphy*, which we

15    do cite in our brief.  And it said that, well, you know, in

16    *Murphy* they found that it was a seizure, but we're going to

17    distinguish ourselves from *Murphy* because there's these

18    differences in *Murphy*.  And the three things that they pointed

19    to from the *Murphy* case was *Murphy* involved felony charges.

20    They also had travel restrictions.  And in that case the

21    compulsory requirement to return to court had an actual

22    substantive effect on the defendant.  The defendant had to

23    return to court eight times.  And we believe that our case is

24    quite similar to the Second Circuit -- Second Circuit's case of

25    *Murphy*.

 1          Here in our case, as you know, there were travel

 2   restrictions, there were felony charges, and Ms. Mau -- LJM was

 3   actually required to return to court more times than the

 4   defendant in *Murphy*.  As we counted, the victim in this case

 5   had to make, we counted nine court appearances.

 6          THE COURT:  Just to be clear though, in Murphy the

 7   defendant could not travel end of sentence.

 8          MR. CHIANG:  No, we did not think that that is a

 9   material difference because you can always ask a court -- you

10   can always ask the court to modify the conditions of --

11          THE COURT:  I don't know.  I don't know what the rule

12   is, how New York looks at that.  But I'm just saying that is a

13   difference.  But go ahead.

14          MR. CHIANG:  Yeah, that is a difference.  We think

15   that it's not a material difference because the defendant in

16   *Murphy* could have asked the court for approval to travel, just

17   like LJM could in this case.  So we think that our case is

18   actually quite similar to the Second Circuit's decision in

19   *Murphy*.

20          And then I think if you look at, you know, Judge

21   Ginsburg's concurrence in *Albright*, which *Murphy* was based on

22   and *Karam* discussed, you know, I think that her remarks seemed

23   to have been interpreted as the difference between a felony

24   charge and a misdemeanor charge.  She says serious charge, you

25   know, I think it's a fair interpretation to mean that there is

1   a difference between felonies and misdemeanors.

2          And the Ninth Circuit in *Karam*, I think that in the

3   way that it conducted its analysis, did seem to think that that

4   was meaningful because when it said that there were travel

5   restrictions in that case, it said that, well, you know, in a

6   felony case the travel restrictions would have been more

7   onerous.  It didn't -- it didn't expound on why it believed

8   that, but I think if you sort of think about the difference

9   between a felony and a misdemeanor, I think the restrictions in

10  a felony case are a little more stringent because I think that

11  if you -- I think very likely trying to get conditions modified

12  to travel could be more difficult than, you know, just a

13  misdemeanor traffic violation.  And I think that, you know, the

14  consequences of not complying with these conditions are going

15  to be more severe than if it was just, you know, a petty

16  offense.

17         So, I think that there is a meaningful difference

18  between a felony and a misdemeanor.  And I think -- you know, I

19  think the Court would be well served by taking into account the

20  Supreme Court's decision in *Thompson versus Clark*, which was

21  issued just last year.  Now, in that case a six-justice

22  majority espoused the view and that -- you know, when there is

23  a malicious prosecution claim brought under the Fourth

24  Amendment, the seizure occurs at the initiation of the baseless

25  charges.  Now, it's not a holding of that case, but it was very

 1    well-reasoned dicta saying that, you know, the gravamen of a

 2    Fourth Amendment claim for malicious prosecution is the

 3    initiation of legal process.  And I think that is a very strong

 4    sort of indication that a six-member Supreme Court block, five

 5    of which are on the Supreme Court today, seem to be heading in

 6    the direction of agreeing that, you know, these pretrial

 7    conditions are Fourth Amendment seizures.  And I think that's

 8    reinforced, if you read the three-justice dissent in *Thompson*

 9    *versus Clark*, the three justices --

10         THE COURT:  You have a much better crystal ball than I

11    do.

12         MR. CHIANG:  Well, I think there's a lot of people who

13    would like to try to forecast what the Supreme Court does.  But

14    I think, you know, you can fairly do so by reading at the --

15    the text of these decisions.  You have a three-justice

16    minority, Alito, Gorsch and Thomas, who say, no, no, no --

17         THE COURT:  Let me ask you.  See, here's the problem I

18    have with your argument, just looking at *Karam*.  The court

19    talked about obtaining permission to travel.  Obtaining such

20    permission, while not burden-free, posed much less of a burden

21    to her than it would to a person charged with a felony,

22    suggesting the actual restrictions are greater for a felony

23    than just a burden on having to come to the court to ask

24    permission to travel.

25         MR. CHIANG:  That's not how I read it, Your Honor.

1          THE COURT:  Well, that's what it says.

2          MR. CHIANG:  What it says is --

3          THE COURT:  That's what it says.

4          MR. CHIANG:  But it doesn't say different

5    restrictions.  It says the same restrictions if it was a felony

6    would be more onerous.  So it's not -- it's not positing a

7    different set of circumstances --

8          THE COURT:  But why?  Why?  How could that be?  Let's

9    say I'm under court supervision, I have one misdemeanor and one

10   felony, two different courts, each time I have to go get

11   permission.  Is it more burdensome in the felony than it is the

12   misdemeanor to go get that --

13         MR. CHIANG:  Well, you know, I think the court in

14   *Karam* seems --

15         THE COURT:  No, answer my question.  Is it more

16   burdensome?  In reality, is it more burdensome?

17         MR. CHIANG:  I think it is burdensome.  I think it

18   is --

19         THE COURT:  Come on, it's not burdensome.

20         MR. CHIANG:  I think it's --

21         THE COURT:  It's the same thing.

22         MR. CHIANG:  I think if it's a felony -- if it's a

23   felony case you're going to have a harder time getting those

24   conditions modified.

25         THE COURT:  That's just not --

1          MR. CHIANG:  Fair enough, Your Honor.  Fair enough.  I

2    understand that the Court disagrees.

3          THE COURT:  Let me ask you this:  If I agree -- if I

4    land where I think there was a seizure based on what happened

5    pre-2015, let's just call it the order changing to OR, but not

6    after, if that's where I land as a matter of law, where does

7    that leave you?

8          MR. CHIANG:  I think the conspiracy is still timely,

9    Your Honor.

10          THE COURT:  Okay.  Tell me why.

11          MR. CHIANG:  And I'll explain why.

12          THE COURT:  Tell me why.

13          MR. CHIANG:  So, I think we're all in agreement

14    that -- that an arrest is indisputably a seizure.  I think

15    that's how seizures were understood back at the founding.  And

16    I think that there's -- I would have no disagreement from my

17    friend on the other side that, you know, an arrest or at least

18    the conspiracy to have her arrested would be a conspiracy for

19    a -- to violate her Fourth Amendment rights.

20          Now, regardless of whether or not all the stuff that

21    happened afterwards is a Fourth Amendment seizure, it's

22    still --

23          THE COURT:  Okay.  I'm talking about statute of

24    limitations now.

25          MR. CHIANG:  Yeah.  So --

1           THE COURT:  Get to the statute of limitations.

2           MR. CHIANG:  So all the stuff that happens after the

3   arrest, even if it's not a seizure, it's still an injury in

4   some way.  There's still -- it's still a deprivation to

5   Ms. Mau.  It still injures her.  And I think that is the scope,

6   I mean that is really the crux of this --

7           THE COURT:  I'm sorry, I'm sorry, you totally lost me

8   there.

9           MR. CHIANG:  Okay.  So say that there's a conspiracy

10  to have Laura Mau arrested.  That occurred before the -- prior

11  to the statute of limitations cutoff.

12          THE COURT:  Right.

13          MR. CHIANG:  But the arrest is only the -- you know,

14  it doesn't close the chapter on the conspiracy because there's

15  still -- you know, after the arrest, there's the prosecution.

16  And what the agreement called for in this case was a

17  prosecution.  And so the fact that she was being prosecuted,

18  the fact that she was, you know, subject to, you know,

19  additional injuries was what the defendants here wanted.

20  That -- that is the crux of the conspiracy.  So even though --

21          THE COURT:  Additional injuries meaning Fourth

22  Amendment injury?

23          MR. CHIANG:  It doesn't have to be a Fourth

24  Amendment --

25          THE COURT:  Why not?  That's what the object is.

1    That's what the object is.

2            MR. CHIANG:  Well, I think, Your Honor, that if you --

3    you know, we -- in our discussion in the brief we talked a lot

4    about how --

5            THE COURT:  Let me ask you this:  The Ninth Circuit --

6    let me get this law so I can tell you what it says exactly.

7            So in *United States versus Inryco*, I-N-R-Y-C-O, Ninth

8    Circuit, 1981 case, 642 F.2d 290.  Sherman Act conspiracy.  As

9    I said, my understanding is that well before 1994 when the

10   Supreme Court said a drug conspiracy doesn't require an overt

11   act, the court had ruled a Sherman Act conspiracy and antitrust

12   conspiracy doesn't require, way back in early 20th century.

13           So the court says, quote:  While a Sherman Act

14   conspiracy is technically ripe when the agreement to restrain

15   competition is formed, it remains actionable until its purpose

16   has been achieved or abandoned, and the statute of limitations

17   does not run, so long as the co-conspirators engage in overt

18   acts designed to accomplish its objectives.

19           Now, then go to *United States versus Brown*, 936 F.2d

20   1042, Ninth Circuit case, 1990.  So this is nine years later.

21   And this was about the statute of limitations in a Sherman Act

22   conspiracy case.  And the court says:  The court instructed the

23   jury that a finding of an overt act is not necessary to a

24   finding that a Sherman Act conspiracy has been formed, and

25   citing back to *United States versus Nash* from 1913.

1          In the second instruction, jurors were asked to

2    determine whether the conspiracy existed after December 12,

3    1983.  The jury was told that, assuming the conspiracy was

4    formed before December 12th 1983, it had to find that a member

5    committed an overt act in furtherance of the conspiracy after

6    that date.

7          And the court says:  The law was correctly stated.

8    Although the jury was told in one instance that an overt act

9    was not necessary and in another that it was necessary, the law

10   was correctly stated.

11         So, if I follow that law, that you need an overt act

12   in the five-year period, what is your overt act to support the

13   Fourth Amendment seizure objective of Count 2?

14         MR. CHIANG:  If -- if you find that an overt act is

15   required and, you know, I think that our reading of the 241

16   conspiracy is that it does not require an overt act --

17         THE COURT:  Okay, wait, wait, wait, wait, wait.

18   You're not listening to me.  Neither does the Sherman Act

19   conspiracy.

20         MR. CHIANG:  Fair enough, Your Honor.

21         THE COURT:  Okay?  So I don't know, you know, you can

22   try to explain to me why 241 will be different, but you're not

23   going to prevail on that argument.

24         MR. CHIANG:  Okay.

25         THE COURT:  Okay.  I'm not sure this is the right law.

```
 1   I'm not sure an en banc Ninth Circuit group would agree with
 2   this law, but it's the law right now in the Ninth Circuit.
 3           MR. CHIANG:  So, to respond to the Court's question
 4   now, we think that the overt acts would be the acts committed
 5   in furtherance of the prosecution of LJM.  And --
 6           THE COURT:  Which ones within the five years?
 7           MR. CHIANG:  It would be the fact that Mr. Kaneshiro
 8   sent a prosecutor to oppose the Motion to Dismiss.  It would be
 9   filing -- filing the opposition of the Motion to Dismiss.  It
10   would be going to court and arguing it.  It would be
11   Mr. Kaneshiro expressing a desire to have the dismissal
12   appealed.
13           THE COURT:  Okay.  So your view then, just so I
14   understand it, I just want to make sure I'm understanding, is
15   that -- your view is there's an overt act within the last five
16   years because even though she wasn't restrained, if my view is
17   right, as of that time, meaning -- I'm sorry, there weren't
18   sufficient restraints for it to be a seizure, is the way I
19   should put it, at that time, there's still a conspiracy to
20   violate the Fourth Amendment by prosecuting her and what could
21   come out of that prosecution, which could be a further seizure.
22           MR. CHIANG:  That's correct.  That's the way that we
23   view it.  And we're also looking at this conspiracy and asking,
24   you know, what -- what is the payoff to the defendants.  What
25   is the -- what do they want out of it.  And, you know, I think
```

1    the Ninth Circuit has consistently said that even if the object

2    or the -- the object of the conspiracy is completed, the

3    conspiracy continues until the defendants get what they want.

4    And if here we're limiting the object of the conspiracy or the

5    objective of the conspiracy to a Fourth Amendment arrest, there

6    is still -- what still continues is their desire springing from

7    that arrest for the victim in this case to suffer the

8    consequences of that arrest through a prosecution.

9            THE COURT:  All right.  Okay.

10           MR. MERMELSTEIN:  Just to respond to that, Your Honor.

11           THE COURT:  You --

12           MR. MERMELSTEIN:  Thank you.  I do think that on the

13   issue of the *Karam* holding, I think counsel is substantially

14   overreaching.  I think *Karam* --

15           THE COURT:  I'm with you on *Karam*, so.

16           MR. MERMELSTEIN:  Okay.

17           THE COURT:  Yeah.

18           MR. MERMELSTEIN:  With respect to the -- I think the

19   last remaining issue then is whether if there was a 2014

20   seizure, Fourth Amendment seizure, an arrest, and it's not

21   entirely clear to me even the deprivations that -- suffered in

22   2014, but it seems to me if that was the objective, as alleged

23   by the government, that objective then was fulfilled in 2014.

24           THE COURT:  Well, so I think the government's theory

25   is that overt acts 48, 49, 50 and 51, I'm not sure 52 is an

1    overt act.  But -- but --

2              MR. MERMELSTEIN:  An omission.

3              THE COURT:  Well, I --

4              MR. MERMELSTEIN:  Failure to appeal.

5              THE COURT:  Well, the case was ultimately, yeah,

6    dismissed because the time for the appeal ran.  I'm not sure

7    that's an overt act.  But 48 through 51 essentially was

8    Mr. Kaneshiro's effort to keep the prosecution alive.  And by

9    keeping the prosecution alive, you know, then what comes out of

10   prosecutions are, from the prosecutor's standpoint, someone is

11   found guilty and incarcerated.

12             MR. MERMELSTEIN:  Well, I --

13             THE COURT:  And so that conspiracy, at least there's a

14   factual issue, I think is what the government is saying, that

15   this should go to the jury as opposed to me deciding whether or

16   not there was something within that five-year period.

17             MR. MERMELSTEIN:  I think if that were the case, Your

18   Honor, that conspiracy to cause a prosecution with the ultimate

19   conclusion that that prosecution would result in a deprivation,

20   I think there's two problems, would result ultimately in a

21   Fourth Amendment deprivation, I think there's two problems with

22   that.  One, you have all this case law that Your Honor

23   helpfully pointed us to.  None of that case law recognizes the

24   Fourth Amendment implications of a malicious prosecution.

25   Because all of those folks were suing, saying I was essentially

1  maliciously prosecuted and ultimately there could be a

2  deprivation of my Fourth Amendment rights, and that was thrown

3  out, Motions to Dismiss.  So that speculative inference as what

4  may happen down the road was not recognized as a Fourth

5  Amendment deprivation.  The other thing that --

6         THE COURT:  This is a conspiracy case.  The 1983 cases

7  are not conspiracy cases.

8         MR. MERMELSTEIN:  Of course.  Of course.

9         THE COURT:  Yeah, so there is a substantial difference

10  there.

11         MR. MERMELSTEIN:  The other thing I would point to,

12  Your Honor, is, in order to be a deprivation under Fourth

13  Amendment purposes legally cognizable, there has to be an

14  unreasonable deprivation.  It cannot just be that someone was

15  seized.  It has to be that they were seized in an unreasonable

16  way without probable cause.  And I would submit that --

17         THE COURT:  Well, again, I did a little research on

18  that issue because I was interested in that issue as well, and

19  there's case law that says -- and I don't know where the

20  government is on this, we're not here to decide that here

21  today.  But there is case law that says if a public official

22  takes an action not based on a legitimate view of prosecution

23  but in order for payoff, someone in Mr. Kaneshiro's position,

24  even if there is probable cause, you can bring that 1983 claim.

25         MR. MERMELSTEIN:  Fair, but the actual -- there would

1    be no Fourth Amendment deprivation in that situation because

2    the Fourth Amendment -- you're right that if you bribe a public

3    official to bring a criminal case, absolutely correct that that

4    is actionable.

5              THE COURT:  Even if there is probable cause.

6              MR. MERMELSTEIN:  Even if there's probable cause.

7    Totally agree with that.

8              THE COURT:  Okay.  Okay.

9              MR. MERMELSTEIN:  That is a separate issue from

10    whether as a result of that prosecution the individual's

11    liberty is restrained and that individual brings a Fourth

12    Amendment claim.  Because in order to bring a Fourth Amendment

13    claim, the deprivation has to be unreasonable under the Fourth

14    Amendment.  And so what we would have here is we'd have a

15    prosecution --

16              THE COURT:  You're saying the prosecution would break

17    that chain.

18              MR. MERMELSTEIN:  Correct, because there's a judge and

19    there's a jury and they would vet the charges, even if the

20    initiation of the charges was tainted.  Once you have a judge

21    and a jury that vet the charges and make an ultimate

22    determination whether those charges are valid or not and

23    whether this person should be imprisoned, the subjective

24    motivation that got us to that place in the first place is

25    irrelevant.  The DA may be culpable, but -- in that

 1    hypothetical situation, but the judge and the jury break that

 2    causation and one cannot say that the deprivation that results

 3    from that is unreasonable.

 4            THE COURT:  Okay.  Thank you.

 5            MR. MERMELSTEIN:  Thank you.

 6            THE COURT:  I just want to hear -- last point, your

 7    response to that.  I'm sorry, I'm talking to Mr. Chiang.

 8            MR. CHIANG:  So, I think the Court makes a fair point

 9    that this is a conspiracy, not -- and so we're looking at what

10    is in the defendants' minds.  What is their intent.

11            I believe, and I want to push back on

12    Mr. Mermelstein's point that, you know, the prosecution, if

13    there is a conviction it breaks the chain.  Well, I don't -- I

14    think the cases say, and I don't know a case off the top of my

15    head, but that if the evidence that's presented is falsified

16    evidence or if the cases -- if the evidence that is presented

17    that is, you know, illegitimate evidence, but the jury received

18    it and reached a conviction, then that would not be a

19    reasonable seizure.  That would -- that would be a unreasonable

20    seizure that violates the Fourth Amendment.

21            THE COURT:  Okay.  All right.  Well, we're going to

22    take a short bathroom break and then I'm going to rule from the

23    bench on these motions.  Okay.  And then we'll talk about sort

24    of some steps going forward in this case.

25            MR. OTAKE:  Can I just place one thing just for the

1    record?

2              THE COURT:  Sure.

3              MR. OTAKE:  Just very briefly, you know, and I know

4    the Court is aware of this, but I think it's worth just putting

5    it into the record.  Hawaii law HRS 804-7.4 and 804.3 make no

6    distinction between a felony and a misdemeanor as it relates to

7    these conditions of release that you mentioned earlier.  I just

8    wanted to put that in the record.

9              And also just to highlight on Page 5 of

10   Mr. Mermelstein's motion where he quotes a Supreme Court case

11   that talks about how statute of limitations should be liberally

12   interpreted in favor of repose.  And I just ask the Court to

13   keep that in mind as you consider these things.

14             THE COURT:  Okay.  Thank you, Mr. Otake.

15             So we'll take about a ten-minute recess and then we'll

16   come back.  Okay?  Thank you.

17        (A recess was taken from 11:27 a.m. to 11:42 a.m.)

18             THE COURT:  Okay.  We're back on the record.  Counsel

19   on the phone, are you there?  Mr. Bervar?

20             MR. BERVAR:  Yes, I'm here, Your Honor.

21             MR. COWAN:  I'm here too, Your Honor, Andrew Cowan.

22             THE COURT:  Okay.  Thank you.

23             Okay.  So I'm going to rule on both of these motions.

24   I will refer to Ms. Tanaka as "defendant" because she's the one

25   who brought this motion.  I may say "indictment," I'm meaning

1    first superseding indictment, to be clear.

2         But obviously we have two counts of conspiracy in this

3    case.  Count 1 is brought under 371 and has three objects of

4    the conspiracy, though we've talked about here, one, honest

5    service wire fraud, and second, the federal program bribery,

6    what will be referred to here as 666.  And there are two

7    objects under 666, Sub (a)(2) and Sub (a)(1)(B).

8         And Count 2 charges the conspiracy against civil

9    rights in violation of Section 241 with two objects.  One of

10   them, the right to file a lawsuit in federal court alleging

11   certain claims isn't subject to this motion.  There's a

12   separate motion that is going to address that.

13        So what we have here is the right under the Fourth and

14   Fourteenth Amendments to be free from unreasonable seizures by

15   one acting under color of law.

16        And so the defendant claims that some of the objects

17   of these conspiracies fall outside the five-year statute of

18   limitations and seeks dismissal of both 666 objects and the

19   Count 1 honest service wire fraud through a quid pro quo to

20   exchange campaign contributions for an agreement to open an

21   investigation into LJM, suggesting there were two separate

22   objects set forth in the honest services wire fraud object.

23        So first some timelines.  The initial indictment in

24   this case was returned against all of the defendants other than

25   Ms. Tanaka on June 2nd of 2022.  Ms. Tanaka was added in the

1    first superseding indictment which was returned by the grand

2    jury on September 8th of last year.  But Mr. Mermelstein

3    concedes that there was a tolling agreement between her and the

4    United States.  And so we use that June 2nd date as the

5    relevant date here for the statute of limitations calculation.

6         And so because the five-year statute applies to both

7    offenses, we have a -- going back five years, we must have, you

8    know, the events after June 1, 2017, that's a -- has to be

9    forward from that period.

10         And as the defense points out, there's no disagreement

11    here, that the statute of limitations has to apply to each

12    object separately.  You don't -- you don't look at it as a

13    whole in the conspiracy, but you look at each object

14    separately.

15         So as to Count 1, the first superseding indictment

16    essentially alleges all of the defendants other than

17    Mr. Kaneshiro made campaign contributions to his campaign

18    committee in return for him to take certain actions as the

19    Prosecuting Attorney for the City and County of Honolulu.

20         And in the manner and means section of that count, the

21    FSI, first superseding indictment, states that, quote, to

22    facilitate access to Kaneshiro and the Department of the

23    Prosecuting Attorney, and persuade Kaneshiro to open an

24    investigation into and prosecute former Mitsunaga & Associates,

25    Inc. employee LJM, Mitsunaga, Otani, Fujii, McDonald, Tanaka,

1    and others would make campaign contributions towards defendant

2    Kaneshiro's reelection campaign.  And that's in Paragraph 21

3    paren 1.

4         Paragraph 21 paren 3 is similar, says:  In exchange

5    for the campaign contributions given to him by Mitsunaga,

6    Otani, Fujii, McDonald, Tanaka and others, Kaneshiro would

7    agree to take official action and exercise his authority as the

8    Prosecuting Attorney for the City and County of Honolulu to

9    open an investigation into and prosecute former MAI employee

10   LJM.  The prosecution of LJM continued until her case was

11   dismissed with prejudice in a written order by Judge Karen T.

12   Nakasone on September 15th, 2017, and the time to appeal lapsed

13   on or about October 15th, 2017.

14        So then if you look at the superseding indictment,

15   there are 52 overt acts alleged.  And all of those, other than

16   acts 48 through 52, fall outside the statute of limitations.  I

17   think that's all not in dispute.

18        48 reads:  On or about June 13th, 2017, acting on

19   behalf of Kaneshiro, Deputy Prosecuting Attorney CS filed a

20   response in opposition to LJM's Motion to Dismiss the felony

21   information against her.

22        49 reads:  On or about July 24th of 2017, acting on

23   behalf of Kaneshiro, CS appeared on behalf of the State of

24   Hawaii and argued against dismissal of the felony information

25   filed against LJM.

1          50:  On or about July 24th, 2017, after Judge Karen T.

2     Nakasone of the First Circuit Court of the State of Hawaii

3     orally dismissed the felony information against LJM, Kaneshiro

4     advised CS that Kaneshiro wanted to appeal Judge Nakasone's

5     decision.

6          51:  On or about September 25, 2017, following a

7     written order dismissing the felony information against LJM,

8     CS, acting on behalf of Kaneshiro, drafted an interoffice

9     memorandum recommending that the DPA, that's the office, appeal

10     Judge Nakasone's order dismissing the case against LJM.

11          And then 52 says:  On or about October 15th of 2017,

12     the time period for filing an appeal of the dismissal order

13     lapsed.

14          Now, some legal background, as I said, that I don't

15     think is in dispute.  Where there is a multi-object conspiracy,

16     the five-year statute of limitations must be met as to each

17     object.  And in order for the conspiracy to have occurred

18     during this period, only one overt act in furtherance of the

19     conspiracy must have occurred during that period.

20          As stated in *Grunewald versus United States*, 353 U.S.

21     391 at Page 397, the government must show both that the

22     conspiracy still subsisted within the five years prior to the

23     return of the indictment and that at least one overt act in

24     furtherance of the conspiratorial agreement was performed

25     within that period.

1          Now, again, I'm talking about Count 1 here.  We'll get

2     to Count 2 in a little bit.

3          And critical to the challenge in Count 1 in

4     particular, Grunewald teaches that, quote:  The crucial

5     question in determining whether the statute of limitations has

6     run is the scope of the conspiratorial agreement for it is that

7     which determines both the duration of the conspiracy and

8     whether the act relied on as an overt act may properly be

9     regarded as in furtherance of the conspiracy, close quote.

10          And we also know, again, this is without dispute, that

11     under general conspiracy law, each conspirator continues to be

12     liable up to the time of abandonment or success.  And that's

13     been stated in different ways over the years, but that comes

14     from *United States versus Williams*, 974 F.3d 320, Third Circuit

15     case, citing *United States versus Kissell*, 218 U.S. 601.

16          And in *United States versus Inryco*, the case I talked

17     about earlier, I-N-R-Y-C-O, 642 F.2d 290 -- well, let me get

18     back to that because that really is Count 2.  The issue we

19     talked about with the statute on Count 2.

20          And I think *United States versus Hitt*, a D.C. Circuit

21     case from 2001, 249 F.3d 1010, describes it best how you

22     determine the scope of the agreement, the conspiratorial

23     agreement by the language in the indictment.

24          Now, I want to draw a distinction between that and

25     sort of where there are factual issues that -- as to, for

1    instance, the seizure issue as to Count 2.  What the courts

2    have said, when you're looking at the scope of the conspiracy

3    for purposes of statute of limitations, you determine the scope

4    based on the language in the indictment.

5         Now, many other cases support this general

6    proposition, that we look to the indictment to determine the

7    scope of the object and the goals of the conspiracy.  *United*

8    *States versus Finlay*, 55 F.3d 1410, a Ninth Circuit case from

9    1995.  *United States versus Girard*, G-I-R-A-R-D, 744 F.2d 1170,

10   Fifth Circuit case.  *Helmich*, H-E-L-M-I-C-H, 704 F.2d 547,

11   Eleventh Circuit case.  *United States versus Bornman*, the case

12   that I will discuss in a minute, 559 F.3d 150, a Third Circuit

13   case, and others.

14        So, let me then turn to Count 1 and the 666 objects of

15   the conspiracy first.  First, defendant states correctly that

16   unlike the honest services wire fraud, the prosecution under

17   666 does not require the jury to find a specific quid pro quo.

18   That's based on the plain language of the statute itself.

19        And according to the defendant, when the government

20   charges a Section 371 conspiracy to commit federal program

21   bribery, such as in this case, that conspiracy is accomplished

22   and completed once the payments have been solicited and

23   accepted with the requisite intent to be influenced.  In other

24   words, the final acts don't have to be done.

25        That, according to the defendant, is when the statute

1    of limitation runs.  Thus, Ms. Tanaka essentially argues that

2    the overt acts set forth in Paragraphs 48 through 52 are not in

3    furtherance of the conspiracy because the conspiracy had

4    accomplished its goals and thus any acts after that

5    accomplishment fall outside the statute of limitations.

6         And the defendant relies heavily on *Bornman*, a 371

7    case with 666 as the object of the conspiracy.  But I

8    ultimately agree with the government that not only is *Bornman*

9    distinguishable, but I believe it actually aids the

10   government's position here.

11        Now, it is certainly true that *Bornman* states, as put

12   forth in the defense brief, that once payments have been

13   solicited and accepted with the requisite intent to be

14   influenced, the crime had been committed and the object of the

15   conspiracy accomplished.  But in her brief, defendant quotes

16   this language in isolation.  In whole, the court states:  The

17   agreement of Luke and Bornman alleged in Count 1 is an

18   agreement to commit a federal crime; namely, to enrich

19   themselves by corruptly soliciting and accepting payments from

20   contractors with the intent to be influenced and rewarded in

21   connection with the particular business.  And once those

22   payments had been solicited and accepted with the requisite

23   intent to be influenced, the crime had been committed and the

24   object of the conspiracy accomplished.

25        In other words, the way I read *Bornman* is that it was

1  simply applying the same rule that I just cited.  The court

2  looks to the indictment to determine the scope of the

3  conspiracy.  And as stated by the government, the outcome in

4  this case was driven by the narrow scope of the conspiracy that

5  was alleged in the indictment.  And given that narrow scope,

6  the court determined that certain overt acts were not in

7  furtherance of the conspiracy as alleged.  In fact, the court

8  stated that had the indictment alleged a scheme, in this case

9  to solicit and accept forbearance of debt collection from

10  contractors who lent money to Bornman, then, quote, we would

11  have a different case.  So the court was very much focused on

12  the allegations in the indictment and the scope of the

13  conspiracy.

14        And that's why I was at times sort of jokingly but

15  nonetheless talking about the difference between an object and

16  objective of the conspiracy, the difference between the object

17  itself and the goals, you know, or the mission of the

18  conspiracy.

19        Again, as stated in *Grunewald*, the crucial question in

20  determining whether the statute of limitations has run is the

21  scope of the conspiratorial agreement for it is that which

22  determines both the duration of the conspiracy and whether the

23  act relied on as an overt act may properly be regarded as in

24  furtherance of the conspiracy.

25        Here, the scope of the agreement as alleged in

1    Paragraph 21 was that in return for campaign contributions,

2    Kaneshiro, quote, would agree to take official action and

3    exercise his authority as the prosecuting attorney for the City

4    and County of Honolulu to open an investigation into and

5    prosecute former MAI employee LJM.  And overt acts 48 through

6    52, certainly 51, fall within the scope of the five-year

7    statute of limitations.

8         Now, to the extent the defendant argues that because a

9    quid pro quo is not required under the elements of 666, this

10   argument fails as well.  As pointed out by the government,

11   although a 666 prosecution does not require a quid pro quo,

12   many in fact do involve a quid pro quo.  And you can look at

13   *United States versus McNair*, M-C-N-A-I-R, 605 F.3d 1152, Fourth

14   Circuit case.

15        Also, an argument can be made -- I want to make it

16   clear I'm not basing my holding on this -- but an argument can

17   be made that even for a substantive violation of 666, Kaneshiro

18   did not, quote, pay the bribe until within five years of the

19   statute of limitations by working to maintain the criminal

20   charges against LJM.  Such a holding could be supported by

21   *United States versus P-A-C-C-H-I-O-L-I*, 718 F.3d 1294, Eleventh

22   Circuit case from 2013.

23        Although, based on different facts, I also think

24   *United States versus Walker*, 653 F.2d 1343, Ninth Circuit case

25   from 1981, also supports my finding that, at least as alleged,

1    Count 1 falls within the statute of limitations.  Walker was

2    charged and convicted at a trial of conspiracy to defraud the

3    United States under Section 371.  He filed a false

4    certification that no bid-rigging had taken place in relation

5    to his bid on two timber sales.  Thus, he argued on appeal that

6    the conspiracy had ended, that is, its objectives were met when

7    the Forest Service awarded him the two contracts upon reliance

8    of the false statements.

9            The Ninth Circuit disagreed.  It found that the jury

10    may have found that one aim of the conspiracy was to repay each

11    co-conspirator who agreed not to bid or submit a low bid and

12    that lasted through the payout to the co-conspirators.  The

13    court concluded that the, quote, agreement itself aimed beyond

14    merely defeating the government process of competitive bidding

15    and encompassed the ultimate objective of making excess profits

16    to be shared among the co-conspirators, close quote.

17            Likewise here, the agreement as alleged in the first

18    superseding indictment is aimed beyond merely accepting

19    campaign contributions with the intent to do something.  It

20    extended, as set forth in Paragraph 21, to the ultimate

21    objective of prosecuting LJM.

22            So in short, I disagree with the defense view that a

23    conspiracy to commit 666 federal program bribery ends on the

24    day when the final corrupt payment is given under the facts of

25    this case and given the specific allegations in the first

1    superseding indictment.

2           Now, as to the honest services wire fraud, I'm not

3    sure we ended up with a whole lot of disagreement here, but I

4    do look at this language about "open an investigation into and

5    prosecute" as a package, not as separate objects.  That's how,

6    Mr. Mermelstein, you can remind me of this come time to settle

7    jury instructions, okay.

8           MR. MERMELSTEIN:  I will, Your Honor.

9           THE COURT:  Yeah, I'm sure you will.  You know, I mean

10   that's how it's been presented and I think the government makes

11   the valid point that it really is the prosecution -- I'm sorry,

12   the investigation is subsumed within the prosecution here.

13          And so although I certainly understand the argument

14   that the defense has made, I agree with the government when it

15   states that the defendant parses the FSI too finely, they say.

16   The language as stated by the government and in my view is the

17   totality of the agreement as a package and not as sort of

18   individual components.  So I'm going to deny the motion as to

19   that ground too as well.

20          Now, Count 2, the 241 conspiracy.  Again, the

21   defendant only seeks to dismiss one object of this conspiracy.

22   There are two objects alleged.  She seeks to dismiss that part

23   of the charge that alleges her constitutional rights under the

24   Fourth and Fourteenth Amendment to be free from unreasonable

25   seizures by one acting under color of law falls outside the

1    statute of limitations.

2           So, I did ask some questions earlier about the sort of

3    conditions that LJM was placed under.  I'm not going to go

4    through all of that again, but we have sort of the

5    pre-February 2015 conditions and the post-February 2015

6    conditions.  Let me say in short my view is that the

7    pre-February 2015 conditions certainly could qualify as a

8    seizure.  I'm not sure that Mr. Mermelstein really argues

9    otherwise in this case.  Somebody who's -- where there's an

10   arrest warrant issued, they self-surrender, they go through the

11   booking process and they post $20,000 cash bond, that that's

12   not a seizure within the meaning of the Fourth Amendment.

13          But then I also think that what happened afterwards

14   when she was on her own recognizance is not a seizure.  That's

15   where I land in that regard.  I'm not going to go into a lot of

16   discussion about this law because we already discussed it,

17   including Justice Ginsburg's concurrence in *Albright versus

18   Oliver*, which has generated just a whole lot of discussion and

19   not a whole lot of consistent jurisprudence, but as to when

20   somebody under conditions of bail subject to prosecution is

21   seized and when they're not.  Some courts have said we just

22   don't buy anything she said, even given the providence of the

23   author, we don't agree with it, and others have, like the Third

24   Circuit, pretty much adopted it.

25          But there are the two Ninth Circuit cases that are

1    really the key cases, *Karam versus City of Burbank*.  I'm not
2    going to go into this in great detail.  I just simply read it
3    differently than the government does.  I think there it's clear
4    that the court did make the distinction between a felony and a
5    misdemeanor.  The conditions of release, though, were the same.
6    So, I understand this is an undecided issue.  I just think in
7    reading all of the cases, and there are a lot of cases out
8    there, I didn't cite all of them in the EO yesterday because I
9    think the Seventh Circuit case is one of the most recent ones
10    and it cites a lot of the other circuits and where they've come
11    down on this issue.  I'm not going to go through all of that.
12    But as I say, there's simply not a lot of consistency.  But
13    having read all of those cases and really studying this issue,
14    I just fall on the side that I think where the Ninth Circuit
15    would land on the question left unanswered in Footnote 6 in
16    *Yousefian*, is that this would not constitute a seizure, those
17    conditions.  And I think that's supported by the *Santana versus*
18    *County of Yuba* case, 2016 Westlaw 1268107.
19            So then, of course, there's a question of how do you
20    view statute of limitations in 241 where there's no overt act
21    requirement to be proven to a jury.  And this, like some other
22    issues in this motion, ended up being more complicated than I
23    thought.
24            Several circuits have held that where a conspiracy
25    statute does not require an overt act, such as a RICO

 1    conspiracy, drug conspiracy, Sherman Act conspiracy, this

 2    conspiracy continues as long as is its purposes have been

 3    neither abandoned nor accomplished.  *United States versus*

 4    *C-O-I-A*, 719 F.2d 1120, it's an Eleventh Circuit case that a

 5    lot of other courts cite, including the First Circuit in *United*

 6    *States versus Torres Lopez*, 851 F.2d 520; *United States versus*

 7    *Brock*, Seventh Circuit, 782 F.2d 1442.  The Fourth and Second

 8    Circuits have held likewise, but not so in the Ninth Circuit.

 9         I talked earlier about the language in *United States*

10    *versus Brown* where the court gave a jury instruction that

11    differed as far as the substantive conspiracy in the Sherman

12    Act conspiracy and the statute of limitations requiring that

13    overt act within five years of the statute -- for the statute

14    of limitations, and the court upheld that as a correct

15    statement of the law.

16         So, then the question becomes, is there anything here

17    that could give rise to a jury making a finding that there was

18    in fact an overt act within the last five years, as set forth

19    and required by *United States versus Brown*.  And where I land

20    on this is, whether I apply the other circuit's law, that I

21    look at whether the purposes have been abandoned or

22    accomplished, or if I apply the five-year overt act rule, I

23    think there's a question of fact for the jury here.  And that

24    is again based on overt acts 48 through 51 which are

25    incorporated into Count 2.  And that is, there's a question of

1    fact as to whether or not the effort to keep the prosecution

2    alive also included an effort to seize, an objective to seize

3    LJM.  That is, to result in a conviction.

4          Now, the argument raised today, and I certainly

5    understand it, by Mr. Mermelstein that if there was a

6    conviction, that it sort of breaks the causation or breaks the

7    chain, I don't find persuasive.  As I said, there's case law

8    that says that a 1983 claim requires a lack of probable cause.

9    If there's probable cause, you can't bring a 1983 malicious

10   prosecution claim.  I don't like that term "malicious

11   prosecution" because it's a state law claim, but it's used in

12   this 1983 context a lot.  So I'll call it 1983 malicious

13   prosecution claim.

14         That -- that ultimately the law is that there's an

15   exception to that if the purpose to bring the claim isn't

16   because there's probable cause but for an illegitimate purpose.

17   So there's a -- I forget which district, it may have been

18   somewhere in Pennsylvania, but a district court case where

19   there was an immigration arrest because the immigration officer

20   intended to rape the individual.  And of course -- well, of

21   course it doesn't matter if there's probable cause or not.

22   What matters is, you know, what was the intent here.  And so

23   you sort of -- that probable cause element drops out and you

24   can still have a prosecution without probable cause.  If that's

25   the case, I don't see any difference with an actual conviction.

1    Prosecutors have discretion.  And if, I'm not saying it's true,

2    if Mr. Kaneshiro was exercising his discretion to prosecute

3    somebody not because in the normal exercise of his discretion

4    he would prosecute but instead because he was filling his

5    campaign coffers, then the violation carries forward.  Then the

6    violation carries forward.

7         So, I do believe it's a question for the jury.  So I'm

8    going to deny both motions.  I know this raises issues as to

9    the scope of jury instructions and so forth, but that's going

10   to be something we'll take up later.

11        All right.  So I want to talk a little bit about sort

12   of management of the case and this further motion that has been

13   filed.  How much time do you need to respond to that motion it?

14        MR. CHIANG:  Your Honor, we would ask for six weeks.

15   I know it's a long ask, but it's a fairly substantive motion

16   and so we would like six weeks to respond.

17        THE COURT:  So give me a date as to what you're

18   seeking.  So essentially mid April?

19        MR. CHIANG:  Yeah, maybe the week of April 17th

20   sometime.

21        THE COURT:  And what I'll do, Mr. Mermelstein, you can

22   request at that point in time just by letter if you want a

23   reply, you can make that request and I'll take a look at it at

24   that point in time.  Okay?

25        MR. MERMELSTEIN:  Your Honor, I recognize it's a -- I

1  recognize it's a substantive motion --

2          THE COURT:  No, no, just speak into the microphone so

3  Mr. Bervar can hear.

4          MR. MERMELSTEIN:  I recognize it's a substantive

5  motion, Your Honor, but six weeks does seem like a lot of time.

6  The government had many years pre-indictment to figure out what

7  charges were appropriate.  All we've said is that the 241

8  charge is not appropriate, it's never been done before.  Six

9  weeks does seem excessive to me, but --

10          THE COURT:  Well, I -- I think it's fine.  I don't

11  have a problem, given our trial date in the case.

12          MS. MARINO:  Your Honor, I was -- Nina Marino, Your

13  Honor.  Thank you.  I was going to -- I agree with

14  Mr. Mermelstein.  My concern is the trial date.  We have an

15  August trial date and six weeks for them to respond and it's

16  just -- it does seem like an incredibly long time.

17          THE COURT:  No, it is.  No, I don't disagree with

18  that.

19          MS. MARINO:  Incredible.

20          THE COURT:  Well, let me just think how that could

21  impact the trial date.  So I was thinking then we'd have an

22  oral argument sometime in, like, May 9th, around there.

23          MS. MARINO:  That's three months before trial, right?

24  It would be better, it would be better, certainly, to resolve

25  that issue.

1          THE COURT:  Okay.  All right.  That's fair.  No,

2    that's a fair point.  All right, I'm going to give you four

3    weeks.  Okay.  I'm going to sort of split the baby here.  So

4    let's say April 3rd for the government's response.  And so how

5    about like the week April 24th for argument?  Can people look

6    at their schedules and see, especially those who need to come

7    in from out of town.

8          Mr. Bervar, does that work for you sometime that week?

9          MR. BERVAR:  Yeah, it's pretty open.  Yes.

10         THE COURT:  All right.  Let me just sort of go down

11   here.  Anyone else have any problems with that date as far

12   as --

13         MR. MERMELSTEIN:  Your Honor, I do have civil

14   commitments, but I do have open on the 27th or the 28th.

15         THE COURT:  Okay.  Well, how about we say the 27th at

16   10 o'clock?

17         MS. MARINO:  That's acceptable.

18         THE COURTROOM MANAGER:  Your Honor, we have a

19   sentencing.

20         THE COURT:  What do we have?

21         THE COURTROOM MANAGER:  Sentencing.

22         THE COURT:  We'll move the sentencing.  Yeah.  Just

23   move that to that afternoon.  Okay.

24         I'm assuming the silence means we're okay from

25   everyone else?  Okay.

1          All right.  As you folks can see from being in this

2    courtroom, and I'm glad we're all here, this is going to be

3    tight if we have all six defendants going to trial.  And so

4    part of what we're going to need to do on the defense side is

5    sort of come up with a plan as to your thoughts as to how we

6    can all fit here.

7          And like where you're sitting, Mr. Kaneshiro, I'm not

8    sure you could see the witness, if there's a witness on the

9    stand.

10          Yeah, he can't.

11          So that's part of the problem also, there's a blockage

12    of the view from over here.  So this is something, I'm not

13    saying we're going to answer it today, but it's something we're

14    going to have to discuss.

15          Obviously jury selection we're going to have to have a

16    lot of discussions about that.  And I also want to say just

17    so -- along the lines, Ms. Marino, of what you said, the

18    motions deadline is June; is that right?  May?  Do you know

19    what that date is?  Does anybody know?

20          MR. MERMELSTEIN:  I think it's May 12th, Your Honor.

21          THE COURT:  Okay.  You know, if there are motions, you

22    can get them filed before then.  That's best, obviously,

23    because we do want to try to roll around and not have this

24    impact the trial date.  I don't know and I hesi -- I'm very

25    hesitant to say this because I don't want anyone to read

```
 1    anything into what I'm saying because I'm not intending it to
 2    be read in any way whatsoever, but if there's any view that a
 3    motion for change of venue will be filed, I just want to make
 4    it clear that if that's filed the last minute and if it's
 5    granted, I don't know, I'm not -- please don't read this as --
 6    like tea leaves.  They're not -- it would be nearly impossible
 7    to get to trial on the date we're talking about if that were to
 8    happen.  Because what I do, I just want to make sure everyone
 9    knows, is the planning that has to go into something like that
10    through the Ninth Circuit, and then the local district court if
11    a -- if there's ever a change of venue, that's a substantial
12    amount of work in the process.  And so if there is such a
13    motion, I highly encourage that to be filed early.  Okay?
14            Again, please, I'm not suggesting you file the motion,
15    you don't file the motion, I'm not suggesting if you do file
16    the motion where I'd land on it.  I have no views on that
17    whatsoever.  But there are some realities with today's budget
18    in the Judiciary.  It used to be we can just say, Okay, let's
19    all pack up and go to Las Vegas or San Diego or San Francisco
20    or wherever and try a case.  It's not that easy anymore with
21    our budgetary constraints.  A question is whether, you know,
22    court staff could go or you borrow court staff.  You know, all
23    of these sort of questions are going to be -- have to be
24    figured out and so you have to take into account, probably do a
25    survey of a bunch of courts and sort of figure out what's
```

 1    possible and what isn't possible.  So, I'm just saying I don't
 2    think we'd get to trial on time if that motion is filed at the
 3    end of the motions period.
 4          All right.  Anything else anyone wants to raise while
 5    we're together?  Mr. Chiang?
 6          MR. CHIANG:  Not from the government.  Thank you.
 7          MS. MARINO:  Yes, Your Honor, thank you.  Nina Marino.
 8    We had filed a waiver of Mr. Mitsunaga's appearance and I'm
 9    requesting that Mr. Mitsunaga be permitted to not appear at the
10    next proceeding.
11          THE COURT:  All right.  If the next proceeding is the
12    next motion and you join, I'm going to deny that motion.  Okay?
13    I expect him to be present.
14          MS. MARINO:  All right.  Your Honor, there is a no
15    contact order in place and it is impacting Mr. Mitsunaga's
16    ability to communicate with his employees at work.  Is that
17    something I should bring to your attention or to the
18    magistrate's attention?
19          THE COURT:  Yeah, you have to bring that up to the
20    magistrate judge first.
21          MS. MARINO:  Okay.
22          THE COURT:  Okay.  And see how he handles that.  Of
23    course you can always appeal it to me if you're unhappy with
24    the result on that, but in the first instance -- is it
25    Magistrate Judge --

1          MS. MARINO:  Porter.

2          THE COURT:  -- Porter's on this case?

3          MS. MARINO:  Yes.

4          THE COURT:  And he's assigned, right, to the --

5          MS. MARINO:  Yes.  Yeah.

6          THE COURT:  Okay.  Yeah, bring it up to Judge Porter.

7          MS. MARINO:  I will do that.

8          THE COURT:  And then we'll see where that goes.

9          MS. MARINO:  Very good.  Thank you, Your Honor.

10        THE COURT:  Anybody else have anything?  Mr. Bervar?

11        MR. BERVAR:  No, Your Honor.  Thank you.

12        THE COURT:  All right.  Thank you all.

13        (The proceedings concluded at 12:18 p.m.,

14  February 28, 2023.)

15

16

17

18

19

20

21

22

23

24

25

```
1                    COURT REPORTER'S CERTIFICATE

2

3         I, CYNTHIA FAZIO, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing pages is a

6    complete, true, and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter and that

8    the transcript page format is in conformance with the

9    regulations of the Judicial Conference of the United States.

10        DATED at Honolulu, Hawaii, March 13, 2023.

11

12

13                    /s/ Cynthia Fazio
                      CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25
```