```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,      ) CRIMINAL NO. 22-00048JMS-WRP
 4                                   )
                  Plaintiff,         ) Honolulu, Hawaii
 5                                   ) November 7, 2023
            vs.                      )
 6                                   )
      (1) KEITH MITSUYOSHI KANESHIRO,) DEFENDANTS OTANI AND
 7    (2) DENNIS KUNIYUKI MITSUNAGA,)  MITSUNAGA'S MOTIONS TO
      (3) TERRI ANN OTANI,           )  DISMISS BASED ON
 8    (4) AARON SHUNICHI FUJII,      )  PROSECUTORIAL MISCONDUCT
      (5) CHAD MICHAEL MCDONALD,     ) DEFENDANT NOS. (01), (04),
 9    (6) SHERI JEAN TANAKA,         )  (05) AND (06)'S NOTICE OF
                                     )  JOINDERS
10                Defendants.        ) DEFENDANT MITSUNAGA'S
                                     )  RENEWED MOTION TO COMPEL
11                                   )  DISCOVERY
                                     ) DEFENDANT MITSUNAGA'S MOTION
12                                   )  FOR RULE 17(c) SUBPOENA TO
                                     )  UNITED STATES ATTORNEY'S
13    _____)  OFFICE

14                     TRANSCRIPT OF PROCEEDINGS
15           BEFORE THE HONORABLE J. MICHAEL SEABRIGHT
                   UNITED STATES DISTRICT JUDGE
16
      APPEARANCES:
17
      For the Government:        MICHAEL G. WHEAT, ESQ.
18                               ANDREW CHIANG, ESQ.
                                 Office of the United States Attorney
19                               Southern District of California
                                 800 Front Street, Room 6293
20                               San Diego, California  92101

21

22    For Defendant (1)          BIRNEY B. BERVAR, ESQ.
      Keith Mitsuyoshi           Bervar & Jones
23    Kaneshiro:                 1100 Alakea Street, 20th Floor
                                 Honolulu, Hawaii  96813
24

25
```

```
 1     APPEARANCES (Cont'd.):

 2     For Defendant (2)          NINA MARINO, ESQ.
       Dennis Kuniyuki            JENNIFER LIESER, ESQ. (By phone)
 3     Mitsunaga:                 RYAN MITSOS, ESQ. (By phone)
                                  Kaplan Marino
 4                                1546 N. Fairfax Avenue
                                  Los Angeles, California  90046
 5

 6     For Defendant (3)          DORIS LUM, ESQ.
       Terri Ann Otani:           Law Office of Doris Lum, LLLC
 7                                1001 Bishop Street, Suite 710
                                  Honolulu, Hawaii  96813
 8

 9     For Defendant (4)          ANDREW M. KENNEDY, ESQ.
       Aaron Shunichi Fujii:      Schlueter, Kwiat & Kennedy LLLP
10                                75-167 Kalani Street, Suite 201
                                  Kailua-Kona, Hawaii  96740
11

12     For Defendant (5)          THOMAS M. OTAKE, ESQ.
       Chad Michael McDonald:     Thomas M. Otake AAL, ALC
13                                851 Fort Street Mall, Suite 400
                                  Honolulu, Hawaii  96813
14

15     For Defendant (6)          MARK MERMELSTEIN, ESQ.
       Sheri Jean Tanaka:         ANDREW S. COWAN, ESQ. (By phone)
16                                Holmes, Taylor, Athey, Cowan,
                                  Mermelstein & Jones LLP
17                                811 Wilshire Blvd., Ste. 1460
                                  Los Angeles, California  90017
18

19

20     Official Court            Cynthia Fazio, RMR, CRR, CRC
       Reporter:                  United States District Court
21                                300 Ala Moana Blvd., C-270
                                  Honolulu, Hawaii  96850
22

23

24
       Proceedings recorded by machine shorthand, transcript produced
25     with computer-aided transcription (CAT).
```

```
 1   TUESDAY, NOVEMBER 7, 2023                    9:28 A.M.

 2              THE COURTROOM MANAGER:  Criminal Number 22-48JMS-WRP,

 3   United States of America versus Keith Mitsuyoshi Kaneshiro, et

 4   al.

 5              This case has been called for a hearing on Defendant

 6   Otani and Mitsunaga's Motion to Dismiss Based on Prosecutorial

 7   Misconduct, and defendant numbers one, four, five and six

 8   Notice of Joinders, and Defendant Mitsunaga's Renewed Motion to

 9   Compel Discovery, and Motion for Rule 17(c) Subpoena to United

10   States Attorneys.

11              Counsel, please make your appearances for the record.

12              MR. CHIANG:  Good morning, Your Honor.  Andrew Chiang

13   and Michael Wheat for the United States.

14              THE COURT:  Yes, good morning.

15              MS. MARINO:  Good morning, Your Honor.  Nina Marino

16   for Mr. Mitsunaga.  He is present in court.  My colleagues

17   Ms. Lieser and Mr. Mitsos are on the phone.

18              THE COURT:  All right.  Thank you.

19              MR. BERVAR:  Good morning, Your Honor.  Birney Bervar

20   on behalf of Keith Kaneshiro, who is present.

21              THE COURT:  Yes, thank you.

22              MS. LUM:  And good morning, Your Honor.  Doris Lum on

23   behalf of Terri Ann Otani, who is present.

24              THE COURT:  Thank you.

25              MR. KENNEDY:  Andrew Kennedy on behalf of Aaron Fujii.
```

1    Good morning, Your Honor.

2              THE COURT:  All right.  Good morning.

3              MR. MERMELSTEIN:  Good morning, Your Honor.  Mark

4    Mermelstein with Ms. Tanaka.

5              THE COURT:  All right.

6              MR. MERMELSTEIN:  And my colleague Mr. Cowan is on the

7    phone.

8              THE COURT:  Okay.  Thank you.

9              MR. OTAKE:  Good afternoon, Your Honor.  Thomas Otake

10   on behalf of Chad McDonald, who is present.

11             THE COURT:  All right.  Thank you.  You all may be

12   seated.

13             Okay.  So here's what I want to cover today:

14   Obviously these motions, right?  And we'll do that first.

15   We'll get through the arguments on those first.  But you can

16   also see we have a new arrangement in the courtroom.  This

17   isn't meant to be how I think we should set up.  It is one way

18   we can set up and I want to start having some of those

19   discussions as well.

20             IT needs to be brought into this because it's not as

21   simple as it sounds to move these tables around because it's

22   all configured into boxes underneath and so forth.  But just so

23   you know, the other option is where you are, Mr. Mermelstein,

24   putting another smaller table there, you can see the outline

25   we've put down, and then Mr. Otake, you know, you or somebody

1    else would be over here instead.  The problem is the closer you

2    get over here, the harder it is to see the witness.

3           So, we'll have that discussion later, but I wanted to

4    start having that discussion now for -- for how we can conduct

5    the trial.  And then address some other matters, procedural

6    matters I want to discuss when we're done with the hearing on

7    the motions before us.

8           So here's sort of where I thought I wanted to go.  If

9    you folks have a strong disagreement, let me know.  I really

10   wanted to start, I think, with Mr. Mermelstein's, he calls it a

11   joinder, I'm looking at it as two different things,

12   Mr. Mermelstein.  You are joining in Mr. Mitsunaga's motion,

13   but you also have a separate vindictive prosecution motion.  So

14   I'm sort of looking at it as covering two different things at

15   the same time.

16          So covering that first, then going to the Mitsunaga

17   Motion to Dismiss, which has been joined by everybody, and then

18   going to the Otani Motion to Dismiss.  In hearing the Mitsunaga

19   Motion to Dismiss, I want to hear arguments on ECFs 299 and

20   300, the discovery requests as well.  Because it seems to me

21   those are sort of tethered together in many ways.

22          So that's how I thought we could proceed.  Does anyone

23   have any issues with that or -- I've just come up with a

24   process thinking we need some format here to proceed by.  Any

25   problem with that?

1          MS. MARINO:  Not really a problem, Your Honor, but

2     I -- I would prefer to address the Motion to Compel first

3     followed by the 17(c) motion and then the Motion to Dismiss,

4     because I think the 17(c) motion and the Motion to Compel could

5     impact the Motion to Dismiss.

6          THE COURT:  Well, it might, but I'm not going to,

7     like, sit here and say yes, okay, I'm granting that motion,

8     therefore let's not hear the rest of it.  I'm going to hear it

9     all today --

10          MS. MARINO:  Great.

11          THE COURT:  -- then I'm going to decide.  And that's

12     why I think it's all tied together.  If you want to argue that

13     first, you're free to do that obviously.

14          MS. MARINO:  Thank you.

15          THE COURT:  Okay?  So with that, Mr. Mermelstein,

16     probably better you take the lectern.

17          MR. MERMELSTEIN:  Thank you, Your Honor.  And I did

18     just before -- before I start on the joinder, I was looking at

19     the papers last night, to the extent Ms. Otani's motion seeks

20     the alternate relief of suppression, I wanted to formally join

21     that motion as well.

22          THE COURT:  On what basis?

23          MR. MERMELSTEIN:  I believe that --

24          THE COURT:  Her client was forced to answer questions

25     to which her client had a Fifth Amendment privilege.  How does

1    that apply to you?

2            MR. MERMELSTEIN:  The case law supports the concept

3    that all defendants have standing to assert a -- to the extent

4    the Court grants that motion, all of the defendants have a

5    standing to assert that the -- that that testimony should not

6    be admissible against them.

7            THE COURT:  Against them.  But if there's no

8    discussion of Ms. Tanaka, there's nothing in there that would

9    tend to incriminate her in any way, right?  It would have to

10   be -- to have standing it has to impact you in some way.  You

11   can't just stand there and say her/me, right?

12           MR. MERMELSTEIN:  No, but --

13           THE COURT:  Anyway, you didn't file such a motion.

14           MR. MERMELSTEIN:  I did not file --

15           THE COURT:  Okay.  So let's focus on what you did

16   file.

17           MR. MERMELSTEIN:  Okay.  I think with respect to the

18   issue of vindictive prosecution, what we have here from my

19   vantage point, we've been around white collar cases for a long

20   time, a number of years, and I see two quite unusual things

21   that happened here.

22           I see a very heavy-handed arrest.  An arrest that was

23   certainly out of character from anything I've seen given the

24   history here, given the numerous offers to self-surrender.  The

25   conversation that I personally had with -- with the senior most

1    person in the San Diego U.S. Attorney's Office, I have left

2    that conversation with Mr. Grossman with the understanding that

3    there was going to be a self-surrender and that all I needed to

4    do was work out the details with Mr. Wheat.  I had not even

5    appreciated that it was not a done deal.

6            The -- so from my vantage point this was a

7    self-surrender situation.  We had entered into a tolling

8    agreement.  So there was no issue with surprise.  Certainly you

9    can have situations when a first indictment is filed that the

10   government wants to arrest folks in secrecy, take a surprise,

11   this was not that situation because the government had --

12           THE COURT:  I'm very familiar with the record.  Yeah.

13           MR. MERMELSTEIN:  All right.  So I think that there

14   was a decision that was made within the prosecution team to

15   arrest and the --

16           THE COURT:  So there are three parts to your motion,

17   as I understand it, right?  The decision to arrest, the manner

18   of the execution of the arrest, and then the motion to detain.

19           MR. MERMELSTEIN:  Yes.

20           THE COURT:  Right?  Those are sort of the three

21   components.  Everyone else was arrested, right?  You concede

22   that?

23           MR. MERMELSTEIN:  Yes.

24           THE COURT:  Okay.  So -- and we have this declaration

25   from the now-retired agent, whose name escapes me at the

1   moment.  But we have her declaration.  It's Meredith Burke,

2   right?  Saying it was sort of the FBI's decision on how to --

3   how to execute this.  You're talking about your years of

4   experience.  I have a lot more years than you do, and that's

5   sort of my understanding as well as to how it works,

6   Mr. Mermelstein.  So, you know, and I'm having trouble on that

7   part of it, the arrest part of it and the manner of the arrest

8   given that declaration.  So speak to that.

9           MR. MERMELSTEIN:  Well, I think the -- I understand it

10  is the FBI's decision, but I think it circles back to why -- to

11  the extent the government knew that there was a five-year-old

12  in the house, to the extent the government knew that this is

13  the way the FBI is going to do arrests in LA in this type of

14  situation, which seems to me very aggressive, I think it

15  circles back to the prosecution team's decision to arrest.  If

16  that's what arrest is going to entail in --

17          THE COURT:  All right.

18          MR. MERMELSTEIN:  -- in Los Angeles, to me it circles

19  back to the government's decision.

20          And the argument that I hear on the other side, sort

21  of a no harm, no foul situation because everyone gets arrested,

22  I did just want the record to be clear that there is a

23  five-year-old child here that has had enduring effects of this.

24  This is a kid that now has nightmares, crying fits.  So there

25  are ramifications to this.  And the simple no harm, no foul,

1   this is what happens, in all situations --

2           THE COURT:  And the vindictiveness is because you

3   exercised what statutory or constitutional right?

4           MR. MERMELSTEIN:  The -- I think it's a due process

5   right to seek redress for -- for the decisions that the

6   prosecution was making.  Decisions that were in violation of

7   the DOJ manual.

8           THE COURT:  So you think you have a due process right

9   to make arguments to the federal government in a grand jury --

10          MR. MERMELSTEIN:  I think there's a --

11          THE COURT:  -- case law that supports that?

12          MR. MERMELSTEIN:  I'm not -- I'm not specifically

13  aware.  I also think that's the reason I styled this motion as

14  a joinder because I think even if ultimately it's not a

15  stand-alone perfected motion with all of the i's being dotted

16  and the t's being crossed, I think it does add to the

17  seriousness of the prosecutorial misconduct.

18          THE COURT:  Okay, that's fine, but you also have

19  stand-alone.  And that's why I'm saying I'm looking at this in

20  two different ways, right?  That you've joined the main motion,

21  I'll call it, Mitsunaga motion that everyone has joined, on the

22  basis of what's argued in that motion and you've included some

23  more facts, I understand that.  But you also say stand alone

24  saying there's vindictive prosecution here that should result

25  in dismissal of the indictment as to your client.

1            MR. MERMELSTEIN:  I do, Your Honor.

2            THE COURT:  Right?  And that does require vindictive

3    action taken because somebody is engaged in a protected

4    statutory or constitutional right, as I understand it.  And so

5    that's where -- I'm not sure where that constitutional or

6    statutory or even procedural right might be.

7            MR. MERMELSTEIN:  I think --

8            THE COURT:  It also seems a little far afield to me

9    also, let me just say, that they're upset with you is what

10   you're saying, not with Ms. Tanaka but with you, and they take

11   it out on her, right, that's your theory.

12           MR. MERMELSTEIN:  Well, I think it's my advocacy on

13   behalf of Ms. Tanaka.

14           THE COURT:  Yeah.

15           MR. MERMELSTEIN:  So I think, as an advocate, I think

16   I've long since learned that my actions are attributable to

17   my -- my clients, positions I take are my clients held

18   responsible.

19           THE COURT:  All right.

20           MR. MERMELSTEIN:  I think that -- I think that the

21   other aspect of this that we haven't yet discussed is the

22   request for detention.  I think that to the extent there is

23   ambiguity as to what happened as to whether the prosecution

24   team is responsible for the manner of arrest, I think that what

25   happened in federal court in LA, I don't think we've gotten

 1    candor from the government there.  I was in court when the

 2    Assistant U.S. Attorney --

 3              THE COURT:  But mistakes can be made, right?  And

 4    they're made all the time in these sort of situations.  And

 5    your understanding is they're lying.  That's your view is that

 6    Ms. Chopra is lying in her declaration.

 7              MR. MERMELSTEIN:  No --

 8              THE COURT:  No, no, I want an answer.  Is that your

 9    view that she is lying to me, to the Court under oath in that

10    declaration?

11              MR. MERMELSTEIN:  My view is that we haven't heard the

12    full story here.  My view is that the -- what the AUSA

13    Srinivasan represented in court is inconsistent with that

14    declaration.  And so I know what was said in court.  I was -- I

15    was there.  And the representation by Mr. Srinivasan was --

16              THE COURT:  Okay.  So if you look at Paragraph 8 of

17    her declaration, she has in quotes what's in her e-mail.  So, I

18    mean it's kind of to me binary.  You're saying this is true,

19    you're saying it's not true.  And it's in quotes.  So are you

20    saying that AUSA Chopra is lying in this declaration?

21              MR. MERMELSTEIN:  I don't know, Your Honor.  I'm

22    saying that I have Mr. Srinivasan, who represented in court the

23    charging AUSAs, and that's a reference to the prosecution team,

24    were concerned about flight risk.  And based on that, we had a

25    hearing in court about whether Ms. Tanaka, who had offered to

1    self-surrender on multiple occasions, has made every court

2    appearance herself, an officer in court both in California and

3    in Hawaii, we had a hearing on whether she should have been

4    detained, and it was the very real possibility that she would

5    have been held in custody and brought --

6              THE COURT:  Was she released that day, though, is that

7    what happened?  What happened?

8              MR. MERMELSTEIN:  Ultimately the magistrate judge

9    there granted bail and she was --

10             THE COURT:  Okay, that wasn't my question.

11             MR. MERMELSTEIN:  Yes.

12             THE COURT:  Was she released that day?

13             MR. MERMELSTEIN:  Yes.

14             THE COURT:  Thank you.

15             MR. MERMELSTEIN:  Yes.

16             THE COURT:  Okay.

17             MR. MERMELSTEIN:  So, I don't make allegations

18    lightly, but there is an inconsistency here.

19             THE COURT:  All right.

20             MR. MERMELSTEIN:  And I don't believe that the

21    government has satisfactorily explained that.  And for the

22    government to take the position that this was just a rogue,

23    we're not -- the government's position here is we're not

24    responsible for --

25             THE COURT:  Do you know what time the detention

1    hearing was in --

2              MR. MERMELSTEIN:  The detention hearing?

3              THE COURT:  -- in Los Angeles?

4              MR. MERMELSTEIN:  I think it was right after lunch?  I

5    think it was first thing after lunch.

6              THE COURT:  Because -- because you see the e-mail from

7    Ms. Chopra says that she was in trial herself.  Right?  And

8    then she says on September 13th at approximately 12:23 p.m. she

9    gets an e-mail from AUSA Srinivasan where he says, you know,

10   Tanaka -- Ms. Tanka's on calendar for today.  Would you like

11   this defendant detained?  And that was only replied to her,

12   there was not a reply all.  So that was in response to a

13   previous e-mail.

14             So the other members of the team didn't see it.  She

15   said she was in trial and at 2:41 then she said, no, we don't

16   want detention.  So, presumably just on the time frame that

17   e-mail would have come in after what happened in LA at the

18   detention hearing.

19             MR. MERMELSTEIN:  I don't know -- I don't know what

20   time zone we're talking -- I haven't seen these e-mails.

21             THE COURT:  Okay, wait, wait, wait.  San Diego and Los

22   Angeles, let me think --

23             MR. MERMELSTEIN:  Well --

24             THE COURT:  -- about time zones.  Give me a moment.

25   Give me a moment, Mr. Mermelstein, I got to think about that.

 1          MR. MERMELSTEIN:  I haven't -- Your Honor, I haven't

 2     seen these e-mails.  So, we're you talking about the government

 3     chose not to disclose this information.  So, their attempts --

 4     their opposition to the motion relies on evidence that they're

 5     not willing to share with the defense.  I think that raises its

 6     own issue.

 7          THE COURT:  All right.  Well, let me hear from the

 8     government.  You'll have a chance for rebuttal.

 9          MR. MERMELSTEIN:  Thank you.

10          THE COURT:  Thank you.

11          MR. CHIANG:  There were semiautomatic firearms in

12     Ms. Tanaka's house.  And that was --

13          THE COURT:  Let's talk about the detention hearing.

14     That's the part of this I want to hear about.

15          MR. CHIANG:  Sure.  Our -- an AUSA from our

16     prosecution team has submitted a declaration under penalty of

17     perjury detailing her e-mail communications with this AUSA --

18          THE COURT:  Am I right on the time frame, did that

19     e-mail go out from her after the detention hearing, do you

20     know?

21          MR. CHIANG:  You know, it is not -- it is not clear to

22     me what time that detention hearing took place, but I know that

23     when -- at 2:41 when --

24          THE COURT:  Do we have a case number for that

25     detention hearing?  We might be able to look it up.

1          Doug, can we look that up if we get -- I don't know,
2    Mr. Mermelstein, if you even have a case number.
3          MR. MERMELSTEIN:  I can -- I can work on it.
4          THE COURT:  Okay.
5          MR. CHIANG:  I can confidently say that the detention
6    hearing occurred after 12:23 when the LA AUSA sent that e-mail
7    to Ms. Chopra, and it occurred before 2:41.  It occurred before
8    2:41.
9          THE COURT:  So between 12:23 and 2:41 is your view?
10         MR. CHIANG:  That's my view.
11         THE COURT:  Okay.
12         MR. CHIANG:  That's my view.  And so when Ms. Chopra
13   saw that e-mail from the AUSA in LA, she immediately replied
14   and she said, We do not want her to be detained.  We do not
15   want her to be detained.  We want her to be -- we want the same
16   bail conditions that --
17         THE COURT:  You know, make this real clear, do you
18   have a problem with just that e-mail, turning that over?
19         MR. CHIANG:  We don't --
20         THE COURT:  To me.  To me.  Just give it to me.
21         MR. CHIANG:  No, we don't have a problem with that.
22   We don't have a problem with that.  We have not turned it over
23   because it's not discoverable in our view.  It's not -- you
24   know, there are no obligations for us to turn it over, but we
25   have no problem --

1          THE COURT:  Mr. Wheat, can you get that so during this

2    hearing I can look at that?

3          MR. WHEAT:  That e-mail?

4          THE COURT:  Yes.

5          MR. WHEAT:  I shall.

6          THE COURT:  Okay.  I want to look at it during this

7    hearing.  We'll come back to this, okay?

8          Mr. Mermelstein, I'll look at it, then we'll have a

9    conversation, further conversation, okay?

10          MR. CHIANG:  So we'll provide you that e-mail, but we

11    can confidently say what Ms. Chopra put in her declaration will

12    match what was written between those two AUSAs.  So that --

13          THE COURT:  Mr. Mermelstein seems to be saying you

14    haven't proven that and he's questioning her veracity on this,

15    and that's why I'm saying at least let me look at this e-mail.

16          MR. CHIANG:  We'll do that.  We'll do that.

17          THE COURT:  I'd like to get this motion fully argued

18    today.  So I want to -- I want to, you know, get that.

19          MR. CHIANG:  So we'll get that to you.  But we're

20    talking about, you know, specific facts.  And the Court knows

21    our view of the facts, but I want to turn a bit to the law

22    because there's no -- there's no legally cognizable vindictive

23    prosecution claim that Mr. Mermelstein has made.  I mean there

24    is -- there's no vindictive prosecution when the government

25    has, you know, effected a lawful search warrant, the defendant

1    was arrested without incident, and there was an unsuccessful

2    argument that was made in court.

3          And, you know, I think this argument was made by an

4    AUSA in Los Angeles with no connection to the prosecution team.

5    He was assigned purely by happenstance of schedule and it

6    just -- there's no -- you know, there's no likelihood that any

7    part of this was vindictive.  And as the Court pointed out,

8    there's no protected statutory or constitutional right at issue

9    in this case.  The right that Ms. Tanaka is leaning on is the

10   right to meet with high-ranking DOJ officials.  But those

11   meetings were granted out of professional courtesy,

12   professional grace.  There's no statutory code that permits

13   them to meet with DOJ officials to try to disqualify the

14   prosecution team.

15         So just as a legal matter this claim goes nowhere, but

16   as a factual matter there's just no basis to conclude that

17   there was any part -- any vindictiveness on the part of the

18   prosecution team.

19         THE COURT:  Thank you.  So my law clerk has printed

20   out, it looks like case number 22-MJ-0368-Duty, presumably the

21   duty MJ, right?  And then after that case number has initial

22   appearance date 9/13/22.  So we're talking about the same date.

23   It says initial appearance time, 1 p.m.  So it was between that

24   12:23 and the 2:41.

25         MR. MERMELSTEIN:  Just so the record is clear on that,

1    Your Honor, there were a number of matters -- there were a

2    number of matters on calendar that day.  So we were not the

3    first hearing.  Whether -- whether it actually took place

4    before or after 2:41, I don't know, but there were a number of

5    cases --

6              THE COURT:  Okay.  Fair enough.  And you folks, do you

7    want to look at this or everyone is okay with that?  Okay.

8              MR. CHIANG:  Just for the record, Your Honor, I think

9    the docket entries will reflect that we had no idea what AUSA

10   Srinivasan said until after Mr. Mermelstein filed his

11   vindictive prosecution motion.

12             THE COURT:  Okay.  Well, let's get this e-mail chain

13   that I can look at and then we'll go from there.  Okay?

14             MR. CHIANG:  Thank you.

15             THE COURT:  And I'll let you argue then by way of

16   reply once we have a little further discussion on that,

17   Mr. Mermelstein.

18             MR. MERMELSTEIN:  And to the -- I don't know if we're

19   talking about one e-mail or a series of e-mails, but it would

20   seem appropriate to have the entire communication between --

21             THE COURT:  Yeah, let me see if I -- you can get that

22   to me, I'll look at it, and then we can have a discussion what,

23   if anything, I put on the record based on that.  Okay?

24             MR. CHIANG:  Yup.

25             THE COURT:  All right.

1          MR. CHIANG:  Thank you.

2          THE COURT:  Okay.  Okay.  So, that motion on hold for

3    right now.  Let me organize my things, and we'll move then to

4    Mr. Mitsunaga's motion.  And I will, of course, Ms. Marino, if

5    you wish to start with the discovery, you can.  If you want to

6    weave it in, you can.  I'll leave that up to you as to how you

7    want to do that.  But I sort of want all of that argument

8    together.

9          MS. MARINO:  Understood.  Thank you very much, Your

10   Honor.

11          And thank you, Your Honor, for permitting the renewal

12   of the Motion to Compel.  This is a very brief argument, but I

13   felt like it was one that needed to be made.

14          So, the Court had noted at the original hearing on the

15   Motion to Compel that the request was governed by Rule 6(e).

16   That's correct, the request is clearly governed by Rule 6(e).

17   The request is governed by Rule 6(e) small two.  There is an

18   error in my motion, there is a small three.  But I'm sure the

19   Court noted that that was an error.

20          THE COURT:  Well, I don't think I noticed the error,

21   but I knew what the rule was.

22          MS. MARINO:  But you knew what I was talking about.

23          THE COURT:  Yes.

24          MS. MARINO:  So it's a really simple argument, Your

25   Honor.  It boils down to what is the importance of the date

1    these subpoenas were issued as opposed to the date that the

2    records were produced.  And my position is the date the

3    subpoenas were issued is critical because that is the date that

4    the government indicated an interest in the records.  And so

5    from my perspective that is the significant date of the

6    government's -- it puts a pointer on the government's

7    investigation.

8         So, they're not randomly asking for documents.

9    They're deliberately asking for documents.  And the whole point

10   of this Motion to Compel was to know the date that they've

11   decided they want to know what those documents look like.

12        THE COURT:  All right.  But you do agree, I assume,

13   that the date of the subpoena is not necessarily the date --

14   I'm not talking about this case, but let's just move it away --

15   hypothetical, the date a subpoena is issued is not necessarily

16   the date somebody becomes a target of a grand jury.

17        MS. MARINO:  No, not necessarily somebody becomes a

18   target, but it is, I would say, necessarily reflective of

19   somebody being under investigation.

20        THE COURT:  Well, being looked at, but the

21   *R Enterprises* case does say that, you know, that's a pretty

22   wide net you can cast, including to determine someone hasn't

23   committed a crime, right?

24        MS. MARINO:  You can.  But I think in the context of

25   all other governmental actions that were taking place during

1    this general time period, from my perspective, and I'll get

2    into this a little bit more with the 17(c) motion, it was very

3    clear that Ms. Tanaka, Mr. McDonald, and Mr. Fujii were

4    absolutely subject of this grand jury investigation and no one

5    was made aware of that fact.  And that of course bleeds into

6    the motion for prosecutorial misconduct.

7            So, just to wrap up the motion to compel, I do not

8    intend on addressing the -- the public policy considerations.

9    I frankly don't think they apply given that the bulk or a large

10   swath of grand jury material has already been produced.  So

11   unless the Court wanted me to address the public policy

12   considerations, I really don't think that really lends anything

13   to the argument.

14           I can briefly address the *Douglas Oil* test if the

15   Court wants to hear about that.

16           THE COURT:  I mean I understand your arguments.

17           MS. MARINO:  Okay.

18           THE COURT:  Yeah.

19           MS. MARINO:  Okay.

20           THE COURT:  I'd rather hear the 17(c).

21           MS. MARINO:  All right.  Fair enough.  I want to talk

22   about what you want to hear about, Your Honor.  Always better.

23           So, the government responds that the request by 17(c)

24   is some kind of workaround from Rule 16.  And I disagree.

25           So, the government does correctly cite to Rule

1   16(a)(2), which is, you know, commonly referred to as the work

2   product rule.  And that says that, you know, we're not entitled

3   to that stuff.

4            THE COURT:  Undiscoverable.

5            MS. MARINO:  Right.  But that rule specifically

6   eliminates 16(a)(2)(E).  Okay.  16(a)(2)(E) is that the defense

7   is entitled to pretty much everything from the government if it

8   is material to preparing the defense.

9            So, I think the government's wrong when they say that,

10  you know, Rule 16 -- that my 17(c) subpoena is some kind of

11  workaround of Rule 16.  I believe I'm entitled to these

12  materials under either rule, under either Rule 17(c) or under

13  Rule 16(b).

14           And I believe that that is supported by case law as

15  well.  So, in the matter of *United States versus Ghailani*, that

16  is a Southern District of New York case, 2010, it's at 687

17  F.Supp.2d 365, that court said that government communications,

18  which is exactly what I'm looking for here, could be

19  discoverable under Rule 16(e).  So, there's support there.

20           Here it's our position, I am sure the Court is well

21  aware, that the internal communications would be material to

22  the defense under Rule 16 because they provide additional

23  evidence that there was an active investigation into these

24  three individuals, Ms. Tanaka, Mr. McDonald and Ms. Fujii --

25  Mr. Fujii.

1          But turning now to the 17(c) subpoena that I've

2    issued, there is, contrary to the government's assertions,

3    there is no Ninth Circuit law that says that a 17(c) subpoena

4    is only for documents to be utilized in trial.  That's simply

5    not true.

6          So, really the Ninth Circuit has not taken a position

7    on that.  But the Second Circuit has.  And the Second Circuit

8    has specifically approved the use of 17(c) subpoenas for

9    records for pretrial hearings.  In one such motion for

10   selective prosecution, the court approved the subpoena and that

11   is in the matter of *Berrios* at 501 F.2 1207, that's a Second

12   Circuit, 1974.  In another pretrial motion where there's a

13   Sixth Amendment claim in the matter of *Stein*, also out of

14   Southern District of New York, I only have the Westlaw cite,

15   2006 Westlaw 1063298.  And in the recent matters of *Lewis,*

16   Westlaw cite of 2005 Westlaw 180885.  And even more recently,

17   as recent as 2021, the matter of *Maxwell*, 21 -- 2021 Westlaw

18   1625392, the court ruled that in that -- in those matters where

19   the records were being sought in connection with a suppression

20   hearing, 17(c) was an appropriate mechanism.

21         So, in conclusion, I think my 17(c) subpoena is

22   properly brought for these particular records.

23         So that being said, I would move on to the *Nixon*

24   factors, unless the Court has any questions at this point.

25         THE COURT:  No.

1              MS. MARINO:  Okay.

2              THE COURT:  I do want to get to the substance of the

3    motion sooner rather than later.

4              MS. MARINO:  Okay.  Well, there isn't all that much

5    more.

6              THE COURT:  Okay.  Okay.  Go ahead.

7              MS. MARINO:  So, the relevance -- obviously I have to

8    show relevance, admissibility and specificity.  So, relevance,

9    I think the Court probably understands why I think they're

10   relevant.  Would be to further demonstrate the interference in

11   the attorney-client relationship between my client,

12   Mr. Mitsunaga, and his attorney Ms. Tanaka.  And I would also

13   further demonstrate the deliberate misrepresentation of the

14   status in Fujii and McDonald.  I mean really sort of bundle

15   that all up.  It is sort of concealing the status of these

16   witnesses in the course of the grand jury investigation.

17             With different consequences, right?  So with Fujii and

18   McDonald, they end up testifying in front of the grand jury

19   unaware that from my perspective, and I'll tell the Court why

20   in a second, they were subjects of the investigation.  And with

21   respect to the relationship between Ms. Tanaka and

22   Mr. Mitsunaga concealing the fact that she was also a subject

23   of the investigation and yet taking a meeting with the

24   government on behalf of Mr. Mitsunaga, unknowing that she's a

25   target in the same investigation.

1          And I will just point out, Your Honor, that I spoke to

2     an ethics lawyer last week that nearly had a heart attack when

3     I told him that happened, for whatever that means.

4          Okay.  So the admissibility of the materials would be

5     from my perspective impeachment of the government's position

6     and also state of mind of -- of the government's position.

7          So let me go to the specificity because I think that's

8     really where the Court wants me to go.  I need to show you that

9     there is a rational inference that the materials sought contain

10    relevant and admissible evidence.

11         So, we start from the position that the government has

12    denied that Fujii, McDonald and Tanaka were under

13    investigation.  So the U.S. Attorney's manual, called the DOJ

14    Manual now, defines a subject of an investigation is a person

15    whose conduct is within the scope of the grand jury's

16    investigation.  A person whose conduct is within the scope of

17    the grand jury's investigation.

18         Well, we know that no less than 45 witnesses were

19    questioned regarding Sherry Tanaka and about her conduct.

20    About where she worked, how often she went to work, who she

21    knew, who her friends were, what kind of law practice she had.

22    So, I think it's fair to say that her conduct was within the

23    scope of the grand jury's investigation.  And that is shored up

24    by questions from the grand jury.

25         So, in the testimony of Mr. Glenn Okino there's a

1    whole colloquy where he's asking -- the grand juror is asking

2    Mr. Okino, Why don't you have a contract with Ms. Tanaka, talk

3    to me about Ms. Tanaka, I want to know, I'm interested in Miss

4    Tanaka.

5           I think it's fair to say that she was a subject of the

6    grand jury investigation based on the evidence.  And yet, the

7    government took a meeting with her on behalf of Mr. Mitsunaga.

8    And I'll get to that meeting later.

9           With respect to Mr. Fujii and Mr. McDonald, I would

10   point out to the Court that at the time of their testimony, the

11   government takes the position that in February, March, they

12   were the first witnesses in front of the grand jury, the

13   government maybe didn't really know anything, therefore why

14   would they call them subjects.  But that's a little hard to

15   swallow when we also know that the questioning of those

16   witnesses were directed at their donations to Keith Kaneshiro,

17   therefore the government knew all about the donations.  Their

18   conduct in connection with the civil case involving Laura Mau.

19   The conduct in -- their conduct in connection with the criminal

20   investigation.  Again, it is really inconceivable to me that

21   these three people were not subjects of the grand jury

22   investigation given the questioning of -- of Fujii and McDonald

23   and --

24           THE COURT:  So if they were subjects.

25           MS. MARINO:  Yes.

1          THE COURT:  What does that mean?

2          MS. MARINO:  Well, it means --

3          THE COURT:  How does that help you?

4          MS. MARINO:  Oh, I'm right there.  What it means is,

5    the government doesn't have to tell people when they testify in

6    front of the grand jury, I think that's *Washington*, that, you

7    know, what their status is.

8          THE COURT:  Even if they're a target you don't have to

9    tell them.

10         MS. MARINO:  I don't think so.  I think that they can

11   just let them --

12         THE COURT:  No, no, I'm saying that's my understanding

13   of the law.  I'm agreeing with you.

14         MS. MARINO:  We're in agreement.  Yes.

15         THE COURT:  Okay.

16         MS. MARINO:  I don't think they have to tell them

17   anything.  But I know, and that is *Babb* maybe -- I'll get the

18   Court the case cite.  I know for a fact they cannot

19   misrepresent to them.  And so these witnesses go in front of

20   the grand jury and they're told, You're not a subject, you're

21   not a target, you're just a witness.  They specifically --

22         THE COURT:  Okay.  So that's what I wanted to get at.

23   It's not they weren't told the status, it's a misrepresentation

24   regarding the status.

25         MS. MARINO:  That's right.

1            THE COURT:  Okay.  All right.

2            MS. MARINO:  That's right.

3            THE COURT:  All right.

4            MS. MARINO:  So, and again, that bleeds into the

5     prosecution misconduct motion.  But I just wanted to shore up

6     the basis for my 17(c) request.

7            I can address the government's claims of privilege.

8     My sort of global position on that is that their blanket

9     assertions are insufficient.  Privileges are just simply not

10    absolute.  And the Court has to weigh all the parties'

11    interests in determining what weight to give to a privilege.

12            So, I think the deliberate process privilege is easily

13    overcome here.  We certainly have made a prima facie showing of

14    misconduct pursuant to *Redland*.  I think the work-product

15    privilege is overcome by a showing of substantial need.  And

16    the attorney-client privilege, I believe the best way to handle

17    that according to *Zolin* is that the Court would review those

18    materials in-camera and then perform a weighing analysis.  I

19    know the government takes a position how could I burden the

20    Court in such a way.  I'm quite confident this entire motion

21    has been a big burden to this Court.

22            THE COURT:  I was going to say everything is a burden,

23    but that's okay, that's all right.

24            MS. MARINO:  I understand, Your Honor.

25            THE COURT:  All right.  Let's move on to the motion

1    itself now, okay?

2              MS. MARINO:  Okay.

3              THE COURT:  When I say the motion, I mean the Motion

4    to Dismiss.

5              MS. MARINO:  I know.

6              THE COURT:  Yup.

7              MS. MARINO:  Court just give me one second.

8              Okay.  This is a big motion.  Quite frankly, I've

9    never brought one in my career.  Been practicing 35 years.  I

10   only know one lawyer in all the lawyers I know that's ever

11   brought one.  Was not an easy thing to bring.  I'm a defense

12   lawyer, I don't like accusing people of anything, and it

13   troubled me to bring it.

14             But, you know, the Fifth Amendment has to stand for

15   something and people have to be treated fairly, and that

16   applies both in the grand jury and outside of the grand jury.

17   And after reviewing an unbelievable amount of material, the

18   cumulative effect of the prosecution's misconduct in and out of

19   the grand jury absolutely violated the Fifth Amendment in my

20   opinion.

21             And the Court knows that, you know, the case law is

22   the case law on this issue.  It doesn't vary all that much.

23   What varies are the facts.  I mean it is a very fact-intensive

24   analysis.  And I hope I make this reference without, you know,

25   insulting anyone, but it's kind of like pornography, like you

1    know it when you see it, you know, but not everyone may see it

2    in the same way.  And so it makes it a, you know, a really

3    difficult motion to bring because I stand here before Your

4    Honor hoping to convince Your Honor to see what I see.

5           So for 16 months this prosecution in my opinion

6    systematically and pervasively sought to interfere in the

7    independence of the grand jury's ability to evaluate witness

8    credibility.  And they did that by asking the same questions

9    over and over and over.  And, you know, it's interesting

10   because in thinking about this, and that is just an

11   interrogation technique.  You know?  That's what every grand

12   juror has seen on TV a thousand times.  They've seen the

13   defendant sitting in the room with the spotlight and they've

14   seen the detective or the police officer questioning,

15   questioning, same question, same question, same question for

16   the purpose of breaking that person down.  That's what they did

17   here.  And they did that in three different ways.

18          They did that first by asking 27 witnesses about

19   making campaign contributions on the same date.  And I want to

20   call the Court's attention to one exhibit, which is from ECF

21   292, and it's eight.

22          THE COURT:  I'm sorry, it's what?

23          MS. MARINO:  292, ECF 292-8.  It's basically my --

24          THE COURT:  292 dash 8?

25          MS. MARINO:  Yeah, my Exhibit H, like Harry, but it's

1    8 on the ECF.

2          THE COURT:  Okay.

3          MS. MARINO:  And I just think that's a really

4    important exhibit, Your Honor.

5          THE COURT:  Go ahead.

6          MS. MARINO:  Because it lists each of the 27 witnesses

7    that were questioned regarding making political contributions

8    on the same date and the testimony follows the summary.

9          THE COURT:  All right.

10          MS. MARINO:  And even when Mr. Koya testified and

11    brought in his checks and said, Wait a second, that's not the

12    same date.  It's the -- that's the date that they were

13    deposited is the same date, but that's not the date they're

14    written.  Even when Mr. Koya said that, prosecution moved as

15    fast as it could to another topic, didn't give that any

16    airtime, and after that asked the same question to Lynne Lam.

17    It was so deliberate to -- to create this misconception that on

18    the same date everybody is making these donations.

19          And that was the purpose of Agent Sakanoi's testimony

20    who testified to an expert witness, a government expert witness

21    who did the expert analysis and determined in her experience

22    and expertise that all these donations are listed on the

23    document as being on the same date.  And the fact that -- that

24    her analysis was based on the campaign contributions, you know,

25    data, is just lost in the wind.  And again, by design.  By

1    design --

2            THE COURT:  There were, as I understand it, and tell

3    me if --

4            MS. MARINO:  Please.

5            THE COURT:  -- I'm wrong, there were two witnesses

6    that testified that the dates of contributions as listed on the

7    campaign spending reports differ, or certainly can differ from

8    the actual date of the check, Mr. Koya and Ms. Otani testified

9    to that.

10           MS. MARINO:  I -- as far as I -- my recollection is

11   Koya.

12           THE COURT:  No, no, Ms. Otani definitely did as well,

13   but do you know of anyone else?  I'm not asking you to agree

14   with me on Miss Otani, obviously, if you don't know.  But your

15   view is it was only Mr. Koya?

16           MS. MARINO:  Yeah, I mean the point it, yes, that's

17   true, but the bigger point is that the government knew the

18   difference.  The government knew the difference.

19           THE COURT:  Okay.

20           MS. MARINO:  And they knew the difference because we

21   have the checks.  They had subpoenaed all the checks.  And so

22   if the Court wants to take a look at 292-9, which is my I, like

23   igloo, you can see that's a summary chart of all the checks

24   that they had that show different dates on a check than the

25   date in which the check was deposited.  So --

```
 1              THE COURT:  But there's -- there's about ten checks

 2    listed here, right?  I just want to make sure we're on the

 3    same -- you're on Page I.D. 5565; is that right?

 4              MS. MARINO:  Yeah, that looks about right, ten or 11,

 5    right.

 6              THE COURT:  Yeah, okay.  I just want to make sure

 7    we're on the same --

 8              MS. MARINO:  Yes, yes.  I know, there's a lot.

 9              THE COURT:  I mean there's a lot more, right, that you

10    folks don't have because the bank has destroyed those

11    documents; is that your understanding?

12              MS. MARINO:  There's a lot more that what?

13              THE COURT:  That you don't have the records for,

14    nobody has the records for.  Other campaign contributions, in

15    other words, besides those ten.

16              MS. MARINO:  I'm only talking about what I got in

17    discovery.

18              THE COURT:  Okay.  Okay.

19              MS. MARINO:  That's all I'm talking about.

20              THE COURT:  Okay.  I think maybe you weren't here at

21    the last hearing when we had this discussion about some of the

22    banks having destroyed some of those records, so the government

23    couldn't get all the records.

24              MS. MARINO:  I read the transcript.

25              THE COURT:  Okay.
```

1          MS. MARINO:  So I know that.

2          THE COURT:  Okay.

3          MS. MARINO:  But it's enough, you know?  It's not

4     like -- like --

5          THE COURT:  Okay, we have a lot to cover so I want to

6     keep moving.

7          MS. MARINO:  Okay, that's fine, let's keep moving.

8          Okay.  So, I'm talking about asking the same questions

9     over and over and over.  And the purpose of doing that is to

10    make the witnesses out to be liars in the juror's mind because,

11    and again, going back to that investigative technique, right,

12    you keep asking the same question, same question, same

13    question, because what that telegraphs to the grand jurors is,

14    Well, that person must not be telling the truth.  That's what I

15    would think if I was sitting there as a grand juror and this

16    person keeps getting called back here.  For example, recalling

17    witnesses, 13 witnesses were recalled six times.  They were

18    asked the exact same questions.  That is at Exhibit 273 dash --

19    I'm sorry, R.  I could count for the Court.  I don't know what

20    one --

21         THE COURT:  Okay.  I'm sorry, you're --

22         MS. MARINO:  Yeah, here we go, 273-19.

23         THE COURT:  ECF 273 dash --

24         MS. MARINO:  Correct.

25         THE COURT:  Okay.  All right.

1          MS. MARINO:  And so that is a grand jury comparison

2    of -- it's a 34-page exhibit of a grand jury comparison of

3    witnesses literally asked the same question over and over and

4    over:

5          Did you ever go to any New Year's parties or any other

6    parties at Mr. Mitsunaga's house?

7          No, I don't recall.

8          Did you ever go to Mr. Mitsunaga's home?

9          No.  I was asked that last time.  I don't recall going

10   to his house.

11         One example of 34 pages.  What is the purpose of that?

12         THE COURT:  Well, what if they just think the person

13   is lying, don't they have a right to ask again?

14         MS. MARINO:  Well, not according to *Samango* and Al

15   Dumarriso [ph. sp.], no.  According to those cases --

16         THE COURT:  *Samango* is a case out of this district.

17         MS. MARINO:  I know.

18         THE COURT:  Fred Samango.  Sort of famous character,

19   well-known character in town.  Anyway --

20         MS. MARINO:  Well, I miss the humor on that.  Looks

21   like it's a funny story, but I did note it was out of this

22   district.

23         THE COURT:  Okay.

24         MS. MARINO:  And then what about the questions, again,

25   same questions about Sherry Tanaka.  45 witnesses are asked

```
 1    about -- about Sherry Tanaka.  And, you know, it had its
 2    intended effect.  I mean one grand juror started asking his own
 3    questions about Sherry Tanaka.  Another grand juror asked one
 4    of the witnesses, Are you a good person?  Where are these
 5    questions coming from?  They're coming from the government
 6    leading the grand jurors down this briar path of don't believe
 7    these people that are testifying because we just keep bringing
 8    them back and asking them the same question, same question,
 9    same question.  And these are not isolated instances like the
10    matter of Venegas.  This is going on for 16 months.
11         And I think that's what -- that's what I saw anyway
12    when I looked at all these cases where a prosecutorial
13    misconduct motion was denied, is that it's one little thing or
14    it's one big thing, but the evidence is overwhelming.  Right?
15    And so the motion gets denied.  Or it's one little thing, for
16    example, it's something like the -- there wasn't exculpatory
17    evidence presented, or there was a complaint about the
18    investigative -- bringing in what -- what the defense would say
19    was evidence that should have been suppressed, something like
20    that.  And the courts have uniformly said that's not a basis to
21    dismiss a case based on prosecutorial misconduct.  But when
22    you've got a weak case, it's a different analysis because you
23    can't fall back on, well, the evidence is so overwhelming.
24         And here I point out for the Court, not that I don't
25    think the Court knows, but there's no quid pro quo date here.
```

1    There's no meeting-of-the-mind date here.  There is at best

2    wildly circumstantial evidence.  This is not a tight case for

3    the government, and that's why they had to resort to this

4    prosecutorial misconduct.  But the acts of misrepresentation --

5              THE COURT:  I'm giving you about five more minutes,

6    Ms. Marino, because we do have to move.

7              MS. MARINO:  Really?

8              THE COURT:  Yes, really.

9              MS. MARINO:  Can you give me ten?

10             THE COURT:  I'll give you ten and then you're going to

11   be done.

12             MS. MARINO:  Okay.  Okay.  Well, then let me turn to

13   Detective Snoops.

14             So, in *Fuchs*, the court specifically said that it

15   would not be harmless -- and *Fuchs* is a Ninth Circuit case --

16   it would not be harmless if the prosecutor acted in any

17   intentional way to mislead the grand jury.  That's Ninth

18   Circuit.

19             So here, this is what the prosecutor does.  Now, we

20   know that Snoops wrote a report.  It was a 17-page report.  We

21   know this, right?

22             Okay.  Question:  And did you conduct any interviews

23   after that?

24             No, sir.  Actually, it was hard to get a hold of

25   anyone.  I called several times and I was only able to get on

1    the phone one time.

2          And you said you had one contact with them, one

3    successful contact?

4          Yes, sir.  Just telephonic.

5          That's false.

6          And what happened?

7          Unfortunately, nothing.  I -- I never got any piece of

8    evidence from them at all.

9          That's false.

10         Did anyone ever contact you about the case?

11         No, sir.

12         That's false.

13         And you say -- and this is the kicker:  And you say no

14   one contacted you from that office to get your nonexistent

15   investigatory report, correct?

16         Correct.

17         Nobody ever contacted you on this case?

18         No, sir.

19         So the complaining party never reached out to you?

20         No, sir.

21         And never asked for your assistance to investigate

22   this alleged crime?

23         After the initial report of them requesting it?  Yeah,

24   no.  No, they didn't.

25         *Fuchs* says that's not harmless.  *Fuchs* says that's

1    bad.  And that is bad.  That's a deliberate misrepresentation

2    to the grand jury.

3         THE COURT:  What do I do with the fact that the Snoops

4    report did make its way to the grand jury?

5         MS. MARINO:  Well, I think you have to look at how it

6    made its way into the grand jury.  It made its way through

7    another witness that didn't testify about it, that just -- it

8    came into evidence.  It made its way without any -- not being

9    tied at all to Snoops' testimony, wasn't tied to his testimony,

10   his ten-minute testimony.

11        So I do think it makes a difference.  There's no

12   evidence that we have it all, that the grand jury even

13   considered it, and why would they of the 200 exhibits when it's

14   given no attention at all by design.

15        THE COURT:  Okay.

16        MS. MARINO:  Okay.  So, I have -- I've talked about

17   McDonald and Fujii and the fact that the government had all

18   this evidence against -- regarding the circumstances.  The case

19   I was referring to before is *Babb*, B-A-B-B.  Washington says

20   they don't have to disclose status, but *Babb* says they cannot

21   misrepresent, which they deliberately misrepresented.

22        THE COURT:  B-A-B?

23        MS. MARINO:  B-A-B-B.

24        THE COURT:  Okay.

25        MS. MARINO:  You know.  And, you know, I mean the

1   prosecutor has a duty of good faith, Your Honor, under *Basurto*.

2   Our position is that they breached that.

3        I've touched on the meeting, the July 14th meeting

4   that Ms. Tanaka had with Mr. Wheat.  If the Court looks at that

5   report, I can point the Court to where that report is.  It's

6   the most contested meeting memorialized in a 302 I've ever

7   seen.  So that is at 273, ECF 273-10.  I note that it's in that

8   meeting Ms. Tanaka specifically asked for an offer for her

9   client.  Mr. Wheat says, No, bring him in.  He knows what he

10  did.

11       And, you know, I got to play that out a little bit.

12  How would that be if she brought him in?  And he is -- and

13  she's a suspect, how does that play?  Horribly.

14       So, I'm wrapping it up.

15       It was not easy to find the eight cases that I

16  identified where this prosecutorial team has been accused of

17  prosecutorial misconduct.  I will say it is in my humble

18  opinion highly unusual for a prosecutor to be accused once,

19  much less eight times.  And --

20       THE COURT:  So as a defense attorney you're asking me

21  to take into account accusations.

22       MS. MARINO:  It's a tough one for me.

23       THE COURT:  It's a really tough one for me, too.

24       MS. MARINO:  I get it.  It's a tough one.  I

25  understand.

1          THE COURT:  Well, when I say that I'm tongue in cheek

2     a bit.   I'm not going to take into account accusations.

3          MS. MARINO:  I understand and I won't challenge that.

4          THE COURT:  All right.  Okay.

5          MS. MARINO:  I think just maybe a few closing remarks,

6     if I can.

7          The prejudice is in the fact that these false

8     narratives are in the indictment.  That's the prejudice.  And

9     that makes them material and that raises a grave doubt that the

10    decision to indict was free from substantial influence.  And I

11    think that there's a line between creating an impression and

12    deceiving.  And I think the government would say to you, All we

13    did was create an impression which is allowed under *Venegas*,

14    and I would say no, certainly not with the Snoops testimony.  I

15    would say with the Snoops testimony, as *Samango* said, the

16    behavior exceeded the limits of acceptability.  And I'm asking

17    the Court to dismiss.

18         THE COURT:  All right.  Thank you.  So everyone's

19    joined.  Just let me hear if there's anything in addition

20    anyone wants to state at this time.  Mr. Bervar?

21         MR. BERVAR:  No, Your Honor, I have nothing to add.

22         THE COURT:  All right.  Ms. Lum?

23         MS. LUM:  No, Your Honor.

24         MR. KENNEDY:  Nothing to add, Your Honor.

25         MR. MERMELSTEIN:  No, Your Honor.

1          MR. OTAKE:  I have a few things to add, maybe like

2    five minutes.

3          THE COURT:  Yeah, come up to the mic then if you will.

4    All right, Mr. Otake.

5          MR. OTAKE:  Good morning, Your Honor.  We filed a

6    simple joinder in large part because Ms. Marino on behalf of

7    her client raised a lot of issues related to my client that we

8    would have otherwise raised independently.  And just to

9    summarize two important parts to this.  My client was called

10   before the grand jury first in February of 2021, February 4th,

11   2021, as Ms. Marino's motion points out, and then again on

12   March 4th, 2021.  And as the motion points out, both of those

13   times he indicated he was represented by Sherry Tanaka.

14          Our position is, on February 4th there's no way the

15   government was not at least concerned about Ms. Tanaka's

16   involvement in the underlying events that they were looking

17   into.  They were clearly looking into campaign donations to

18   Mr. Kaneshiro by Mr. Mitsunaga and people who worked for him

19   related to a prosecution of Laura Mau.  That is clear from day

20   one that's what they were looking into.  And they knew that

21   Ms. Tanaka was involved in the facts behind what they were

22   looking into.  Not saying that any of what they were looking

23   into was true, but that she was involved in the underlying

24   facts related to their investigation.

25          On February 4th, 2021, and this is on Page 8 of the

```
 1    motion, after being told by Mr. McDonald that he was being
 2    represented by Ms. Tanaka that day, who was outside, obviously,
 3    not in the grand jury room as we all know, they asked him:  Do
 4    you know of a relationship between Ms. Tanaka and
 5    Mr. Kaneshiro?  They were asking him on February 4th, 2021,
 6    about Ms. Tanaka and whether she had a relationship with
 7    Mr. Kaneshiro.  Clearly when we look at the definition of
 8    subject, at the very least they knew that she was likely to be
 9    a witness in the underlying facts of what they were looking
10    into.  They knew that, and they allowed -- they allowed
11    Mr. McDonald to be represented by Ms. Tanaka in front of the
12    grand jury knowing that.  And that's a big problem, and I'll
13    talk about why that is in a second.
14            It was -- it was better for them not to raise it.  It
15    was better for them not to raise this issue with Ms. Tanaka.
16    22 witnesses at least.
17            THE COURT:  When you say raise it, you mean raise it
18    with the Court or the --
19            MR. OTAKE:  With the Court.  With the Court.  It was
20    better for them to allow 22 witnesses to be represented by her.
21    And I'm not saying anything negative about her.  She didn't
22    know, and this is -- this is what -- when I really started
23    thinking about it, you know, I thought to myself, How would I
24    have handled it?  Let's say Mr. McDonald called me up when he
25    first got the subpoena, I had nothing to do with anything.  You
```

1    know, I would have called up Mr. Wheat and, you know, for the

2    most part had a good working relationship through the years,

3    and perhaps because I was not a witness or a subject of the

4    underlying matter that was being investigated, perhaps he would

5    have talked to me more about it, and perhaps we could have

6    figured out what this was about and then I could have made

7    decisions for Mr. McDonald as to what to do and how to handle

8    it and --

9             THE COURT:  But there is law in the Ninth Circuit that

10   says it's not the prosecutor's job to make sure there's a

11   conflict-free representation.

12            MR. OTAKE:  Well --

13            THE COURT:  That's sort of on you people, not those

14   people.

15            MR. OTAKE:  But this goes -- this goes beyond that,

16   right?  And number one, to be fair to Ms. Tanaka, she didn't

17   know.  How was she supposed to know what they were looking into

18   and what the conflicts may or may not have been?  That's the

19   problem.  If he shared that with me, maybe I would have known

20   more about it.  But the point is they were interfering with

21   a --

22            THE COURT:  But if she didn't know how would that in

23   any way impact her --

24            MR. OTAKE:  Well, I'm just saying, just to be fair to

25   her, she didn't know, they knew.  They knew.  And that's why

1   I'm not -- I'm saying --

2         THE COURT:  Right, so why would her phone call with

3   Mr. Wheat be different than yours?

4         MR. OTAKE:  Because he likely would have shared more

5   with me because I was not a witness or a subject in what they

6   were --

7         THE COURT:  I doubt he would have shared much of

8   anything with you.

9         MR. OTAKE:  Well, I mean the good thing, Your Honor,

10  you have experience in this, right, as a U.S. Attorney, you

11  know how it works.  When an attorney calls you up, 'Eh, my

12  client got a subpoena.  Let's sit down, let's figure out

13  what -- you know, what do you think is going on.  And obviously

14  those conversations weren't going to take place because of --

15  of --

16        THE COURT:  Right, but it's not his job to make sure

17  she's conflict free.

18        MR. OTAKE:  But it's his job to not interfere with the

19  attorney-client -- with an attorney-client relationship.  And

20  if he knows, if he knows that Mr. McDonald is there saying

21  Sherry Tanaka is my attorney, and he has reason to believe that

22  she was involved in the underlying facts that they're looking

23  into, that's just -- it just stinks, they should do something

24  about that.

25        THE COURT:  All right.  I understand the argument.

1          MR. OTAKE:  Anyway, you understand the argument.

2          22 witnesses, it was easier, it was better for them

3    not to raise it.

4          Then you get to the part that Ms. Marino raises about

5    affirmatively telling Mr. McDonald he was not a subject or

6    target.  And it's different than if they didn't say anything at

7    all.  And that, again, Page 41 and 42 of the motion.

8          Now, just basic common sense.  It is clear from day

9    one, from day one of this investigation they're looking into

10   campaign donations to Mr. Kaneshiro by Mitsunaga employees

11   related to the prosecution of Laura Mau.  That's what they're

12   looking into.  Subject being a person whose conduct is within

13   the scope of the grand jury.

14         They knew Mr. McDonald was a high-ranking executive of

15   Mitsunaga, of MIA.  They knew he donated to Mr. Kaneshiro

16   because they had -- they knew about it, they asked him about

17   it, they had records, I believe, to show it.  And they knew he

18   was involved in the civil trial against Mr. -- I mean against

19   Laura Mau, which, by the way, the jury found she had breached

20   her duty of loyalty to the company.  So, they knew all of those

21   things and they tell him he's not a subject and he's not a

22   target.

23         Now, these two issues, the main point I want to make

24   and I'll sit down is they're interrelated.  They're

25   interrelated.  It's bad enough to misrepresent someone -- to

1   someone that they're not a subject when common sense -- you

2   know, I mean how could they not have at least thought that,

3   that he was -- hey, he was -- that perhaps this conduct fell

4   within the scope of the investigation.  How could they not have

5   thought that?  Mr. Wheat, they're smart people.

6          And -- but to do that, to misrepresent that in the

7   context of also knowing that he's there with an attorney that

8   day, who they know they're also -- conduct falls within the

9   subject of an investigation, and to represent that to him and

10  allow him to have conflicted counsel, I mean that -- it's

11  interrelated and it makes it all the worse.  And it just

12  stinks.

13         But I point out again, it was better for them, it was

14  more convenient for them to allow her to represent 22

15  witnesses --

16         THE COURT:  All right.  You're repeating yourself now

17  and we're short on time.

18         MR. OTAKE:  That's all I'm saying.

19         THE COURT:  All right.

20         MR. OTAKE:  And so I appreciate Ms. Marino including

21  that in her motion.  We join in the motion in its entirety and

22  everything she said today.

23         THE COURT:  Okay.

24         MR. OTAKE:  It's a problem.

25         THE COURT:  So we're going to hear from the

1    government, then we'll take a break, unless anyone really needs

2    a break right now.

3            MR. WHEAT:  Your Honor, before Mr. Chiang addresses

4    the Court I want to confirm that the Court had received the

5    e-mail.

6            THE COURT:  Yes.  I'll look at that during the break.

7            MR. WHEAT:  Okay.  Thank you.  I just wanted to make

8    sure you got them.

9            THE COURT:  Yes.

10            MR. CHIANG:  We have a lot to cover, but I want to be

11    respectful of the Court's time and I'll try to move through.

12            THE COURT:  Yeah, and we may break during your

13    presentation.  Let's see how long.

14            MR. CHIANG:  Okay.  But I'll try to move through it

15    swiftly, but there are some things that I think do need a

16    response.

17            THE COURT:  Of course.  Okay.  Go ahead.

18            MR. CHIANG:  My colleague Ms. Marino has called this a

19    weak case, but we just respectfully disagree.  I mean the facts

20    just do not bear it out.  There is no doubt about this

21    indictment.  There is no doubt about the scope of

22    incriminating --

23            THE COURT:  Let's get to the conduct and move away

24    from that.

25            MR. CHIANG:  Sure.  They talk about us interfering

1    with their attorney-client relationship.  But I think it's

2    telling that they have not cited a single case that shows that

3    this factual circumstance arises to some sort of due process

4    violation.

5         What we did in this case is we avoided contact with

6    represented parties.  I don't see how that's -- that can

7    constitute interference.  If anything that's respectful of the

8    attorney-client relationship.  By my likes, it would be

9    interference if, you know, a representative of the government

10   contacted a represented party and told that party, Hey, you

11   know, we think you should fire your attorney because we think

12   your attorney is engaging in criminal conduct.  I think that

13   would be interference.  That's not what we did here.

14        But they're saying that that's what we should have

15   done, is that we should have --

16        THE COURT:  Well, I think they're saying you should

17   have come to the Court.

18        MR. CHIANG:  Well, you know, I -- what we did was we

19   tried to stay as far away from the represented party as

20   possible.  And I think that's proper.

21        I mean if, you know, they seem to think that, you

22   know, if you choose, you know, a person that -- your

23   co-conspirator and you make that person your attorney, then

24   that sort of drapes the entire criminal conspiracy with all

25   these legal protections.  That we're supposed to -- anytime we

1    suspect that the attorney is part of the conspiracy we have to

2    now warn the entire conspiracy.  But that's just not how the

3    real world works and it's not how it works under our, you know,

4    our Constitution.

5         So, I'm just going to quickly leave it at that because

6    there's just no claim of a constitutional violation here.

7    There's no interference.  We stayed away.

8         I want to address Detective Snoops very quickly.

9    Ms. Marino said repeatedly that Snoops provided false

10   testimony.  But I think what's clear is, if you look at Snoops'

11   testimony and you look at the two previous reports that he

12   wrote, what he was really concerned about, his central

13   preoccupation was that the person who filed the complaint,

14   Mr. Fujii, he's the one that filed the complaint, he could not

15   get a hold of Mr. Fujii.  That's the person who he wanted to

16   talk to.  That's the actual complainant.  He got a hold of

17   Mr. Fujii one time on the phone, he said that he would call him

18   back, and he never did.  And so what he was trying to convey to

19   the grand jury was, I could not get a hold of the complainant

20   in this case.

21        Now, they've tried to make a big issue about how, you

22   know, Mr. Snoops didn't touch on a contact or couple of

23   contacts seven months down the line with Ms. Tanaka, but the

24   grand jury was not all -- not at all misled about this fact

25   because they had the exhibits.  They had the reports that

 1    revealed this information as exhibits.  These exhibits were

 2    shown to the grand jury six times over the course of a single

 3    year, and the grand jury had evidence that showed that this

 4    contact with Ms. Tanaka seven months down the line was not a

 5    legitimate law enforcement contact.  She was not going to him

 6    for a legitimate law enforcement reason because there was

 7    evidence in the grand jury to show that by that time the MIA

 8    defendants already had cultivated a relationship with

 9    Mr. Kaneshiro through bribes.  And he was sending Tanaka to go

10    talk to Detective Snoops so that he could generate some sort of

11    police report to justify Mr. Kaneshiro's entry into the case.

12         They had -- they had that evidence that supports

13    that -- that supports that inference and they also knew that

14    these exhibits that Ms. Tanaka gave to Detective Snoops, they

15    were irrelevant and they were completely unhelpful.  And how

16    did they know that?  They knew that because there was testimony

17    in the grand jury that showed that associates of Mr. Kaneshiro,

18    his closest -- one of his most respected deputy prosecutors had

19    reviewed everything and concluded that the victim in this case,

20    LJM, did not commit a crime.  She did not commit a crime.

21    There was an investigator who conducted an extensive

22    investigation and concluded that he felt like what

23    Mr. Kaneshiro was doing was like selective prosecution.

24         So this, you know, seven months down the line contact

25    with Ms. Tanaka was neither here nor there.  And if anything,

 1  it supported the fact that they had abandoned the police

 2  department entirely because now they had --

 3          THE COURT:  Why don't you move on to the campaign

 4  contributions and the --

 5          MR. CHIANG:  Yes.

 6          THE COURT:  -- persistent nature of the questioning

 7  about them being the same day.

 8          MR. CHIANG:  So, first of all, it's the function of

 9  the grand jury to ask questions.  It can ask questions and it

10  can see what the response to it is.  It can ask questions

11  again --

12          THE COURT:  I'm not asking you about the grand jury's

13  role, I'm asking you about questions that Mr. Wheat or others

14  asked witnesses, assuming in the question that contributions

15  were actually made on the same day.

16          MR. CHIANG:  The meaning of the word "contribution"

17  is, when does money go from one party to another.  And so when

18  the prosecutors were in the grand jury asking about, Did you

19  contribute on this date, they were trying to get at, Did money

20  get to the Kaneshiro campaign on this date.  And, you know --

21          THE COURT:  I mean that's not the way the question was

22  asked.  Those questions were asked.

23          MR. CHIANG:  We went by the evidence that was

24  available.  And the evidence that was available was provided by

25  the spending commission that had listed the dates of certain

1    contributions.  And they claimed that the grand jury was

2    misled, but they weren't misled because they knew what those

3    dates stood for.  They heard testimony that those dates were

4    actually the dates that Mr. Kaneshiro had --

5              THE COURT:  So they heard that from Mr. Koya, right?

6              MR. CHIANG:  They heard that from Ms. Otani.

7              THE COURT:  And Ms. Otani.  Anywhere else did they

8    hear that from?

9              MR. CHIANG:  Those were the two sources.  But

10   importantly, we did not dispute the witness testimony on that

11   point.  We didn't dispute it on that point, but we also

12   provided evidence that the -- when they received the

13   contributions, they were depositing it fairly instantaneously.

14   So, on or about those dates that's when those contributions

15   were being made.

16             THE COURT:  Yeah, I don't have a problem with the on

17   or about so much because even the ten or 11 checks that -- in

18   the exhibit that Ms. Marino has, you know, does show it's

19   relatively near the same date.  I think her problem is more the

20   nature of the questioning in the grand jury.  Leading

21   constantly to the conclusion that they were the same day the

22   checks were written.  That's at least her claim.

23             MR. CHIANG:  Well, you know, the grand jury is allowed

24   to ask questions and the grand jury is allowed to hear what the

25   response of the witness --

1          THE COURT:  I'm not talking about asking questions,

2     it's about the questions that were asked by you folks in the

3     grand jury.

4          MR. CHIANG:  But the grand jury is -- is -- can listen

5     to the questions that are asked and can listen to the responses

6     that are given.  If the response -- if the responses that are

7     given --

8          THE COURT:  But if you keep asking, When did you beat

9     your wife, what day was it, right?  I think that's what

10    Ms. Marino is getting at.  You know, you just keep asking the

11    question over and over again, after a while she's saying the

12    grand jury believes that there was a beating because you keep

13    asking what day was it you beat your wife.

14         MR. CHIANG:  Well, the evidence before the grand jury

15    showed how the contribution apparatus of MAI worked.  And it

16    showed what was happening was -- it wasn't as if, you know,

17    everyone was writing checks on the same day and putting it into

18    a bag on the same day.

19         THE COURT:  Okay.  So where is the -- other than Otani

20    and Koya, which I understand is there, where else is that

21    evidence?

22         MR. CHIANG:  There's -- there's -- the grand jury

23    viewed the checks themselves.  So they knew that the checks did

24    not match exactly with the contribution date.  But they also

25    heard testimony --

1          THE COURT:  And just some checks, right?  You don't

2     have --

3          MR. CHIANG:  Some checks.  Not every check.  Not every

4     check, but some checks they saw.  And they saw that those

5     checks did not match that person's date of contribution that

6     was being reported by Hawaii spending commission.

7          But what they also heard was witness testimony that

8     the way that the MAI defendants were engaging in this bribery

9     scheme was that they were calling out for contributions from

10    people who they wanted to contribute to Mr. Kaneshiro.  And

11    these called-outs would get communicated through, you know,

12    sometimes through an intermediary, sometimes more.  And when

13    the checks would flow in, it would flow in at different times,

14    sometimes through one or more intermediaries.  And so it made

15    perfect sense that when these checks were being bundled, they

16    weren't going to be all dated on the same day.  And when they

17    were given to Mr. Kaneshiro, they were given at a time when

18    someone within the company had determined that there was enough

19    money to hand over to the Kaneshiro campaign.  And we know

20    through witness testimony that there was someone from the

21    Kaneshiro campaign, at least Ms. Otani on one occasion, that

22    delivered these checks in a batch and handed it to people who

23    were associated with Mr. Kaneshiro.

24         THE COURT:  All right.  And whose testimony is that?

25         MR. CHIANG:  That's Carol Nakamura.

1           THE COURT:  Carol Nakamura's testimony.

2           MR. CHIANG:  Carol Nakamura.  She was Mr. Kaneshiro's

3    longtime executive assistant and she testified that during a

4    lunch or some social gathering she had a meeting with

5    Ms. Otani, and Ms. Otani gave her a batch of checks that were

6    large.  They were much larger than anything that Mr. Kaneshiro

7    usually got, and she reported this to Mr. Kaneshiro because she

8    took note of how big the checks were and she said that she was

9    very happy to receive them because they needed the money.

10          THE COURT:  All right.

11          MR. CHIANG:  So that goes to the contribution dates.

12   And if there's any other questions the Court has, I'm happy to

13   answer them, otherwise we'd submit on our briefing because

14   we've submitted a fairly exhaustive brief to the Court.

15          THE COURT:  All right.  Let's take a break.  I will

16   give you a reply.  I'm going to look over this e-mail chain

17   that I received and then -- so we'll pick up in about ten

18   minutes.  Okay?

19       (A recess was taken from 10:46 a.m. to 10:57 a.m.)

20          THE COURT:  We're back on the record with counsel and

21   the defendants.

22          Before I hear back from Ms. Marino, I do think I want

23   to hear from the government on what you really didn't address,

24   I think, which is whether or not there were any

25   misrepresentations to witnesses as to their status as being a

1    witness as opposed to a subject or target.

2           MR. CHIANG:  Your Honor, there were no

3    misrepresentations.  When Chad McDonald and Aaron Fujii

4    testified in February of 2021 they were the very first and very

5    second witnesses to testify in the grand jury.

6           THE COURT:  Okay.  That time they were -- they came

7    back, though, or did one of them come back?

8           MR. CHIANG:  They came back one month later in March.

9    And when they came back, no witnesses had appeared in the

10   intervening period between those two dates.  So when we --

11          THE COURT:  So they were the first, second, third and

12   fourth witnesses, is that what you're saying?

13          MR. CHIANG:  They were the first, second, and I think

14   there was maybe one person who testified between Mr. Fujii and

15   Mr. McDonald on the same day.  So they were the first, second,

16   third and fifth witnesses.

17          THE COURT:  Okay.

18          MR. CHIANG:  For this entire grand jury investigation.

19          THE COURT:  Okay.

20          MR. CHIANG:  So at the time when we represented that

21   they were witnesses in the grand jury, that was the belief of

22   the prosecution team.  And, you know, to now go back and say

23   that we knew that they were targets and that -- or maybe that

24   they were subjects, I think it just doesn't account for how

25   this investigation unfolded.  I mean it unfolded over a lengthy

1    period of time and it was built, you know, brick by brick,

2    witness by witness.  And I think, you know, at the end of the

3    investigation when the entire picture of the criminal

4    conspiracy is clear, I think it's easy to go back and, you

5    know, criticize and scrutinize, you know, what prosecutors

6    should have known and when.  But, you know, in reality that's

7    just not how the investigation works.  It builds over time.  We

8    don't really know where it's going to lead and we have -- we do

9    not have a fully formed picture.  At the time that we are, you

10   know, questioning a lot of these witnesses in the grand jury,

11   especially witnesses who are the first, second, third and fifth

12   in the entire grand jury investigation.

13            THE COURT:  All right.

14            MR. CHIANG:  Okay.

15            THE COURT:  All right.  Ms. Marino?

16            MS. MARINO:  Thank you.  I'm not going to be long.

17   Prosecution continues to take tremendous liberties with the

18   facts.  The Court is quite right.  It's our position that the

19   prosecution should have notified a court of the dilemma of

20   having an attorney representing an identified target when that

21   attorney is the subject -- without question a subject of the

22   grand jury investigation.  And they did not.

23            And it is not about warning the entire conspiracy, as

24   the government said.  That's not what I'm saying at all.  But

25   she's the lawyer for my client having a meeting with the

 1    government.  That is entirely unproductive because she's the

 2    subject in the same investigation, and that's the problem with

 3    the interference with the attorney-client relationship.

 4             THE COURT:  I think I understand --

 5             MS. MARINO:  So with respect --

 6             THE COURT:  -- the argument.

 7             MS. MARINO:  Thank you.  With respect to Detective

 8    Snoops --

 9             THE COURT:  I understand Detective Snoops too.  I've

10    looked at that before, I've looked at it again.  So I'm very

11    familiar with it.

12             MS. MARINO:  Okay.  Because what they said wasn't

13    accurate.

14             THE COURT:  I've read the testimony.

15             MS. MARINO:  Oh, okay.  Great.  Because she did

16    follow-up right away, Tanaka, and said that she was

17    representing the company, as any lawyer who represents the

18    company would.  So, and there was no testimony that Snoops was

19    waiting for Fujii.  I mean that's ridiculous.  They have a

20    lawyer.  It's a company.

21             THE COURT:  Well, Ms. Tanaka told Detective Snoops

22    that she had authority from MIA to speak on their behalf.

23             MS. MARINO:  That's correct, Your Honor.  I know the

24    Court's very familiar with the record.

25             Just I would point out the testimony of Lynn Nishiki

1    makes clear that the deposits were not made instantaneously.

2    This is sort of like a repeated misconception.  And I don't

3    believe that the government ever answered the Court's question

4    as to what was the purpose of the nature of the questioning

5    regarding the same day of the contributions, and I think that's

6    because they can't answer the question.

7           So, I think I'll -- if the Court wants to hear

8    anything else about Mr. McDonald, maybe my colleague would

9    address that, but I will just say that, in closing, that this

10   idea of this brick by brick building of a case is not borne out

11   by the transcripts and the nature of the questioning and the

12   answers, considering the same questions were asked over the

13   course of 16 months and that they already knew the answers to

14   those questions before they even seated the grand jury.

15          THE COURT:  All right.

16          MS. MARINO:  Thank you.

17          THE COURT:  Thank you.  Anything, Mr. Otake?  No?

18   Okay.

19          All right.  So that will conclude argument on that

20   motion.  Obviously I'm taking this under advisement and not

21   ruling from the bench on that matter.

22          Okay.  So now let's get back to Ms. Tanaka's motion.

23          So, I have reviewed the e-mail chain between the

24   Central District and the Southern District, in particular

25   between Ms. Chopra and Mr. -- or AUSA Srinivasan.  And as the

 1    government sets forth in its briefing and in the declaration,

 2    on September 9th before, obviously, the arraignment, there was

 3    communication about need a copy of the arrest warrant, the

 4    indictment, you know, the typical sort of communication one

 5    would assume you would have between districts when there's

 6    communication about what's going to be happening.

 7         And then on September 13th, 2022, at 12:23 p.m., I

 8    assume that is California time, AUSA Srinivasan e-mails AUSA

 9    Chopra and says, Tanaka is on calendar for today.  Would you

10    like this defendant detained, question mark.

11         Response comes back on the 13th at 11:41 a.m., and it

12    says, Hi, Raj, sorry for the delay.  I've been in trial.  We do

13    not need to move to detain her.  Her co-defendants have been

14    un -- I'm sorry, have had unsecured $50,000 bond set by the

15    magistrate in Honolulu.  We would ask for the same for her, and

16    for her to make her way to Honolulu for arraignment.

17         So that's what I have by way of this e-mail chain.  So

18    with that I'll hear any further argument from either counsel.

19    Mr. Mermelstein?

20         You can walk this way if you want, Mr. Mermelstein.  I

21    feel like you're going the long way around.

22         MR. MERMELSTEIN:  I wanted to be respectful.

23         THE COURT:  No, no, I understand that.  I appreciate

24    that, so I'm telling you you can walk that way.

25         MR. MERMELSTEIN:  Your Honor, I just -- not to belabor

1    this point, but I think that you have -- we still don't -- yes,

2    we have an e-mail that reflects what the declaration says, but

3    that doesn't answer the fundamental question of, we have an

4    AUSA that stood up in court and said it was at the behest of

5    this prosecution team that he is requesting detention.

6         Now, that -- there was no communication -- there was

7    no -- I just feel like we don't have the full story because we

8    don't have an understanding whether there were any other

9    communications between the prosecution team and this AUSA.  And

10   we don't have any declaration from the -- Mr. Srinivasan

11   explaining why he made this representation in court other

12   than -- and I think we have to take it at face value.

13        And so as we stand here right now, I think we have a

14   situation where we have conduct, frankly, that I think we've

15   met our burden with respect to establishing that there was

16   inappropriate conduct, and I don't think the government has

17   refuted it.

18        I think this motion ultimately rises or falls based on

19   the strength of the -- Ms. Marino and Ms. Marino's motion, and

20   I understand that.  But in terms of weighing the -- the depth

21   of the prosecutorial misconduct here, I think that this conduct

22   here goes on the scale and is properly --

23        THE COURT:  I don't mind putting it on the scale.  The

24   question is, as a stand-alone argument for dismissal based on

25   vindictive prosecution based just on that alone, right?  Just

1    on your zealous representation of Ms. Tanaka, and then the

2    claim that there was vindictiveness in the issuance of an

3    arrest warrant, the manner of the arrest, and then in the

4    motion to detain, I guess what I want to hear from you is, are

5    you arguing that there is sufficient basis on that alone for me

6    to dismiss the indictment as to your client, or are you saying

7    that has to be taken into account with everything else in

8    relation to the arguments made by Ms. Marino on behalf of

9    Mr. Mitsunaga?

10           MR. MERMELSTEIN:  I think we've made the prima facie

11    showing.  Your Honor has questioned whether there is an

12    independent due process right to challenge -- to go up the

13    chain at DOJ and challenge the --

14           THE COURT:  See, I was -- I was reading this -- and if

15    I'm reading it wrong, you tell me -- I was reading this as kind

16    of two different motions in some ways, Mr. Mermelstein.  And

17    one was you were joining Mr. Mitsunaga's motion and saying that

18    look at this conduct and look at that in light of everything

19    else that you have that's been raised by Ms. Marino.  But I

20    also sort of took it as a stand-alone motion.  Maybe just

21    liberally construing it I sort of took it that way.  That

22    you're saying even aside from what Ms. Marino is saying in her

23    motion, there is vindictive prosecution here and sufficient to

24    dismiss the indictment standing alone.  And I'm just trying to

25    find out from you if that is your view or that's not your view.

 1          MR. MERMELSTEIN:  I hadn't focused on -- focused

 2    precisely that way, Your Honor.  I had focused it -- and that's

 3    perhaps the reason why you haven't seen extensive briefing on

 4    this issue of whether redress to the DOJ is -- is in and of

 5    itself a right that was trampled on.  Because I saw it more in

 6    the nature of this is prosecutorial misconduct in the form of

 7    what we would recognize as vindictive prosecution, but this is

 8    prosecutorial misconduct --

 9          THE COURT:  So you're not asking me to rule on

10    vindictive prosecution standing alone as to your client based

11    on your representation of her and then the arrest, the manner

12    of the arrest and the detention?

13          MR. MERMELSTEIN:  I think that's right, Your Honor.  I

14    think this is best understood as a additional misconduct.

15          THE COURT:  Okay, fair enough.  And it's just -- I'm

16    not being at all critical.  I'm telling you how I read it, and

17    again, maybe I read too much into it.  I was sort of looking at

18    you're coming from two different angles.  Okay.  But you're

19    telling me it's one angle.

20          MR. MERMELSTEIN:  Yes.

21          THE COURT:  Okay.  Thank you.

22          MR. MERMELSTEIN:  Okay.

23          THE COURT:  Okay.  So with that -- you can be seated.

24    I think that's enough.

25          So with that I'm going to -- to the extent there was a

1    stand-alone motion I'm going to deny it.  In other words, to

2    the extent that it could be read to say standing alone there

3    was a claim of vindictive prosecution just based on

4    Mr. Mermelstein's representation of Ms. Tanaka, and then the

5    arrest, the manner of the arrest warrant, the manner of the

6    arrest and the detention hearing, I'm going to deny that, and

7    it sounds as if that's not even what Mr. Mermelstein is

8    raising.  I will take it into consideration in the larger

9    motion that's pending.  And that's agreeable with you,

10   Mr. Mermelstein?

11           MR. MERMELSTEIN:  Yes.

12           THE COURT:  All right.  Okay.  So continuing effort to

13   stay organized, let me move on now to Ms. Lum's motion.  We'll

14   hear from you, Ms. Lum.

15           MS. LUM:  Thank you, Your Honor.  I won't belabor --

16           THE COURT:  Can I ask a couple questions that will

17   help me to start?

18           MS. LUM:  Absolutely.

19           THE COURT:  I understand your argument that in

20   Ms. Otani's, I think it's June 24th grand jury appearance.  I'm

21   looking at this as, just so you know the way I've sort of

22   broken it down in my own mind, as grand jury number one is

23   May 27.  I mean just two, three and four, right?  So then

24   June 24th, July 15th and August 26th.

25           Are you claiming there was some sort of prosecutorial

1    misconduct in the ruling of Judge Kobayashi or are you just

2    saying Judge Kobayashi made a mistake, or some combination of

3    the two?  That's what I'm trying to get an understanding.

4          MS. LUM:  Our position is a combination.

5          THE COURT:  Okay.  All right.  And go ahead and argue

6    that, my having that understanding, go ahead and argue, and

7    I'll ask you questions.

8          MS. LUM:  About that specific?

9          THE COURT:  Well, no, just in general.  I just want to

10   sort of understand, because I wasn't a hundred percent sure

11   where you were landing on that.

12         MS. LUM:  Okay.  That's fair.  Just in the broadest

13   overview, we have the government's indictment lasering in on

14   this quid pro quo.  So it's extremely problematic that they're

15   going to bring Ms. Otani in and ask her about her relationship

16   with co-conspirators, her -- her contribution and her role in

17   dealing with Laura Mau.  That's in the simplest, broadest

18   terms --

19         THE COURT:  Wait, wait, wait a minute.  There's

20   nothing improper with the government calling the target to the

21   grand jury, the Ninth Circuit has said, and giving them their

22   Fifth Amendment rights, right?

23         MS. LUM:  Correct.

24         THE COURT:  Okay.  The problem here, as I see it, is,

25   based on your argument, that in grand jury number one, she goes

1    in and I think she invokes the Fifth every question other than,

2    Are you feeling okay today, something like that, some sort

3    of --

4              MS. LUM:  She invokes the Fifth, yes.

5              THE COURT:  Right?  But she invokes the Fifth to

6    questions clearly she could not invoke the Fifth on.  You would

7    agree with that?

8              MS. LUM:  I would agree, yes.

9              THE COURT:  Okay.  And then there are other questions

10   that you're now arguing she did have a valid Fifth Amendment

11   privilege on.

12             MS. LUM:  Correct.

13             THE COURT:  Right?  And you're saying Judge Kobayashi

14   told her you have no privilege to, let's call them 50

15   questions, may be 48, but let's just round it off to 50.  Judge

16   Kobayashi said you have no privilege as to the entirety of

17   those 50 questions, you have to go and answer them.

18             MS. LUM:  Correct.

19             THE COURT:  Right?  So what relief are you seeking

20   then if I were to agree with you in part on that?  Don't I just

21   look and see which of these questions were already asked in

22   grand jury two, three and four, and then determine if those

23   were asked; and if so, suppress those?

24             MS. LUM:  Not -- not quite --

25             THE COURT:  Okay.

1           MS. LUM:  -- Your Honor.

2           THE COURT:  So help me then.

3           MS. LUM:  Because -- if I could, the analysis we're

4     asking you to consider is, there's two categories.  The first

5     grand jury testimony in May, Judge Kobayashi ordered all of the

6     questions to be answered.

7           THE COURT:  Right.

8           MS. LUM:  So that's one category.  The other category

9     is all the other questions that were asked subsequently.

10          THE COURT:  But Judge Kobayashi said that she can

11    invoke the Fifth if she wants on those, that she wasn't ruling

12    on those.

13          MS. LUM:  We would still argue based on the fact that

14    Judge Kobayashi's order compelled her to testify to questions

15    that she had a legitimate Fifth Amendment right to.  Things

16    like contributions, her dealings with Laura Mau, all of those

17    things were asked on the first grand jury in May.  So that

18    order --

19          THE COURT:  And Judge Kobayashi said as to any other

20    questions, I'm not ruling.  She said that specifically.

21          MS. LUM:  Judge Kobayashi's order, we would say is,

22    again, it stripped Ms. Otani of her Fifth Amendment rights, it

23    clearly -- on certain questions.  So based off of that order

24    where she was told she has to answer these questions, it had

25    then a chilling effect on the rest of her -- her --

 1          THE COURT:  Well, she comes in to grand jury number

 2     four and starts reading statements again.  I mean, look, Judge

 3     Kobayashi, it's pretty clear, was extremely frustrated with

 4     Ms. Tanaka.  And let me say I think all the judges were

 5     extremely -- in the court were extremely frustrated because we

 6     were getting these Motions to Compel when people were taking

 7     the Fifth when they had no business taking the Fifth.

 8     Essentially blanket invocation of the Fifth.  And so, you know,

 9     you read it, you can read the frustration in Judge Kobayashi's

10     voice.  I'm sure you agree with me on that.

11          MS. LUM:  I agree.

12          THE COURT:  And her view was, it's Ms. Otani's

13     obligation to show something falls within the Fifth, and she

14     didn't do that, and therefore she said, You have to answer all

15     the questions.  Tell me why that's wrong.

16          MS. LUM:  So Ms. Otani wasn't there at the Motion to

17     Compel.

18          THE COURT:  Her representative was.

19          MS. LUM:  Right.  And so --

20          THE COURT:  And she was taking the position,

21     Ms. Tanaka, that it's valid to invoke the Fifth on anything.

22          MS. LUM:  I'm not going to speak for Ms. Tanaka,

23     but --

24          THE COURT:  No, no, she represented your client.  So

25     she was speaking for Ms. Otani at that time.

1          MS. LUM:  I will say that even the government at that

2     Motion to Compel was essentially asking, Which of these

3     questions can she or can she not invoke the Fifth on, and that

4     was never answered at the Motion to Compel.  It was a blanket,

5     You got to answer all 50-some-odd questions.

6          THE COURT:  Right, but the way it unfolded was, Judge

7     Kobayashi was asking questions of Ms. Tanaka, and Ms. Tanaka

8     was essentially saying that Mr. Wheat is so aggressive my

9     client has a right to invoke the Fifth as to every single

10    question asked.  What color shirt are you wearing today?  I'm

11    invoking the Fifth.

12          And so I think Judge Kobayashi's view, it was, Well,

13    you know, it was Ms. Otani's burden to show she had a valid

14    Fifth Amendment privilege.  And instead of doing that, she's

15    coming in and saying, I have a privilege to everything, taking

16    what, quite frankly, was an absurd position.

17          MS. LUM:  If Ms. Tanaka represented that she had a

18    valid Fifth Amendment to every question, it -- she's clearly

19    right in certain questions.  So --

20          THE COURT:  No, no, no, but she's wrong as to that

21    statement, right?

22          MS. LUM:  I would argue that that does not take away

23    Ms. Otani's Fifth Amendment right to the questions --

24          THE COURT:  Right, but it's her obligation to show she

25    has a Fifth Amendment privilege.  It's not the obligation of

1    the government to show otherwise.  Right?

2          MS. LUM:  I think the very nature of the question in

3    this case where, again, it is a quid pro quo, you're talking

4    about campaign contributions, it's not -- it's not a far reach

5    to say that if you're asking Ms. Otani about her contributions,

6    about --

7          THE COURT:  Was Judge Kobayashi ever told that by

8    Ms. Tanaka?

9          MS. LUM:  I don't believe she was.

10         THE COURT:  That's the point I'm making.  So what is

11   Judge Kobayashi supposed to do when she's asking, What's the

12   privilege, and she's not getting that answer?  She's getting an

13   answer there's a privilege to everything.  What exactly is the

14   judge supposed to do?

15         MS. LUM:  Well, Your Honor, this Court also had a

16   Motion to Compel, and at that hearing this Court -- what this

17   Court did was say, Don't abuse the privilege, but this Court

18   never ruled specifically on what -- what they had to testify

19   to.  And that's the difference between that Motion to Compel

20   and Ms. Otani's Motion to Compel.

21         In Ms. Otani's Motion to Compel she was ordered, she

22   was compelled to specifically answer all of the questions that

23   were asked of her.

24         THE COURT:  Okay.  So, let me ask you this then, let's

25   assume I agree with you on that, just hypothetically, okay,

 1    that you have me with that, okay.  Why isn't it -- and put
 2    aside *Kastigar* for just a minute, we'll come back to that, just
 3    put that aside for a second -- why is it then my job, if I were
 4    to agree that there are certain questions in which she could
 5    invoke the Fifth, to look at those questions that were asked in
 6    grand jury number one, and determine which of those were
 7    reasked in grand jury two, three and four, and then suppress
 8    those -- those statements, those -- that grand jury testimony
 9    as to questions as to which she may have had a valid Fifth but
10    which she was ordered to testify about?
11        MS. LUM:  I mean absolutely those should be
12    suppressed.  I think in addition we're asking that you suppress
13    the other questions and answers because of, again, a chilling
14    effect that the court orders had on Ms. Otani.
15        THE COURT:  Okay.  You just lose me there totally,
16    because Judge Kobayashi said, I'm not ruling about any other
17    question.  And maybe Ms. Otani wasn't there, but Ms. Tanaka was
18    there, that was her attorney, as her representative.  And so to
19    me it was pretty clear that Judge Kobayashi was saying, You
20    have to go in and answer these 50 questions, but I am not
21    ruling on privilege as to any other questions.  And then in
22    fact Ms. Otani did invoke the privilege.
23        MS. LUM:  She invoked her privilege on -- on, for
24    example, questions regarding her niece, correctly.  She did not
25    invoke her privilege on all the other questions that she, I

1    would argue, had a legitimate Fifth Amendment right to --

2            THE COURT:  She was told her privilege -- I'm not

3    going to go on with that argument because you're going to lose

4    me on that, you lost me on that already, okay.  I'm not going

5    to rule for you that anything she testified to after that --

6    you made your record on that, but I just don't buy that.

7            So I'm really focused on the questions that Judge

8    Kobayashi did say, You have to answer, that were then reasked

9    whether in grand jury one -- I'm sorry, two, three or four it

10   seems to me would apply.

11           MS. LUM:  Okay.  And I -- and forgive me, but if I

12   could just take a step back.  She was -- if this Court believes

13   that the order to answer those 50-some-odd questions were

14   incorrect, that in fact Ms. Otani had a Fifth Amendment right

15   to certain questions, you know, I would ask the Court to

16   consider what effect that would have on someone in Ms. Otani's

17   shoes.  Could she understand what she could properly invoke and

18   which questions she couldn't properly invoke?  The fact that

19   she, again --

20           THE COURT:  Ms. Lum, I want you to answer my question,

21   not talk about what you want to talk about.  Okay.

22           MS. LUM:  Yes, Your Honor.

23           THE COURT:  I'm not going to go with that argument.

24   So it leaves you with, you know, the same question.  What would

25   be the remedy, if I were to agree that some of those 50

1    questions are questions in which she could have invoked the

2    Fifth.

3         MS. LUM:  If this Court feels that she was compelled

4    against her legitimate right, I think the burden then shifts to

5    the government to prove that everything else was -- was proper.

6    So, I would argue that once I have shown that she was compelled

7    to answer incorrectly, it turns to the government, and that's

8    where I would ask for an evidentiary hearing.

9         THE COURT:  Okay.  Now you're getting to *Kastigar*, is

10   that what you're asking for?

11        MS. LUM:  Yes.  I mean I am asking for both --

12        THE COURT:  We're way before that, right?  Because I

13   don't even know if the government plans to use any of this

14   stuff, right, if I make this finding.  Because honestly, I've

15   read it all.  I have a sort of spreadsheet before me as to

16   questions in grand jury one, two, three and four where

17   questions were asked in one and then whether there's follow-up

18   in two, three and four.

19        And in my reading it, there isn't much there.  There

20   just isn't much there that's left.

21        MS. LUM:  And, you know, that's the government's

22   argument as well.  It's basically they're arguing kind of no

23   harm, no foul.  And I would argue that that's not the analysis.

24   It's not the, again, the ends justify the means.

25        If there's nothing there, then it should all be

1    suppressed at the very least.  If they're not going to use it,

2    if it -- if it --

3            THE COURT:  I'm sorry, you just totally lost me there.

4    If -- let's take a question.

5            In grand jury number one Ms. Otani was asked -- I'm

6    just looking at this spreadsheet I have -- Do you recall a

7    meeting on November 2nd, 2011 -- that is referring to a meeting

8    at Mitsunaga and Associates concerning LJM.

9            If there's no other question, which there doesn't

10   appear to be in grand juries two, three and four regarding that

11   question, then it kind of is no harm, no foul.  Right?  I mean

12   it just was never followed up.  It wasn't asked again.

13           MS. LUM:  I respectfully disagree.  I think the fact

14   that the government didn't ask it again shows that they knew it

15   was problematic.

16           THE COURT:  Okay.  So maybe they thought there's a

17   concern here that Judge Kobayashi went too far.

18           MS. LUM:  Yes.

19           THE COURT:  So?

20           MS. LUM:  Then --

21           THE COURT:  Suppress the whole testimony?

22           MS. LUM:  Yes.  That is -- that is our ask.

23           THE COURT:  All right.

24           MS. LUM:  And again, it's not -- it's --

25           THE COURT:  And then let me just give another one.

1  She's asked:  What role did you play in a civil trial involving

2  LJM here in U.S. District Court?  And she was asked about that

3  in subsequent grand jury.  But the role she played is very

4  obvious because there's a 70-page transcript, or whatever it

5  is, from her testimony in that trial, right?  So, it seems to

6  me the response -- my response would be to suppress her answers

7  to those questions, but I don't know if we need a *Kastigar*

8  hearing where we have that preexisting transcript.  It was very

9  clear what her role was.

10         MS. LUM:  The fact that there's another transcript out

11  there I don't think nullifies Ms. Otani's right to assert the

12  Fifth --

13         THE COURT:  It doesn't.

14         MS. LUM:  -- grand jury proceeding.

15         THE COURT:  No, you're absolutely right.  You can

16  testify in one proceeding and assert the Fifth in another.

17  That's clear.  I'm just talking about sort of the *Kastigar*

18  argument you're making.

19         MS. LUM:  Correct.  So, again, in the simplest terms,

20  she was compelled to testify.

21         THE COURT:  Right.  So I can -- so if I say the

22  government can't use the answers to those questions later in a

23  trial here.  Let me rephrase that.  That was sloppy.

24         If she's asked a question in grand jury number one in

25  which she had a legitimate Fifth, she's told to answer it, and

1    then she comes back and does answer it.  Then my view is, we

2    should suppress that evidence.  That testimony that she gave,

3    whether it be in grand jury two, three or four.  Right?

4           MS. MARINO:  Correct.  And then I would go one step

5    further and say that the government at that point, again, this

6    is going into *Kastigar*, that they would have to show that --

7           THE COURT:  They knew the answer.

8           MS. LUM:  -- they didn't make use of -- I'm sorry?

9           THE COURT:  Yeah, that they didn't make use of it.

10          MS. LUM:  Right.

11          THE COURT:  Right.  And she said almost nothing in the

12    grand jury.  You know, like, I don't remember.  I don't

13    remember where there's a whole transcript.  I'm just saying the

14    *Kastigar* hearing may not be a hearing.  That's for another day

15    I suspect.  That may be for another day.

16          MS. LUM:  It still falls on the government to show.

17          THE COURT:  I understand.  I understand.  Anything

18    else?

19          MS. LUM:  Does the Court have any further --

20          THE COURT:  No, I want to hear from the government,

21    then I'll come back to you.

22          MS. LUM:  Understood.

23          MR. CHIANG:  Your Honor, I'm happy to answer any

24    questions the Court has.  I don't know that I have too much

25    further to add.

 1          THE COURT:  Well, I mean this issue of Judge

 2   Kobayashi's ruling, if I were to find that there should have

 3   been a question-by-question analysis, and that is what

 4   Mr. Wheat asked for in that hearing but never happened, then

 5   isn't it appropriate for me to go through grand jury two, three

 6   and four and see where those questions were asked again and

 7   then to suppress the answers to those questions?

 8          MR. CHIANG:  Yes.  I think that's appropriate.  And I

 9   think, you know, if you were to look at some of the questions

10   that were asked or that Ms. Otani has problems with, you know,

11   questions about any contacts with Kaneshiro, contacts with this

12   Mitsunaga role in unemployment benefits hearing, so those

13   questions were never asked again.  So there's, you know, there

14   is -- there is really -- I don't think there's any problem with

15   those questions being asked because --

16          THE COURT:  They weren't asked again.

17          MR. CHIANG:  -- they weren't asked again.  They

18   weren't asked again.

19          THE COURT:  On how many occasions did you meet with

20   Keith Kaneshiro at the office of the DPA?  She invoked the

21   Fifth, and never asked again.

22          MR. CHIANG:  Never asked again.

23          THE COURT:  Right?  Who went with you to those

24   meetings with Keith Kaneshiro?  Again, never asked again.

25          So, it seems to me there are a number of questions

1    that weren't, but there were some that were asked that were

2    asked again.

3        MR. CHIANG:  There were some that were asked that were

4    asked again.  The ones that we were able to locate were

5    questions about a meeting with -- about LJM, and questions

6    about, you know, being a signer on Dennis Mitsunaga's bank

7    account.  I mean Ms. Otani didn't answer -- well, she answered,

8    but she said I don't know, I don't remember.  So, you know, I

9    don't know that --

10        THE COURT:  But, for instance, she says:  What caused

11    you to run construction permits for an individual by the name

12    of LJM?  In grand jury four she testified that she investigated

13    the planning and permit office for the permits that LJM ran by

14    Googling the website; she doesn't recall when.  So, I mean, you

15    know, it's things like that, right, that presumably couldn't

16    use the answer in --

17        MR. CHIANG:  Our view is for that particular question

18    she volunteered that information without being specifically

19    asked the question.

20        THE COURT:  Okay.  Well, I have to go back and look at

21    that.

22        MR. CHIANG:  Yup.

23        THE COURT:  But I'll tell you what I'm not -- if I'm

24    inclined to say there's some problem with some of these

25    questions, I'm not inclined, and I want to hear from both of

 1    you on this, I'm not inclined to right now try to dissect what
 2    those are.  In other words, I think what I'd do is order you
 3    folks to meet and confer and see where you can agree, and then
 4    we can take it up question by question at a later date.
 5          MR. CHIANG:  I think that seems very practical.  I
 6    think that works.
 7          THE COURT:  Because otherwise I'm doing this on my own
 8    without any input essentially.
 9          MR. CHIANG:  Right.
10          THE COURT:  Right?  So I'll put the burden on you
11    folks first and then come back to me if you can't -- where you
12    can't reach some consensus.
13          What about the *Kastigar*?  I don't know if we get there
14    or not, but you sort of say *Kastigar* doesn't apply at all, but
15    why would that be?  It seems to me *Kastigar* could apply in this
16    situation.
17          MR. CHIANG:  Well, I don't think *Kastigar* --
18          THE COURT:  Let me give you a hypothetical.  Okay.
19    Totally apart from this case.
20          Somebody is put in the grand jury and asked, Did you
21    commit the crime of robbery, and the person invokes the Fifth,
22    and a judge orders the person to go in the grand jury and
23    answer that question.  So they go in the grand jury and they
24    say, Yeah, I committed the crime of robbery.  And then -- and
25    then you want to use that in your case in chief, and the judge

```
 1    throws it out, says, No, you can't because there was -- had a
 2    valid Fifth Amendment privilege.  Wouldn't Kastigar have the
 3    same rationale apply that you then would have to put on
 4    evidence -- and let's say the person said, and I did it by --
 5    or was embezzlement, and I did it through Bank of America,
 6    right?  Wouldn't you have to show that you independently would
 7    have found those Bank of America records and not through that
 8    testimony?
 9              MR. CHIANG:  I'm following the Court's reasoning.  I
10    think when we did our briefing on why Kastigar didn't apply we
11    were really responding to the claim that, you know, the entire
12    indictment should be dismissed.  And, you know --
13              THE COURT:  Okay.
14              MR. CHIANG:  -- Kastigar really doesn't support that.
15              But if the Court is saying, well, you know, if there
16    are some questions in which she could have invoked the Fifth
17    Amendment but was ordered to do so, then the proper -- the
18    proper step to take is, I think, exactly what the judge -- what
19    the Court has proposed, which is to isolate those particular
20    questions and see if that's something that, you know, shouldn't
21    come in later --
22              THE COURT:  All right.
23              MR. CHIANG:  -- at trial.
24              THE COURT:  Okay.  Thank you.
25              MR. CHIANG:  Thank you.
```

1          THE COURT:  Ms. Lum?

2          MS. LUM:  I know the Court has voiced its primary

3    reasoning of those initial 50 questions.  I would argue that

4    *Kastigar* does apply.  I would further argue that, you know, it

5    is almost unquestioned that she was compelled to testify to

6    those first 50 questions.

7          THE COURT:  Yes.  Yes.

8          MS. LUM:  And based off of that compulsion, her Fifth

9    Amendment was affected.

10         THE COURT:  All right.  You're arguing the same thing

11   I told you I don't want you to argue.  Okay?

12         MS. LUM:  Okay.

13         THE COURT:  So let's talk about what I'm interested

14   in.  Do you agree that if I -- if I find that she had a valid

15   privilege as to certain questions, I should just sort of say

16   that and then let you folks try to work out what you can.

17   Where you can't we'll come back and have further discussion on

18   those, does that make sense to you?

19         MS. LUM:  That's an alternate relief, yes.  I mean not

20   my -- not my first ask, but yes, that's --

21         THE COURT:  Yeah, you're not getting an indictment

22   thrown out for something that you say where Judge Kobayashi

23   made a mistake.

24         MS. LUM:  Aside from throwing out the indictment, what

25   I'm also asking for is the Court to consider her Fifth

 1   Amendment right as to the -- as to the other questions.

 2              THE COURT:  I've heard you say that about ten times

 3   now.

 4              MS. LUM:  I understand.

 5              THE COURT:  Okay.  All right.  Thank you.

 6              All right.  So, let's have sort of a discussion on the

 7   seating and so forth.  First of all, Mr. Otake, let me say,

 8   that table I understand is not nearly long enough.  And so

 9   that's just sort of there to provide some -- because there will

10   be a microphone, there would be a monitor and so forth.  So

11   we'd probably get a table that's about six inches wider, if we

12   can find one, or more depth.

13              MR. OTAKE:  Thank you.  This is fine.  I mean if --

14   even if maybe a little longer, but this is not bad at all.  And

15   I would much prefer this than sitting there (indicating)

16   because I need to be able to see the witnesses, hundred

17   percent.

18              THE COURT:  Right.

19              MR. OTAKE:  And from here we have a good view.  But if

20   there's a little bigger table.  I mean obviously we would want

21   to not look like we're singing karaoke when we're here, but if

22   there was a permanent microphone.

23              THE COURT:  Sure.  I'm working with IT to see how we

24   can do that to get one monitor and one microphone on that

25   table.

1              MR. OTAKE:  Yeah.

2              THE COURT:  You know, one of these mics.

3              MR. OTAKE:  But from location-wise that is fine.

4              THE COURT:  Okay.

5              MR. OTAKE:  And the table is actually not too bad at

6     all too.  I mean I don't want it to get bulky where people,

7     especially if Mrs. Otani is here and needs, you know, some room

8     to get through.  I don't think this table is too bad at all to

9     be honest.  Whatever you guys want to do.

10             THE COURT:  Okay.  All right.  Mr. Mermelstein, are

11    you okay where you are?

12             MR. MERMELSTEIN:  Well, it is -- it does obstruct

13    my -- the corner of the bar.

14             THE COURT:  Right.  And just so you know, this -- not

15    that it matters, but these can be put out of the way, this can

16    be moved.  But that's -- you know, there's nothing we can do

17    from here, right.

18             MR. MERMELSTEIN:  No, I understand.

19             THE COURT:  And what if you switch with Ms. Tanaka,

20    just see what that looks like.

21             MR. MERMELSTEIN:  I guess I -- I think it would be

22    helpful to have someone sit in the jury box, then I can --

23             THE COURT:  The witness stand you mean?

24             MR. MERMELSTEIN:  Yes.

25             THE COURT:  All right.  I will be your test subject.

1              MR. OTAKE:  Can I ask a few questions?

2              MR. MERMELSTEIN:  Actually, given your height, I think

3      it's fine.  If it's a shorter witness, it may be difficult.

4      But I can -- I can just move down the table or figure something

5      out.

6              THE COURT:  Okay.  And I think we're going to try to

7      get a chair that's a little higher or at least put that chair

8      up, discussion I've had with my staff to try to do that.

9              Is everyone okay then, everyone else okay with this

10     setup?

11             MR. BERVAR:  These chairs aren't as comfortable.

12             THE COURT:  I understand, but we can't fit those

13     chairs is the problem.

14             MS. MARINO:  I was planning on having my colleague

15     Mr. Mitsos here to try the case.  I'm just wondering how that

16     impacts --

17             THE COURT:  Right, so here's the other part of this is

18     I'm going to try to move everything this way a little bit more

19     towards the jury box so that we can have some people sort of

20     sitting behind you, if you will.

21             One thing we could do, that big monitor behind you,

22     Mr. Otake, my idea was to move that over here by the jury,

23     facing the jury.  The monitor facing sort of the public who

24     wants to watch would be there.  We could close off where

25     Mr. Schum is a couple of rows there and allow counsel,

1   paralegals, whoever, to sit there.  Or to sort of get behind

2   others at counsel table.  I'm certainly not saying he can't

3   come, Ms. Marino, it's just a question of where the person can

4   sit.

5        MR. OTAKE:  And, Your Honor, and even more so, I think

6   this table is fine, and I don't mind if local counsel or

7   somebody else sits here.  I mean I think a bigger table might

8   just start to interfere with all of that, so...

9        THE COURT:  Okay.  And what about -- I mean have you

10  folks talked about paralegal stuff?  Are you going to have one

11  paralegal for all of you or are you going to each have a

12  paralegal?  Or it's way too early to know that?

13       MS. MARINO:  Right now I'm just planning on having

14  Mr. Mitsos with me.

15       THE COURT:  Okay.  Anyone else having anyone else

16  here?  Mr. Mermelstein, anyone from your office?

17       MR. MERMELSTEIN:  Not sure yet, Your Honor.

18       THE COURT:  Okay.  I think with just one more we can

19  make that happen just sitting behind you there.

20       MS. MARINO:  Okay.

21       THE COURT:  I think we can make that happen.  How many

22  people are going to be on the government side altogether?

23       MR. WHEAT:  Your Honor, we'd like three chairs at the

24  table.  There will be two lawyers and a paralegal at the table,

25  and a lawyer and an agent, just like we did the last trial.

1          THE COURT:  All right.  So I think that would work.

2          Now, let's talk about exhibits though because --

3          MR. OTAKE:  Can I just -- one last concern.  I mean if

4   you're thinking of moving everything this way, you know, I

5   think the government's table is going to start to get too close

6   to the jury for my comfort, so...

7          THE COURT:  Well, and we may not have to if there's

8   only one other person.

9          MR. OTAKE:  That's fine.  I just raise that as a

10  concern.

11         THE COURT:  I understand the concern.  And I wasn't

12  thinking of more than six inches or so, because I was thinking

13  maybe some people could sit, you know, behind like where

14  Mr. Mermelstein is, but it just doesn't even look like it would

15  work so well, would it, you know.  Pretty tight, right?

16         MR. OTAKE:  Could they sit here, I mean here and --

17  right behind Ms. Marino or --

18         THE COURT:  Yes, yes.

19         MR. OTAKE:  I mean that might be enough.

20         THE COURT:  Right.  So if we do that, what we could do

21  is put sort of bookshelves over against this wall (indicating)

22  for defense exhibits.  You folks are going to have to figure

23  out sort of lower bookshelves probably behind here, is my

24  guess, if you're going to have more, right?

25         But I want everyone to think about -- I think Renee

 1    reached out to you, said about how many binders do you think
 2    you might have, and the reason was I was trying to figure out
 3    what this might look like.  And if we have like say 40 binders
 4    total, somewhere in that neighborhood, what I'm thinking is,
 5    first of all, I only need one set.  So, regardless of what any
 6    orders say or anything, each of you can provide me with one
 7    set, okay?  Of your own binders.
 8            And while we're at it, let me just tell you a little
 9    pet peeve of mine.  Don't overstuff binders.  Don't.  It's just
10    so annoying when you're up here and you open a binder and
11    everything falls out because they're totally overstuffed.  And
12    so try to use the smaller binders, you know, what is it,
13    three-inch or something, binder.
14            Other thing that can be very helpful is different
15    colored binders so that it's really so much easier for Renee.
16    If, you know, Mr. Bervar, you're talking about one of your
17    binders, say, Pick up the green binder.  You know, it's just so
18    much easier in trial.  You know, it's a small thing, but it
19    actually helps a lot.  So talk about that.  Talk about exhibit
20    numbering.  We don't want overlap in exhibit numbering.  You
21    know, just make sure you think through all those things as you
22    start to get ready.
23            But what I was thinking is one set for the defense of
24    everything, one set for the prosecution, one set for me.  I
25    don't know if anyone on the defense is going to have a problem

1    with that.  My thought is most people are going to be digital

2    more than hard copies anyways.

3                    (Court and law clerk conferring.)

4            THE COURT:  Right, and obviously we need a witness

5    copy.  Right, we need the original also.  And those will all be

6    sort of over here (indicating).

7            But my idea is one set, which we could put up over

8    here and you folks can obviously go to as you need.  But I

9    don't know, you know, I may hear from some people say, Judge, I

10   can't deal with it electronically, you know, and that's a

11   hardship.  I don't think we'll have more than two sets for the

12   defense side, but I can't imagine that would be required.

13           I guess another option is sort of in front of the

14   table here we could put some bookshelves and there could be a

15   second set there.

16           Thoughts?

17           MS. MARINO:  I think those are all good ideas.  At the

18   risk of incurring the Court's wrath, does the Court have a rule

19   as to when the government needs to turn over their exhibits

20   considering they have identified a lot of exhibits?

21           THE COURT:  I'm not there yet.

22           MS. MARINO:  Got it.

23           THE COURT:  I'm really not in that mindset right now.

24           Okay.  Mr. Bervar?

25           MR. BERVAR:  No.

1          THE COURT:  You're good?

2          MR. MERMELSTEIN:  My question, I guess, is the Court's

3    inclination that the exhibits are going to be digitally

4    produced as well so that folks would have access to a digital

5    copy on the computer and that's why you're saying we only need

6    one --

7          THE COURT:  Right, right.  So the way typically it

8    would work, and make sure I'm understanding at least the

9    government's case, for most exhibits you would want to display;

10    is that right, Mr. Wheat?

11          MR. WHEAT:  That's correct, Your Honor.

12          THE COURT:  Okay.  So there's a mechanism in here, as

13    I think many courts now, where Ms. Honda, when she's here, can

14    display the exhibit to everyone but the jury, right?  And then

15    there's -- foundation is laid, whatever it is, and then if I

16    admit the exhibit and it's asked to be published, then it's

17    published and the jury has it as well as counsel.  So it would

18    be on the screen in front of you as well there.  And of course

19    I don't know what you'll have on your own laptop,

20    Mr. Mermelstein, as well.

21          MR. MERMELSTEIN:  But the idea is that there's going

22    to be a digital copy of the exhibits available.  Is the

23    government -- is the inclination that the government will make

24    a digital copy --

25          THE COURT:  Well, you could do that, right?  I mean

```
 1    that should not be a hardship, should it?  Or is it?

 2            MR. WHEAT:  As I read the Court's scheduling order,

 3    that we are to give a digital copy and have a hard copy in the

 4    courtroom.  And when our exhibits are used or admitted, if the

 5    defense wanted to use those, we would certainly be amenable to

 6    calling those up.

 7            THE COURT:  Right.

 8            MR. WHEAT:  As we always have.

 9            THE COURT:  Right.  Okay?  And I always require that,

10    right, if it's one of your exhibits and they're doing a cross,

11    you know, and you're the one who's pulling it up,

12    Mr. Mermelstein, I'd ask you to pull it up, and vice versa,

13    right?  So I don't think that would be an issue.

14            So I'm thinking four alternates.  I know it's a little

15    bit early for this discussion.  I just want to have a

16    discussion while we're all here because I don't know when we're

17    going to be here again.  Does anyone have any strong feelings

18    one way or the other about four alternates?

19            Silence.  Okay.

20            So I told the jury in that initial questionnaire it's

21    going to be a two-month trial.  So we need to talk about timing

22    on this and where that looks like for the government as far as

23    how much time I'm going to give the government.  And we can

24    continue this discussion if you folks want to think about it,

25    but, you know, I'm planning a two-month trial here.
```

1          MR. WHEAT:  I think that's a good figure.

2          THE COURT:  Okay.  I mean I assume there will be a

3    substantial defense case.  I'm not discounting that.  So I want

4    to sort of try to get some sense.  I understand it's harder for

5    the defense than the prosecution because you won't know if your

6    client is going to testify now and all those sort of things, I

7    get that, but I am trying to sort of get a sense of what the

8    timing looks like.

9          For your case in chief, Mr. Wheat, what are you

10   thinking?

11         MR. WHEAT:  Your Honor, I'd say, you know, probably

12   four to five weeks.

13         THE COURT:  Okay.

14         MR. WHEAT:  And that'll depend a lot on the trial day.

15   Does the Court have an idea of what hours we'll be keeping?

16         THE COURT:  So we're going to keep as much Monday

17   through Friday as I can, 8:30 to 2:30.  And what I do, for

18   those of you who haven't tried a case before me, is we take one

19   break, 10:15 or so, sort of a pretty quick bathroom break.

20   Then around noon we have our lunch break.  I always put air

21   quotes around it because it's about 20 minutes.  And obviously

22   you have to bring your own lunch in if you're going to eat

23   lunch because -- and we'll get you rooms and so forth.  But

24   what that does is it allows everyone to be done at 2:30.  The

25   jurors like it, attorneys end up liking it a lot more because

 1   then you have the whole afternoon to prepare.  So it is a

 2   little bit shorter, but it's not that much shorter when you

 3   start adding the hours, Mr. Wheat, all together.

 4            So that's going to be sort of the daily schedule.  It

 5   also allows if there are issues we need to discuss, it allows

 6   us to discuss those, you know, at 2:30, not 4:35.  So it

 7   provides for a little more of a humane schedule, I think.

 8   Okay?

 9            So, the ability-to-serve questionnaire, right, the

10   one-page questionnaire, that's, I think, supposed to be back in

11   soon and we'll start getting distributed to you folks.  We

12   already have an order on this, right, as to the timing on all

13   of those things, right?

14            So, just so you understand my view on this, I want

15   jurors that we all believe are going to be able to serve that

16   length of time, right?  So, you know, I said that jury is going

17   through the end of April.  If there's a juror that has a trip

18   planned early May, first week of May, we don't want to bring

19   that person in, right, because it just doesn't make any sense.

20   So I'm just saying sort of think about it in the sense of let's

21   all make an effort to bring in jurors that we know would be

22   able to serve.

23            This is an ability to serve questionnaire, it's not

24   are you biassed, are you in favor of one party or the other,

25   it's can you serve.  You know, we still get certain people who

1    say I live with grandma and she has heart issues, and I'm
2    afraid of COVID.  You know, do you really want to bring that
3    person in, you know, and have them uncomfortable for a whole
4    trial.  Probably not.  So I'm saying think about being rather
5    liberal in those excuses, is what I'm trying to say.  I've had
6    trials sometimes where counsel was thinking I may not think
7    it's an appropriate excuse, so they withhold their agreement to
8    excuse, and then I say, No, no, let's let that person go.
9    Right?
10           So, you folks will get together, have an agreement as
11   to which jurors of those should be stricken.  And then if you
12   don't agree on some, you file that, and then I think we have a
13   hearing date set to have those arguments.  And then there's a
14   date by which the joint questionnaire is due.  Does anyone
15   remember what that is?  I think it got -- okay.  Thank you.
16           MS. MARINO:  The date the joint questionnaire --
17           THE COURT:  The longer questionnaire.  Right.
18           MS. MARINO:  Yeah, I think that's December 11.  The
19   second questionnaire, it's called, right?
20           THE COURT:  Yeah, right.
21           MS. MARINO:  Yes, that's December 11.  And --
22           THE COURT:  What's it say -- what's due on
23   December 11?
24           MS. MARINO:  The second questionnaire.  After a
25   mandatory meet and confer, counsel to provide the Court with a

 1   proposed agreed upon --

 2            THE COURT:  Okay.

 3            MS. MARINO:  Right?

 4            THE COURT:  Right.  Right.  Okay.  And then obviously

 5   if you have questions you don't agree upon, you know, you can

 6   submit those separately, right?  But, again, make an effort to

 7   try to agree.

 8            You know, I've done this with Mr. Wheat before.  I

 9   don't think -- well, and Mr. Bervar, we've done this before.

10   So you folks are familiar with the questionnaire we used in

11   Kealoha.

12            MR. WHEAT:  Your Honor, I'll take the laboring oar and

13   put it in the Court's format and distribute it to counsel.

14            THE COURT:  Okay.  And if you can get that out

15   earlier, you know, these sort of things, like the earlier the

16   better, right?  Just stay in front of the curve on all of this.

17            All right.  So, Mr. Otake, that table, I mean you

18   really think you can use a binder plus have a --

19            MR. OTAKE:  I was okay with it until I started hearing

20   you talk about having a monitor to see the exhibits.  So I'm

21   not sure, is that --

22            THE COURT:  Another six inches do you think would do

23   it, if we find a table about six inches more depth to it?  The

24   length is okay, right, it's just I think the --

25            MR. OTAKE:  Yeah.

1          THE COURT:  -- a little --

2          MR. OTAKE:  Yeah.

3          THE COURT:  -- lacking, sort of.

4          MR. OTAKE:  Yes, I think that would do it.  The issue

5    is, it's fine as it is if we didn't need a monitor to look at

6    exhibits.

7          THE COURT:  All right.

8          MR. OTAKE:  Thank you.

9          THE COURT:  Okay.  And to the extent any of these

10   other chairs can be used, if any of you have bad backs, you

11   know, I understand all of that and so I want to be

12   accommodating.  We're just trying to make sure we can fit.  I

13   don't know we've ever had a six-defendant trial go in this

14   courthouse.  Not in my time at least.  So I've been concerned

15   about this and been working with my staff and IT to come up

16   with something that will work.

17         Okay.  Is there anything else then to take up today?

18         MR. WHEAT:  No, Your Honor.  Thank you.

19         THE COURT:  Let's just go down the line.

20         MS. MARINO:  Thank you.  No, Your Honor.

21         MR. BERVAR:  No, Your Honor.

22         MS. LUM:  No, Your Honor.

23         MR. KENNEDY:  No, Your Honor.

24         MR. MERMELSTEIN:  No, Your Honor.

25         MR. OTAKE:  No, Your Honor.

1              THE COURT:  Okay.  Well, thank you all very much.

2    Court is in recess.

3              (The proceedings concluded at 11:52 a.m.,

4    November 7, 2023.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE

 2

 3          I, CYNTHIA FAZIO, Official Court Reporter, United

 4   States District Court, District of Hawaii, do hereby certify

 5   that pursuant to 28 U.S.C. §753 the foregoing pages is a

 6   complete, true, and correct transcript of the stenographically

 7   reported proceedings held in the above-entitled matter and that

 8   the transcript page format is in conformance with the

 9   regulations of the Judicial Conference of the United States.

10
            DATED at Honolulu, Hawaii, December 1, 2023.
11

12

13                        /s/ Cynthia Fazio
                          CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25
```