MERRICK B. GARLAND
Attorney General
MICHAEL G. WHEAT, CBN 118598
JOSEPH J.M. ORABONA, CBN 223317
JANAKI G. CHOPRA, CBN 272246
COLIN M. MCDONALD, CBN 286561
ANDREW Y. CHIANG, NYBN 4765012
Special Attorneys of the United States
880 Front Street, Room 6293
San Diego, CA 92101
619-546-8437/7951/8817/9144/8756
michael.wheat@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT
### DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> KEITH MITSUYOSHI KANESHIRO (1), <br> DENNIS KUNIYUKI MITSUNAGA (2), <br> TERRI ANN OTANI (3), <br> AARON SHUNICHI FUJII (4), <br> CHAD MICHAEL MCDONALD (5), <br> SHERI JEAN TANAKA (6), <br><br> Defendants. | CR. NO. 22-00048-TMB-NC <br><br> UNITED STATES' TRIAL BRIEF <br><br> Trial Date: March 12, 2024 <br> Time: 9:00 a.m. <br><br> Honorable Timothy J. Burgess |

The United States, through its counsel, Merrick B. Garland, Attorney General,

and Michael G. Wheat, Joseph J.M. Orabona, Janaki G. Chopra, Colin M. McDonald,

and Andrew Y. Chiang, Special Attorneys of the United States, hereby files its Trial

Brief in this case.

I

## STATEMENT OF THE CASE

### A.   THE INDICTMENT

The First Superseding Indictment ("FSI") alleges two crimes against all defendants. Count 1 charges a conspiracy to commit offenses against the United States, namely (1) honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and (2) two forms of federal program bribery in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2). Count 2 of the FSI charges a conspiracy against rights, in violation of 18 U.S.C. § 241. Section 241 makes it a felony to "conspire to injure, oppress, threaten, or intimidate any person in any State, . . . in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same[.]" 18 U.S.C. § 241. The rights implicated in Count 2 are (1) the right under the Fourth and Fourteenth Amendment to be free from unreasonable seizures by one acting under color of law; and (2) the right to file a lawsuit in federal court alleging claims under Title VII and the ADEA.

### B.   TRIAL STATUS

A jury trial is scheduled to begin on March 12, 2024, at 9:00 a.m. Following jury selection, opening statements are expected to begin on or about March 15, 2024. The United States estimates its case-in-chief will last approximately 20 full trial days.

2

C.    DEFENSE COUNSEL

Birney B. Bervar is retained to represent Defendant Kaneshiro; Nina Marino is retained to represent Defendant Dennis Mitsunaga; Doris Lum has been retained to represent Defendant Terri Ann Otani; Andrew M. Kennedy has been retained to represent Defendant Aaron Fujii; Thomas Otake has been retained to represent Defendant Chad McDonald; and Mark Mermelstein is retained to represent Defendant Sheri Jean Tanaka.

D.    CUSTODY STATUS

All defendants are currently on pretrial release pending trial.

E.    JURY WAIVER

Defendants have not filed a jury waiver, and none are anticipated.

F.    PRESENTATION OF EVIDENCE

The United States will utilize PowerPoint for its opening statement and closing arguments, and Trial Director, a computer-based evidence presentation system, to publish its trial evidence. The United States' anticipated trial exhibits include video and audio recordings. For jury deliberations, the United States requests that a stand-alone monitor with speakers be provided to the jury for its use. The United States is prepared to provide such technology as necessary.

G.    PRE-TRIAL RULINGS

During the course of this case, the Court has denied the following motions:

- Motion for bill of particulars. ECF No. 112.

- Motion for partial dismissal based on the statute of limitations. ECF No. 168.
- Motion to strike surplusage. ECF No. 169.
- Motion to dismiss the complaint, raising the following issues: "One, does 18 U.S.C. § 241 encompass the right to file a lawsuit in federal court? Two, is § 241 unconstitutionally vague, as applied to Defendant Tanaka?[1] And three, does the FSI sufficiently allege a seizure under the Fourth Amendment?" ECF No. 195.
- Motion to dismiss the complaint on the grounds that it "fails to allege an explicit quid pro quo 'that preceded and controlled the delivery of the official act by the public official.'" ECF No. 218.
- Motion to dismiss based on allegations of prosecutorial misconduct and substantive joinders to the motion to dismiss. ECF No. 315.

In resolving these motions, the Court has made the following rulings, among others:

First, the right to file a lawsuit under Title VII and the Age Discrimination in Employment Act ("ADEA") is a specific right covered by 18 U.S.C. § 241. ECF No. 195 at 9–13.]

Second, the FSI sufficiently pleads that the Defendants conspired to injure, oppress, threaten, or intimidate L.J.M. of her right to be free from unreasonable seizures by one acting under color of law. ECF No. 195 at 15–17. In particular, the Court noted that § 241 "charges a *conspiracy*, not a substantive offense. And to be convicted under § 241, the object of the offense (a violation of LJM's Fourth Amendment rights) need not in fact ever happen." *Id.* at 16. And the Court found

---

[1] With respect to an "as-applied" challenge incorporated in Issue No. 2, as is common for such a question, the Court deferred that fact-driven argument to trial. ECF No. 195 (citing *United States v. Bychak*, 2021 WL 734371 (S.D. Cal. Feb. 25, 2021)).

that "it is reasonable to infer that the prosecution of an individual (in return for campaign contributions) could have been intended to result in an unlawful incarceration, a clear Fourth Amendment seizure." *Id.*

Third, that claims of prosecutorial misconduct were "separately and collectively" "overblown." ECF No. 315 at 11.

### H.    PENDING RULINGS

Motions *in Limine* are currently scheduled to be heard on Monday, February 26, 2024. Defendant Tanaka's motions to sever and continue the trial date are also scheduled to be heard on February 26.

### I.    STIPULATIONS

Defendant Kaneshiro has stipulated that the four pages of handwritten notes, on lined paper, concerning L.J.M. (Laurel J. Mau) ("Mau") were written by Mr. Kaneshiro. *See* ECF 369. The United States anticipates proposing additional stipulations to streamline the presentation of evidence at trial and focus the issues for the jury, such as foundation of certified records, transcripts, and recordings. If the anticipated stipulations are reached, several records custodians and court reporters will not need to testify.

### J.    DISCOVERY

The United States has produced substantially more evidence than was required under the discovery rules, and will continue to comply with its statutory and constitutional discovery obligations.

5

K.    RECIPROCAL DISCOVERY

The United States has requested reciprocal discovery from the defendants on several dates, including July 11, 2022, July 28, 2022, September 19, 2022, December 7, 2022, March 29, 2023, September 12, 2023, October 2, 2023, December 22, 2023, January 16, 2024, January 17, 2024, and January 19, 2024. As of today, the United States has only received reciprocal discovery from Defendant Kaneshiro. No other defendant has provided reciprocal discovery. The United States requests that the Court exclude any evidence at trial that was not properly provided to the United States under Rule 16(d)(2). *See, e.g., United States v. Swenson*, 298 F.R.D. 474, 478 (D. Idaho 2014) ("Exclusion of documents or materials Defendants have failed to produce is the most serious of the sanctions available under Rule 16(d)(2). However, in the circumstances of this case, the Court would be justified in imposing this sanction. Despite the unchallenged Procedural Orders, Defendants have unreasonably refused to provide reciprocal discovery. They have enjoyed the benefit of the Government's generous production without the burden of reciprocating. The Government was entitled to rely on the reciprocal discovery elections of each Defendant and did so when complying with its own discovery obligations.").

Of specific importance is reciprocal discovery pertaining to the defendants' anticipated advice of counsel defense. As of February 16, 2024, the parties have exchanged, and met and conferred regarding, proposed jury instructions. Through this process, the United States learned that the defendants anticipate advancing an advice

of counsel defense. The United States has not, however, received any affirmative waiver of the attorney-client privilege or reciprocal discovery from the defendants regarding this defense. The case law concerning this defense suggests that it is prudent to address the contours of a waiver of the privilege and discovery concerns prior to trial to avoid undue mid-trial delay. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991) (a party may not invoke privilege "to prejudice his opponent's case or to disclose some selected communications for self-serving purposes"). To be sure, courts have held that "[w]here a party raises a claim which in fairness requires disclosure of the protected communication, the privilege may be implicitly waived." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992); *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) (work product privilege is also waived). The reason for this waiver is based in fundamental fairness – the attorney-client privilege may not be "used both as a sword and a shield." *Chevron Corp.*, 974 F.2d at 1162.

As a result, defendants should not be permitted to rely on an advice of counsel defense without a formal waiver of the attorney-client privilege as to that same topic, and appropriate reciprocal discovery to allow the United States to sufficiently rebut such a defense. Otherwise, defendants would be permitted to use the privilege as "both a sword and shield." So, for example, defendants should not be permitted to elicit testimony that they or their co-conspirators took steps, or thought that their conduct was lawful, based on what their attorney told them or documents their attorney

7

prepared. If defendants were allowed to present this evidence, they would have all the benefits of an advice of counsel defense – *i.e.*, arguing that they counted on counsel to steer them in the "right" direction, and therefore could not have had the intent to commit the charged crimes – without having to waive the privilege or meet the legal requirements for the defense.

In sum, because they have not waived privilege or produced appropriate reciprocal discovery, defendants should not be permitted to argue or present evidence that their conduct was legal because they and/or their co-conspirators consulted with an attorney.

## II

## STATEMENT OF FACTS

### A.   LAUREL MAU IS FIRED

Mitsunaga & Associates, Inc. ("MAI") is a large engineering and architectural firm in Honolulu, responsible for major development projects in the State of Hawaii. For fifteen years, and up through November 10, 2011, Laurel J. Mau worked for MAI as an architect specializing in interior design work. During her fifteen years with MAI, Mau received no written reprimands or counseling about her work. During the summer of 2011, Mau met with Defendant Dennis Mitsunaga, the principal of MAI, regarding her long-time employment at his firm. Mau had not received a raise in four years, and wanted to discuss her status and future at MAI, so that she could make her own evaluation and decision about her employment there.

During the meeting Mau asked for a raise, but it was not in the context of an ultimatum; Mau wanted to see whether Mitsunaga valued her services enough to give her a raise. Mitsunaga said that he would think about it and get back to her.

After about four months, on November 2, 2011, Mitsunaga replied through a letter, delivered by his trusted cousin Defendant Terri Ann Otani. *See* ECF No. 390-1 (Mitsunaga's letter to Mau). That letter was harshly critical of Mau, but stated that Mau would receive a $5/hour raise, among other things.

Mau was shocked by Mitsunaga's letter. Because it contained several inaccuracies, Mau prepared a detailed response, with supporting documentation. *See* ECF No. 390-2. Included in Mau's response were references to an ugly incident directed against Mau by her then supervisor, Steven Wong. In 2000, Wong and other male employees at MAI created and then distributed a series of emails containing images of Mau's face superimposed onto photographs depicting the bodies of scantily clad women. In addition, Wong also sent Mau a collection of medical facility brochures advertising breast augmentation and reconstruction suggesting her need for the services. Not surprisingly, Mau complained to Mitsunaga about this conduct. Wong was removed as Mau's supervisor, but not terminated. In addition, in October of 2004, to ameliorate the harm done to Mau by MAI employees, Mitsunaga gave Mau paid parking, a cellphone, and a gasoline card for use with her personal vehicle. Mau's cellphone, unlike others who were issued/given company phones (those not harassed), was not given to her exclusively for MAI business, but

9

as compensation for the sexual harassment she endured at the hands of Mitsunaga's employees.

Mau hand delivered her response letter on the morning of November 10, 2011, by handing it to MAI's receptionist, Lynn Taguchi, and asked her to put it in Mitsunaga's inbox, which Ms. Taguchi did. Upon leaving for lunch, Mau noted that her letter was gone from Mitsunaga's inbox.

Several hours later, Mau was abruptly terminated. Although Mau repeatedly asked, orally and in writing, for a reason for her termination, none was given, except that her services were no longer needed. An MAI employee, Robert Sakuda, was told to videotape Mau at her desk while she cleaned up. Mau was not told why she was being videotaped. Mau was filmed in the office, in the garage, and as she drove from the parking structure.

## B.   MAI'S BURGEONING MALICE TOWARDS MAU

After Mau's termination she applied for unemployment benefits from the State of Hawaii. Primarily headed by Defendant Tanaka, MAI contested Mau's employment benefits by claiming that she had performed "side jobs" on company time. The initial unemployment examiner found in Mau's favor. MAI then appealed the examiner's decision to an administrative hearing officer, who held a hearing, took evidence, and then affirmed the examiner's decision in favor of Mau. According to the Unemployment Appeals' Officer, Carole Richelieu, the case was "infamous" within the unemployment office for how it would "never die." Richelieu

had "never received so much documentation" from an employer before (a foreshadowing of the 1,800 pages of exhibits the defendants—led by Defendant Tanaka—cobbled together to support Mau's felony information packet several years later). According to Richelieu, it was "obvious" that "everything was scripted on behalf of the employer." Based on her first-hand observations, Richelieu perceived that MAI was "picking on" Mau.

MAI was not deterred by Richelieu's decision and appealed again to the Hawaii Circuit Court (Case No. 12-1-0523-02). That case continued until September 6, 2012, when the Circuit Court affirmed Mau's entitlement to benefits. In all, Defendants' efforts to keep Mau from unemployment benefits spanned from November 2011 until September 2012.

## C.   THE RETALIATION TAKES OFF

Throughout the unemployment litigation, it became increasingly apparent that Mau would file a civil lawsuit against MAI. She initiated the steps necessary to sue MAI in federal court on the basis of sex and age discrimination under Title VII and the ADEA. And on June 14, 2012, for instance, the EEOC sent Mau—copying MAI—a "Notice of Right to Sue" letter. ECF No. 390-5.

About 30 days later, on July 17, 2012, Defendant Fujii reported an alleged "theft" to the Honolulu Police Department ("HPD"). See First Superseding Indictment ("FSI") ¶ 9. When the beat officer arrived to log the report, Fujii provided the officer a 17-page memorandum titled "THEFT COMPLAINT AGAINST

STANFORD MASUI AND LAUREL MAU." *See* ECF No. 390-6 8–24. Masui is a Honolulu-based attorney. He did not know until 2021 that MAI had filed a police report against him. Masui's only connection to MAI was that he had filed a civil complaint against MAI (and Mau). Masui's in-laws (Mr. and Mrs. Loo) wanted work done on their home. Mau had volunteered to help with the renovations. Mau helped in three primary ways: (1) referring Masui to an architect who drew up the renovation plans; (2) referring Masui to a general contractor; and (3) applying for the required building permits. Mau did not receive compensation for her help. When the project went awry, Masui sued various parties, including Mau and MAI. Among other things, Masui claimed a belief that Mau was acting as an employee of MAI in rendering her help, so he included MAI in the lawsuit.

Even while Masui's case was a garden variety civil lawsuit, MAI (through Defendant Fujii) took the dramatic step of lodging a police report alleging criminal theft against Masui and Mau—MAI's then-courtroom adversaries in two separate cases (Masui's lawsuit and Mau's employment lawsuit). The tangled "theft" theory Fujii espoused in his report to HPD boiled down to this: that Mau was working an unauthorized side job; that she did so while on MAI's time and using MAI's equipment like its email account and cell phone; and that Mau and Masui stood to benefit at MAI's expense.

Multiple times in the "affidavit," Mau and Masui are listed as "suspects." The report says that "FUJII, V.P. of [MAI], is willing to prosecute." Fujii's complaint

against Masui and Mau is replete with references to their alleged thievery—including, for instance, that "[t]he agreement between S Masui and [Mau] was intentionally done in secrecy without the knowledge or approval of MAI for both their financial advantage at the expense of MAI."

After filing the police report, Fujii simply walked away. Despite efforts by HPD Detective Snoops to follow-up, Fujii did not cooperate, satisfied with the paper trail laid against MAI's courtroom adversaries, content to leave them to deal with whatever consequences might result. Later, MAI would falsely claim that Detective Snoops told MAI to bypass him and go straight to the Prosecutor's Office.

### D.   THE CONSPIRACY TAKES SHAPE

On August 20, 2012, four weeks after Fujii filed the police report against Mau and Masui, Mau filed her employment discrimination lawsuit against MAI in federal court. Masui's lawsuit against MAI resulted in him and Mau being maliciously named in a police report. But Mau's lawsuit sparked an even more malicious response from MAI.

Within several weeks of the filing of the lawsuit, on September 28, 2012, MAI started angling to have Mau prosecuted by Kaneshiro's office. On that day, Carol Nakamura—Kaneshiro's assistant and closest confidant—emailed Defendant Terri Ann Otani, the following: "Hi Terri: I received a call from Councilmember Ann Kobayashi this morning regarding a meeting with Keith and Dennis. Keith is happy to meet with him. Please give me a call so that I can get a little more information."

On October 1, 2012, Otani emailed Nakamura select "info" "prior to Dennis' meeting with Keith." The email stated in part, "Laurel J. Mau – Theft 1st degree," and listed the case number for the HPD report filed by Fujii, discussed above.

Kaneshiro, Mitsunaga, and Tanaka then met on October 4, 2012, at which time Mitsunaga personally requested that Kaneshiro prosecute Mau for theft because she purportedly stole from MAI by performing side jobs on the clock.

Thus began a courtship in which the two men—Mitsunaga and Kaneshiro—or their assistants, routinely met, lunched, spoke, or corresponded with one another about the Laurel Mau case. On multiple occasions, Kaneshiro requested information about Mau from MAI's attorney, Tanaka, directly. This was an unprecedented relationship. Of the thousands of cases prosecuted by Kaneshiro each year, Laurel Mau's file was one of only "half a dozen or less" cases of interest kept in Kaneshiro's secretary's filing cabinet.

E.    THE FLOW OF MONEY

Although no prosecutor would believe felony charges were appropriate for minor workplace disputes, Mitsunaga was willing to dispense cash—lots of it. Within a month of that meeting, Mitsunaga tapped into his network of employees, relatives, and business associates, and for the first time, began funneling substantial and disproportionate amounts of money to Kaneshiro disguised as campaign contributions. These contributions were bundled, delivered together, and recorded on the same dates—proof of a coordinated effort within MAI to transfer as much

14

money to Kaneshiro as possible while making the transfers appear legitimate and to make sure he knew where the money was coming from, Mitsunaga.

For instance, on October 25, 2012, just three weeks after their meeting to discussion prosecuting Mau, the Kaneshiro campaign reported eight donations. Of those eight, five came directly from MAI:

- Defendant Dennis Mitsunaga - $4,000 (the maximum amount permitted)
- Chan Mitsunaga (Dennis's wife) - $4,000
- Glen Okino[2] - $4,000
- Defendant Aaron Fujii - $1,000
- Defendant Sheri Tanaka - $250

Beginning with this batch of donations in October 2012, Mitsunaga became a prolific Kaneshiro contributor. To skirt state contribution limits, Mitsunaga's family members, employees, and associates, joined together to amplify his spending. In the ensuing four years, the Hawaii Campaign Spending Commission reported grouped contributions from MAI employees, relatives, and associates, on six specific dates: October 25, 2012; January 28, 2013; April 3, 2013; November 26, 2013; October 22, 2015; and October 19, 2016. These contributions were extremely disproportionate, accounting for roughly 40% of all contributions that Kaneshiro received in those years (nearing $50,000).

---

[2] Okino is in business with Dennis Mitsunaga, contributed to different political campaigns at Mitsunaga's request, and recruited other subcontractors to donate as well.

Mitsunaga's sprawling contribution apparatus depended on his exertion of pressure on others within MAI's business orbit—affiliates, subcontractors, and vendors—to contribute to political candidates of Mitsunaga's choosing. One of Mitsunaga's business partners complied with numerous requests from Mitsunaga to donate to politicians in Hawaii—including to Kaneshiro. Mitsunaga specified how much this business partner was required to give, and also ordered him to pressure their subcontractors to make political contributions, as well. One of these subcontractors described the culture of expected political expenditures as follows: "we were doing work with Mitsunaga, and it was pretty much sort of understood that, you know, if you want to continue doing or have the opportunity to bid on their project, that it was expected of you."

Defendants Fujii and Otani acted as Mitsunaga's lieutenants and applied the pressure on his behalf, as well. Both of them reached out to smaller vendors who did business with MAI and demanded that they contribute to political candidates of Fujii and Otani's choosing, including to Kaneshiro. These were not requests for voluntary contributions. One such vendor questioned the legality of what he was doing but nonetheless complied out of fear of losing MAI's business.

F.    THE QUID PRO QUO

Kaneshiro's response to the sudden flow of MAI largesse pulled back the curtain on the defendants' *quid pro quo* agreement. Despite no real investigation by the police department, Kaneshiro convened a meeting with MAI's attorney, Tanaka,

16

and in her presence, made a show of directly assigning the Mau case to two of his best employees: a respected fraud prosecutor (who would one day replace Kaneshiro as head of the office) and an investigator with 27 years of experience as an FBI agent.

Unfortunately for the conspirators, these officials took their jobs seriously. They conducted a thorough investigation, and in investigative reports and a legal memorandum, concluded Mau did not commit a crime. What Kaneshiro did next further revealed the *quid pro quo* agreement. Rather than close out the case, he pivoted and reassigned it to a junior attorney who had only been in the office four months. And this junior prosecutor, despite having reservations about the evidence, obeyed direct orders to bypass the grand jury and charge the case using a felony information process he knew would confuse the screening judge. Indeed, the nearly two thousand pages he submitted with the felony information had been created and handed over by Tanaka, McDonald, Otani, and Fujii themselves, with no law enforcement investigation. The junior prosecutor also did not know about the financial relationship between Kaneshiro and the MAI defendants.

After Kaneshiro got an arrest warrant issued for Mau, three of the MAI defendants, Tanaka, McDonald, and Otani, went down to courthouse to watch Mau's arraignment and humiliation. After the hearing, Tanaka stood outside the courtroom with a camera as Mau departed.

As Mau's attorneys began to investigate the allegations and talk to witnesses, they discovered that some of the witnesses had been interviewed by a prosecuting

attorney's investigator—the former FBI agent who found no crime. When the attorneys' confronted the newest prosecutor assigned to the case, Chasid Sapolu, he was unaware of the prior investigative reports or the prior prosecutor's declination.

G.    RELATIONSHIP BETWEEN CIVIL CASE AND CRIMINAL CASE

Mau's federal civil case ended in a wash. The civil jury returned a verdict against Mau on her claims of workplace discrimination. But, more importantly here, the civil jury also rejected MAI's several counterclaims against Mau, awarding MAI a solitary dollar on its breach of loyalty counterclaim while returning a verdict for Mau on the remaining counterclaims. Despite this fact, the defendants repurposed their failed civil claims and converted them into felony theft charges. Drawing from the same pool of evidence that failed to convince a civil jury of Mau's improprieties, and relying on similar legal theories of fraud, the defendants alleged in the criminal case that Mau "stole" from the company by using MAI's email account and phone to do her side jobs and by submitting inaccurate time sheets.

Years later, the Circuit Court judge who dismissed the criminal charges against Mau for lack of probable cause underscored that Kaneshiro was "little more than acting as the recipient of, and conduit for, MAI's submissions." Against Kaneshiro's wishes, both his division chief and appellate chief refused to appeal the dismissal, because the judge's findings were not contestable. What was more, one of Mau's supposed "victims" came to the grand jury and testified that facts attributed to him were not true. In fact, he expressed surprise he was ever named a victim,

18

because he did not believe he was a victim, nobody notified him he was a victim, and he did not think Mau committed a crime against him.

H.    THE MALICIOUS TAX INVESTIGATION REFERRAL

On August 7, 2014, after the conclusion of the civil trial in July 2014 and before the filing of criminal charges in December 2014, the MAI defendants opened yet another front against Mau. Defendant Otani, from her MAI email, and as "Corporate Secretary" for MAI, emailed a complaint to the State of Hawaii Department of Taxation, with the subject line "[Mau] – Alleged Tax Evasion/Fraud." A letter attached to the email, on MAI letterhead and signed by Otani, states in part that "[Mau] was terminated and a further investigation revealed that she received payment from these 'side job' clients, but failed to report the income on her taxes." Otani's referral sparked a formal audit and investigation into Mau by the Department of Taxation. Mau was thereafter subjected to an investigation into her financial activity and tax compliance. Notably, Otani did not inform the investigator that MAI and Mau had just completed a civil lawsuit against each other. According to the investigator, that sort of information was something he would have investigated because it made the tax referral look malicious. For several months, Mau was subjected to an invasive tax investigation—she was formally advised that she was under investigation, her records were pulled, she was interviewed, among other things. After several months, on October 6, 2014, the Department of Taxation closed the case, finding no improprieties in Mau's file.

19

I.      MAU'S CASE IS DISMISSED FOR LACK OF PROBABLE CAUSE
        AND DUE PROCESS CONCERNS

As referenced above, after multiple years, Mau's criminal case came to an end

in 2017. At a hearing in July 2017, Judge Nakasone orally dismissed the four theft

charges against L.J.M. for "lack of probable cause." Judge Nakasone also voiced

grave concerns about the "unusual" role that Defendant Sheri Tanaka (MAI's

attorney) played in the criminal investigation:

> The investigation here is also unusual on the fact that the attorney for
> the complainant in Counts 1 and 2, Mitsunaga, appears to have
> orchestrated the vast majority of the investigation in terms of preparing
> and retrieving declarations and/or affidavits of persons supporting the
> complainant's version of events. . . . And the prosecutor investigated
> participation was little more than acting as the recipient of the
> complainant's submissions. Especially telling were the selective
> transcript pages that were provided in the information. . . . So the Court
> also found it very unusual that these isolated statements were supplied
> as exhibits in a highly selective fashion comprising the record of
> evidence supporting the indictment. Other than the complainant
> Mitsunaga's own in-house investigation, no independent outside
> investigatory body appears to have been consulted.

ECF No. 383-1 at 11-12. Two months later, in September 2017, Judge Nakasone

produced a written order which affirmed her prior oral findings. ECF No. 346-1.

After receiving the written order, the deputy prosecutor, acting on Kaneshiro's

orders, drafted a memorandum recommending that the office appeal to a higher

court. FSI ¶ 22(51). Pursuant to office procedures, however, the Chief of Appeals

and the Chief of the Career Criminal Unit had to sign off on the appeal. After reading

Judge Nakasone's written decision, they refused.

III

## WITNESSES

The United States will submit its witness list in a separate pleading.

IV

## EXHIBITS

As directed by the Court, an exhibit list will be filed with the Court on February 27, 2024.  Also, exhibits will be pre-marked and provided to the Court in accordance with the Court's scheduling order. In summary, the United States intends to offer evidence related to the following categories of exhibits:

1. <u>Telephone Records</u> – charts and summaries of telephone records pertaining to defendants.

2. <u>Audio</u> – audio recordings of statements made by defendants or co-conspirators.

3. <u>Transcripts</u> – certified transcripts containing prior sworn testimony of defendants or co-conspirators.

4. <u>Email Records</u> – email records pertaining to defendants and witnesses.

5. <u>Photographs</u> – photographs of defendants, witnesses, and relevant places and events.

6. <u>Business Records</u> – bank statements, checks, and summary charts.

7. <u>Video recordings</u> – including of Mau's initial appearance in her state criminal case.

8. <u>Public records</u> – records from court proceedings in federal court, state court, and agency proceedings.

21

V

<u>LEGAL ISSUES</u>

A.    <u>ESSENTIAL ELEMENTS AND RELEVANT CASE LAW</u>

    1.    *Conspiracy Law*

The defendants are charged in Counts 1 and 2 of the indictment with conspiring to do other specified crimes. A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed. *United States v. Iribe*, 564 F.3d 1155, 1160-61 (9th Cir. 2009) (holding that conspiracy to commit a crime "does not require completion of the intended underlying offense.").

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) ("The agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture."). The agreement need not be explicit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence. *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) ("An agreement to commit a crime can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence."); *United States v. Gonzalez*, 906

22

F.3d 784, 792 (9th Cir. 2018) (noting that tacit agreement is sufficient for conspiracy conviction). A conspiracy may exist even if some members of the conspiracy cannot complete the offense, so long as the object of the conspiracy is that at least one conspirator complete the offense. *Ocasio v. United States*, 578 U.S. 282, 286-92 (2016).

A person may be a member of a conspiracy even though the person does not know all of the purposes of or participants in the conspiracy. *United States v. Escalante*, 637 F.2d 1197, 1200 (9th Cir. 1980); *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977). A single conspiracy can be established even though it took place during a long period of time during which new members joined and old members dropped out. *United States v. Green,* 523 F.2d 229, 233 (2d Cir. 1975). *See also United States v. Perry*, 550 F.2d 524, 528 (9th Cir. 1997) (holding that law of conspiracy does not require government "to prove that all of the defendants met together at the same time and ratified the illegal scheme"); *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978) (holding that proof that defendant "knew he was plotting in concert with others to violate the law was sufficient to raise the necessary inference that he joined in the overall agreement").

2. *Conspiracy to Commit Offense Against U.S. – 18 U.S.C. § 371*

In order for a defendant to be found guilty of the crime of conspiring to commit an offense against the United States as stated in Count 1 of the indictment, the government must prove each of the following elements beyond a reasonable doubt:

1. First, beginning as early as October 2012, and continuing no later than

23

October 2017, there was an agreement between two or more persons to commit at least one of the crimes as charged in the indictment;

2.   Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3.   Third, at least one overt act was taken on or after June 2, 2017, for the purpose of carrying out the conspiracy.

Ninth Circuit Model Jury Instruction No. 11.1 (2022 ed.) (modified).

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. *United States v. Mackey*, 652 F.Supp.3d 309, 329 (E.D. N.Y. 2023) (finding, in a prosecution brought under 18 U.S.C. § 241, that reasonable jury could find that innocent, yet foreseeable, acts of third party "unwittingly furthered the ends of the conspiracy against [individuals'] right to vote. It is of no import that those [third parties] were unaware of the conspiracy, so long as the conspirators caused them to [act] and their doing so furthered the objects of the conspiracy."). The government is not required to prove that each defendant personally did one of the overt acts. *See*, e.g., *United States v. Gonzalez*, 786 F.3d 714, 718-19 (9th Cir. 2015) ("so long as jurors in a federal criminal trial unanimously agree that the Government has proven each element of a conspiracy, they need not unanimously agree on the particular overt act that was committed in furtherance of the agreed-upon conspiracy"). The jury need not unanimously agree on a particular overt act that was committed in furtherance of the agreed-upon conspiracy. *Id.*

24

The overt act can be performed by a single conspirator or by an innocent third party, if the third party is acting at the direction of a member of the conspiracy or if the third party's act is caused or induced by a previous act or contact by a member of the conspiracy and results in furthering the conspiracy. *Winebrenner v. United States*, 147 F.2d 322, 326 (8th Cir. 1945) (in a prosecution for conspiracy to defraud the United States under 18 U.S.C. § 371, finding that innocent act by third party that was "induced" by the defendant was an overt act in furtherance of conspiracy to establish venue); *United States v. Johnson*, 165 F.2d 42, 45 (3d Cir. 1947) (noting that: "[I]t is not necessary that an overt act in furtherance of conspiracy necessarily be a criminal act.  An innocent act by a third party, if caused by previous act or contact on the part of one of the conspirators, would be enough. Therefore, the filing of the trustee's report above referred to, while itself a perfectly legal act, may be an overt act in furtherance of a conspiracy if such filing is part of the general plan of the conspirators with regard to the subject-matter in which the report is filed."); Wayne R. LaFave, Criminal Procedure § 16.2(g) (5th ed. 1992).

Conspiracy to commit a crime "does not require completion of the intended underlying offense" or object of the conspiracy. *United States v. Uribe*, 564 F.3d 1155, 1160-61 (9th Cir. 2009).  The Court must instruct the jury on the elements of the underlying offenses which are objects of a conspiracy under § 371. *United States v. Alghazouli*, 517 F.3d 1179, 1189 (9th Cir. 2008).

There are three crimes charged as objects of the conspiracy under § 371 as charged in Count 1 of the indictment: (1) honest services fraud; (2) federal program bribery (giving a bribe); and (3) federal program bribery (receiving a bribe).

(A)    Honest Services Fraud

The first crime involves honest services wire fraud. This crime has the following elements:

1.    First, the defendant devised or knowingly participated in a scheme or plan to deprive the citizens of the City and County of Honolulu of their right to the honest services of defendant Keith Kaneshiro;

2.    Second, the scheme or plan consisted of a bribe in exchange for the services of defendant Keith Kaneshiro. The "exchange" may be express or may be implied from all the surrounding circumstances;

3.    Third, defendant Keith Kaneshiro, as the Prosecuting Attorney for the City and County of Honolulu, owed a fiduciary duty to the citizens of the City and County of Honolulu;

4.    Fourth, the defendant acted with the intent to defraud by depriving the citizens of the City and County of Honolulu of their right of honest services of defendant Keith Kaneshiro;

5.    Fifth, the defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing an act by defendant Keith Kaneshiro;

26

6.      Sixth, there was a clear and unambiguous quid pro quo—that is, an agreement involving a specific intent to give or receive a thing of value (campaign contributions) in exchange for an official act (investigating and prosecuting Laurel J. Mau); and,

7.      Seventh, the defendant used, or caused someone to use, an interstate wire communication to carry out or to attempt to carry out the scheme or plan.

Ninth Circuit Model Jury Instr. Nos. 4.13, 15.34 and 1535 (2022 ed.) (modified).

The government is not required to prove that the defendant knew his or her acts were unlawful. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid. (That is frequently the defense asserted to a criminal bribery charge – and though it is never valid in law, it is often plausible in fact.)").

"Bribery" involves a corrupt agreement to exchange a thing of value for official action by a public official, in other words, a clear and unambiguous *quid pro quo*. The public official and the payor need not state the exchange in express terms. Rather, the intent to exchange may be established by circumstantial evidence, based on the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them. *See* Title 18, U.S.C., § 201(b)(2) (bribery includes a public official

soliciting or accepting a thing of value "personally or for any other person or entity..."); Title 18, U.S.C., § 666(a)(1)(B) (bribery for government agent to solicit or demand a thing of value "for the benefit of any person..."); *see also* published jury instructions discussing honest services fraud and bribery in: (1) *United States v. Renzi et al.*, 08-cr-00212-DCB-BPV, ECF 1225, at 22-24 (D. Ariz., June 6, 2013); (2) *United States v. Lindberg et al.*, 19-cr-00022-MOC-DSC, ECF 168, at 12-17 (W.D.N.C., Feb. 20, 2020); and (3) *United States v. Quintanilla et al.*, 19-cr-00522, ECF 389 at 10-14 (S.D.T.X., October 10, 2022).

The public official and the payor need not state the exchange in express terms. Rather, the intent to exchange may be established by circumstantial evidence, based on the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.  *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999).

A clear and unambiguous *quid pro quo* means there is no uncertainty about the terms of the agreement. *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992). When a contributor and a public official understand the terms of an agreement to exchange official action for money, they have engaged in a clear and unambiguous *quid pro quo*, and this understanding need not be verbally explicit. *See, United States v. Inzunza*, 638 F.3d 1006, 1014 (9th Cir. 2011); *see also United States v. McCormick*, 500 U.S. 257, 273 (1991); *Evans v. United States*, 504 U.S. 255, 268 (1992).

28

Bribery also includes a public official's solicitation of or agreement to accept a thing of value in exchange for official action, whether the payor actually provides the thing of value, and whether or not the public official ultimately performs the requested official action. *See, United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) ("[I]t is neither material nor a defense to bribery that had there been no bribe, the (public official) might, on the available data, lawfully and properly have made the very recommendation that (the briber) wanted him to make.").

The government need not prove that the thing of value caused the public official to change his position. It is not a defense that a public official would have lawfully performed the official action anyway, or that the official action was lawful, desirable, or even beneficial to the public. *United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (a "valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability"). The crime of honest services fraud is not concerned with the wisdom or results of the public official's decisions, but rather with the manner in which the public official makes his decisions. *Id.*

A "fiduciary" duty exists whenever one person or entity places special trust and confidence in another person—the fiduciary—in reliance that the fiduciary will exercise his or her discretion and expertise with the utmost honesty and forthrightness in the interests of the person or entity, such that the person or entity relaxes the care and vigilance that he or she would ordinarily exercise, and the

fiduciary knowingly accepts that special trust and confidence and thereafter undertakes to act on behalf of the other person or entity based on such reliance. *See, e.g. United States v. Milovanovic*, 678 F.3d 713, 721 (9th Cir. 2012) (en banc).

A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use. *See, United States v. Cusino*, 694 F.2d 185, 188 (9th Cir. 1982). It need not have been reasonably foreseeable to the defendant that the wire communication would be interstate in nature. Rather, it must have been reasonably foreseeable to the defendant that some wire communication would occur in furtherance of the scheme, and an interstate wire communication must have actually occurred in furtherance of the scheme. *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) (Actual path of the transmission demonstrates interstate commerce).

(B)     Federal Program Bribery (Giving a Bribe)

The second crime involves giving a bribe to an agent of a program receiving federal funds. This crime has the following elements:

1.     First, defendant Keith Kaneshiro was an agent of the City and County of Honolulu;

2.     Second, that the City and County of Honolulu was a local government that received in a one-year period benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance;

3.      Third, the defendant corruptly gave, offered, or agreed to give money to defendant Keith Kaneshiro with the intent to influence defendant Keith Kaneshiro in connection with any business, transaction, or series of transactions of the City and County of Honolulu;

4.      Fourth, that the business, transaction, or series of transactions involved anything of value of $5,000 or more; and,

5.      Fifth, there was a clear and unambiguous quid pro quo—that is, an agreement involving a specific intent to give or receive a thing of value (campaign contributions) in exchange for an official act (investigating and prosecuting Laurel J. Mau).

*See* Eighth Circuit Model Jury Instr. No. 6.18.666B and 6.18.666C (ed. 2022) (Giving a Bribe and Receiving a Bribe); *United States v. Bynum*, 327 F.3d 986, 991 (9th Cir. 2003) (discussing 18 U.S.C. § 666).

For purposes of Section 666(a)(2) the term "corruptly" means that the defendant acted voluntarily and intentionally and, at least in part, in exchange for Kaneshiro investigation and prosecution of Laurel J. Mau. *United States v. Lonich*, 23 F.4th 881, 902 (9th Cir. 2022) ("[a]n act is done 'corruptly' if it is performed voluntarily, deliberately, and dishonestly, for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means"); *United States v. Garrido*, 713 F.3d 985, 1002 (9th Cir. 2013) (holding that Section 666 does not require that the public

official "intended to be influenced in an official act" and the "need for a 'limiting principle' to distinguish between illegal and legal gratuities … is not relevant to violations of § 666 because § 666 contains both a corrupt intent requirement and a requirement that the illegal gift or bribe be worth over $5,000.") (internal formatting and quotations omitted).

The government does not need to prove a direct connection between the bribe and an expenditure of federal funds. It is sufficient to show that the City and County of Honolulu received federal benefits in excess of $10,000. *Sabri v. United States*, 541 U.S. 600 (2004) ("We can readily dispose of the position that…the statute must require proof of connection with federal money as an element of the offense…It is certainly enough that the statute condition the offense on a threshold amount of federal dollars defining the federal interest, such as provided here…"); *United States v. Kranovich*, 401 F.3d 1107, 1111-12 (9th Cir. 2005) ("[W]e therefore hold the government was not required to establish any connection between the embezzled funds and a federal interest from the express requirement in § 666(b) that the County received federal benefits in excess of $10,000.").

The solicitation or acceptance by a public official of a campaign contribution, or the giving or offering of a campaign contribution to a public official by a donor does not, in itself, constitute a federal crime even though the donor has business pending before the official.  However, if a public official demands or accepts money in exchange for a specific requested exercise of official power, such a demand or

32

acceptance, or the giving or offering of a campaign contribution to a public official by a donor, does constitute a federal crime regardless of whether the payment is made in the form of a campaign contribution.  Ninth Circuit Model Jury Instr. No. 9.7 (2022 ed., last updated Aug. 2023) (relying on *McCormick v. United States*, 500 U.S. 257, 273 (1991); *Evans v. United States,* 504 U.S. 255, 257-58, 267 (1992); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 936 (9th Cir. 2009)); *see  United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (holding that "what *McCormick* requires is that the quid pro quo be clear and unambiguous, leaving no uncertainty about the terms of the bargain"). The intent to exchange may be established by circumstantial evidence, based on the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them. *See McCormick*, 500 U.S. at 273; *Carpenter*, 961 F.2d at 827. The agreement must be clear and unambiguous but there is no requirement that it be verbally explicit. *See id.*

(C)    Federal Program Bribery (Receiving a Bribe)

The third crime involves receiving a bribe as an agent of a program receiving federal funds. This crime has the following elements:

1.    First, defendant Keith Kaneshiro was an agent of the City and County of Honolulu;

2.    Second, that the City and County of Honolulu was a local government that received in a one-year period, benefits in excess of $10,000

under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance;

  3. Third, defendant Keith Kaneshiro corruptly solicited, demanded, accepted, received, or agreed to accept from the defendant anything of value in connection with any business, transaction, or series of transactions of the City and County of Honolulu;

  4. Fourth, that the business, transaction, or series of transactions involved anything of value of $5,000 or more; and,

  5. Fifth, there was a clear and unambiguous quid pro quo—that is, an agreement involving a specific intent to give or receive a thing of value (campaign contributions) in exchange for an official act (investigating and prosecuting Laurel J. Mau).

*See* Eighth Circuit Model Jury Instr. No. 6.18.666B and 6.18.666C (ed. 2022) (Giving a Bribe and Receiving a Bribe); *United States v. Bynum*, 327 F.3d 986, 991 (9th Cir. 2003) (discussing 18 U.S.C. § 666).

 The legal principles discussed above which apply to the crime of giving a bribe are also applicable to this third crime of receiving a bribe.

/ /

/ /

/ /

/ /

### 3.    *Conspiracy Against Rights – 18 U.S.C. § 241*

In order for a defendant to be found guilty of the crime of conspiracy against rights between October 2012 and October 2017 as stated in Count 2 of the indictment, the government must prove each of the following elements beyond a reasonable doubt:

1.    First, there was an agreement between two or more persons to injure, oppress, threaten, or intimidate Laurel J. Mau in the free exercise or enjoyment of at least one of her rights secured by the Constitution or laws of the United States;

2.    Second, the defendant knowingly became a member of the conspiracy with the intent to injure, oppress, threaten, or intimidate the victim in her free exercise or enjoyment of at least one of Laurel J. Mau's rights secured by the Constitution or laws of the United States; and,

3.    Third, Laurel J. Mau was present in the State of Hawaii

*United States v. Reese,* 2 F.3d 870, 885 (9th Cir. 1993); *see also United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018) ("In order to convict Gonzalez and Ayala of violating § 241 based on the first object of the charged conspiracy, the government had to prove: (1) that two or more persons agreed to deprive Carrillo of his right to be free from the use of excessive force, and (2) that Gonzalez and Ayala knowingly joined the agreement and intended to deprive Carrillo of his right to be free from the use of excessive force.").

Additionally, the jury must find that at least one overt act was performed on or after June 2, 2017, for the purpose of carrying out the conspiracy. *See* ECF 170 at 49 (Judge Seabright's pretrial ruling that although § 241 does not have an overt act requirement, under Ninth Circuit precedent in *United States v. Brown*, 936 F.2d 1042, 1048 (9th Cir. 1991), an overt act is required to place the conspiracy within the five-year statute of limitations).

The words "injure," "oppress," "threaten," and "intimidate" are not used in any technical sense, but instead cover any conduct intended to frighten, punish, or prevent the free action of other persons. *See* Eighth Circuit Model Jury Instructions, No. 6.18.241 (Conspiracy to Deprive a person of Civil Rights (18 U.S.C. § 241) (elements—defining "injure, oppress, threaten, and intimidate") (2023 ed.); *United States v. McDermott*, 29 F.3d 404, 408 (8th Cir. 1994) (upholding how the court defined the terms "injure, oppress, threaten, or intimidate"); *United States v. Handy*, 2023 WL 6199084 (D.D.C. Sept. 22, 2023) (unpublished) (same); *see* final jury instructions in *United States v. Kim*, 19-cr-00166-VAP, ECF 183 at 34-35 (C.D. Cal., Nov. 22, 2019).

A person acts under "color of law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation. A private person who is jointly engaged with state or county officials in the prohibited action also acts under color of law. Eighth Circuit Model Jury Instructions No. 6.18.242 (Deprivation of Civil Rights (18 U.S.C. § 242)

36

(n.2 [this language should be used when a state or government employee is charged. See *West v. Atkins*, 487 U.S. 42 (1988) and *United States v. Colbert*, 172 F.3d 594, 596 (8th Cir. 1999) for a discussion of when state or government employee's actions fall "under color of law."] and n.3 [If a private citizen is charged, substitute this language. In *United States v. Price*, 383 U.S. 787, 794-95 (1966), the Supreme Court held that a private person acts "under color of law" if that person willfully participates in joint activity with someone that person knows to be a public official.]); *United States v. Martinez-Mercado*, 919 F.3d 91, 99 (1st Cir. 2019) ("[p]rivate persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [section 241]") (quoting Price, 383 U.S. at 794); *United States v. Reese*, 2 F.3d 870, 896 (9th Cir. 1993) ("Private individuals can run afoul of section 241 by conspiring with police officers or other officials.").

Count 2 alleges that the defendants conspired to injure, oppress, threaten, or intimidate Laurel J. Mau in the free exercise or enjoyment of the following two rights: (1) first, the right to be free from unreasonable seizures by one acting under color of law; and (2) second, the right to file a lawsuit in federal court alleging claims under Title VII of the Civil Rights Act and the Age Discrimination in Employment Act. *See* ECF 195 at 10 (Judge Seabright's pretrial rulings that there is indeed a specific right to "file a lawsuit in federal court" under Title VII). The Court should instruct the jury that both of these rights are rights specifically secured by the Constitution and laws of the United States. *See* Eighth Circuit Model Jury Instr. No.

6.18.241 (2022 ed.); Eighth Circuit Model Jury Instruction No. 6.18.242 (2022 ed.)

("You may find the defendant acted willfully even if you find that he or she had no

real familiarity with the Constitution or with the particular constitutional right

involved."); Fifth Circuit Pattern Jury Instruction No. 2.11 (2019 ed.) (when

analyzing § 242: "To find that the defendant was acting willfully, it is not necessary

for you to find that the defendant knew of a specific Constitutional provision or

federal law that his [her] conduct violated."); *United States v. Reese,* 2 F.3d 870, 885

(9th Cir. 1993) (holding that the "defendant need not have been thinking about the

law to have acted in reckless disregard of federal rights."); *United States v. Price*,

383 U.S. 787, 796-806 (1966) (discussing nature of protected right: "The language

of § 241 is plain and unlimited. As we have discussed, its language embraces all of

the rights and privileges secured to citizens by all of the Constitution and all of the

laws of the United States.").

The right to be free from unreasonable seizures is violated in the case of a

malicious prosecution. A malicious prosecution occurs where: (1) a criminal case

against a defendant is instituted without probable cause; (2) the criminal case was

instituted with malice; (3) the defendants intended the criminal case to result in an

unlawful incarceration without evidence satisfying probable cause; and (4) the case

was terminated in the defendant's favor. ECF 195 at 16 (Judge Seabright's pretrial

ruling that "the prosecution of an individual (in return for campaign contributions)

could have been intended to result in an unlawful incarceration, a clear Fourth

Amendment seizure"); *id.* at 16 ("By arguing that the FSI fails to allege a specific seizure, Tanaka ignores that § 241 charges a *conspiracy*, not a substantive offense. And to be convicted under § 241, the object of the offense (a violation of LJM's Fourth Amendment rights) need not in fact ever happen." (citing *United States v. Parker*, 165 F. Supp. 2d 431, 456 (W.D.N.Y. 2001)); *Thompson v. Clark*, 596 U.S. 36, 43 (2022) (the "gravamen of the Fourth Amendment claim for malicious prosecution, as this Court has recognized it, is the wrongful initiation of charges without probable cause.").

Malice exists if the motive in instituting the case was without probable cause and for a purpose other than bringing the defendant to justice. *Thompson*, 596 U.S. at 44 ("the 'motive in instituting' the suit 'was malicious,' which was often defined in this context as without probable cause and for a purpose other than bringing the defendant to justice"); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004); *Fatai v. Ramos*, No. 19-CV-603-DKW-WRP, 2023 WL 2392707, at *14 (D. Haw. Mar. 7, 2023) ("Malice exists if "the 'motive in instituting' the suit ... [was] without probable cause and for a purpose other than bringing the defendant to justice.") (citing *Thompson*, 142 S. Ct. at 1338).

Probable cause exists when, under all of the known facts, an objectively reasonable person would conclude there is a fair probability that the accused has committed a crime. Ninth Circuit Model Civil Instruction No. 9.23 ("'Probable cause' exists when, under all of the circumstances known to the officer[s] at the time,

an objectively reasonable police officer would conclude there is a fair probability that the plaintiff has committed or was committing a crime.") (last updated Aug. 2023) (modified); *United States v. Price*, 980 F.3d 1211, 1225 (9th Cir. 2019) (probable cause exits where, "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that the defendant had committed a crime").

A judicial finding of probable cause may be rebutted upon proof that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) ("Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.") (citing sources).

For the Count 2 conspiracy against Laurel J. Mau's right to be free from unreasonable seizures, the government does not need to prove that Laurel J. Mau was ever unreasonably seized or unlawfully incarcerated. Rather, the government must show an agreement to injure, oppress, threaten, or intimidate Laurel J. Mau in the free exercise or enjoyment of her right to be free from an unreasonable seizure.

The prosecution against Laurel J. Mau in Hawaii State Court alleged she committed Theft in the Second Degree. Under Hawaii Revised Statutes Section 701-831(1)(b), a person commits the offense of Theft in the Second Degree if he or she

obtains or exerts control over the property of another, the value of which exceeds $300, by deception, with intent to deprive the person of the property.  This crime has the following elements:

    1.    The Defendant obtained or exerted control over the property of another;

    2.    That the Defendant did so by deception;

    3.    That the Defendant did so with intent to deprive the person of the property;

    4.    That the Defendant was aware or believed the value of the property exceeded $300; and

    5.    That the value of the property exceeded $300.

Hawaii State Pattern Jury Instruction No. 10.19 (2021); *State of Hawaii v. Atwood*, 129 Haw. 414, 420, 301 P.3d 1255, 1261 (2013) ("[W]here a defendant is charged with theft by deception in a situation involving a contract, the intent element of the crime is not met where evidence shows that the defendant performed, or intended to perform, his or her part of the contract; conversely, the intent element is satisfied only when the defendant intends not to perform his or her contractual obligations.").

    Probable cause to believe a person has committed Theft in the Second Degree may exist only where evidence as to each of the five elements above is provided. *State of Hawaii v. Taylor*, 126 Haw. 205, 218, 269 P.3d 740, 753 (2011) ("'Probable cause' has been defined as 'a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt

of the accused.' Furthermore, in order to support an indictment, the prosecution must

provide evidence of each essential element of the charged offense to the grand jury.

If no evidence is produced as to a material element of the offense, a person of

ordinary caution and prudence could not have a 'strong suspicion' that the defendant

is guilty of the [charged] crime." (citations and quotations omitted).

B.    <u>TRIAL EVIDENCE</u>

1.    *Admission of Business Records Pursuant to Fed. R. Evid. 902(11)*

The United States intends to admit business records—e.g., phone and email

tolls, bank, and other records—through declarations pursuant to Rule 902(11) and

Rule 803(6). This comports with the rules of evidence and obviates the need to call

various custodians to authenticate these records.

Specifically, Rule 803(6) states that a record is "not excluded by the rule

against hearsay, regardless of whether the declarant is available as a witness," if:

(A)    the record was made at or near the time by—or from information
       transmitted by—someone with knowledge;
(B)    the record was kept in the course of a regularly conducted activity of a
       business, organization, occupation, or calling, whether or not for profit;
(C)    making the record was a regular practice of that activity;
(D)    all these conditions are shown by the testimony of the custodian or
       another qualified witness, or by a certification that complies with Rule
       902(11) or (12) or with a statute permitting certification; and
(E)    the opponent does not show that the source of information or the
       method or circumstances of preparation indicate a lack of
       trustworthiness.

Fed. R. Evid. 803(6) (emphasis added). In turn, Rule 902(11) provides that the

following is "self-authenticating":

> The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them.[3]

*Id.* (emphasis added). As the Advisory Committee has explained, Rule 902(11) was designed to provide a procedure "by which parties can authenticate certain records of regularly conducted activity, other than through the testimony of a foundation witness." Fed. R. Evid. 902, Advisory Committee Notes (2000 Amendments).

Here, on December 22, 2023, the United States provided written notice under Fed. R. Evid. 902(11) of its intent to rely upon the certificates of authenticity produced in discovery to establish the authenticity and admissibility of records at trial. The United States has received no response to this notice. Accordingly, the United States intends to introduce these business records without calling various custodians to authenticate the records.

---

[3] Admission of certified copies of business and public records has repeatedly been found to comply with the requirements of the Confrontation Clause. *United States v. Anekwu*, 695 F.3d 937, 974 (9th Cir. 2012) (foreign business records); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (public records); *see also Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 322-23 (2009) (recognizing that at common law a "clerk could by affidavit authenticate or provide a copy of an otherwise admissible record"). Moreover, the United States does not intend to introduce the actual declarations into evidence at trial. *See United States v. Hagege*, 437 F.3d 943, 958 n.6 (9th Cir. 2006) (finding no Confrontation Clause violation where records certifications were not themselves admitted into evidence).

2.    *Admission of Public Records*

Certified records of federal and state governments may be offered into evidence by the United States pursuant to Federal Rule of Evidence 902. These records are excepted from the hearsay rule by Rule 803(8), and so long as they meet the requirements of the Rule, their introduction does not require a sponsoring witness.  *See United States v. Fryberg*, 854 F.3d 1126, 1135–36 (9th Cir. 2017) (explaining that for Confrontation Clause purposes, "[a] business or public record is not testimonial due to the mere possibility that it could be used in a later criminal prosecution," but based on whether "the *primary* purpose of the record is for use as evidence at a future criminal trial") (citation and quotations omitted).

3.    *Admission of Summary Charts of Voluminous Evidence*

The United States intends to offer several summaries of voluminous evidence in accordance with Fed. R. Evid. 1006. Specifically, the United States will seek the admission of charts and summaries pertaining to phone communications between co-conspirators and financial records.

Fed. R. Evid. 1006 states that:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

The purpose of Rule 1006 "is to allow the use of summaries when the documents are unmanageable or when the summaries would be useful to the judge and jury." *United States v. Rizk*, 660 F.3d 1125, 1130 (9th Cir. 2011) (citation omitted). The party offering the summary into evidence must establish that the "underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." *Id.* (citing *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996)). The underlying materials "must be admissible, but need not themselves be admitted into evidence." *Id.* (citing *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988)).

The Ninth Circuit has repeatedly approved of the use of Rule 1006 summaries, particularly where, as here, the summaries will aid in organizing information contained in numerous documents into understandable form. *See, e.g.*, *Goldberg v. United States*, 789 F.2d 1341, 1343 (9th Cir. 1986) (testimony concerning summaries of voluminous tax records permitted); *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls permitted to help jury organize and evaluate evidence); *Keith v. Volpe*, 858 F.2d 467, 479-80 (9th Cir. 1988) (summaries necessary to present relevant facts in government agency files);

Here, the United States intends to admit Rule 1006 summaries including: (1) spreadsheets/charts reflecting calls/texts between co-conspirators; and (2) spreadsheets/charts summarizing financial records. *See, e.g.*, *United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary charts of telephone calls

permitted to help jury organize and evaluate evidence).[4] These charts summarize data from various grand jury returns, containing thousands of pages of data. Those underlying records have all been produced to the defendants. Further, the United States provided notice of its intent to introduce summary charts to the defendants on January 16, 2024, and provided draft summary charts on January 16, 2024, January 19, 2024, and February 8, 2024. In the event any updates are made to the draft charts provided, the United States will provide the updated charts to the defendants.

4.      *Checks and Legal Documents Are Admissible*

At trial, the United States intends to offer into evidence a number of agreements, contracts, checks, and other legal documents which are relevant to this case. These types of documents are not subject to hearsay objections.  It is well-settled that signed instruments such as contracts, agreements, checks, and promissory notes are writings that have independent legal significance, and are non-hearsay. *United States v. Rubier*, 651 F.2d 628 (9th Cir. 1981); *Kepner-Tregnoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994). Signed instruments are verbal acts, which have legal reality independent of the truth of any statement contained in them. The fact that a party signs a legal document creates legal rights,

---

[4] Any challenges to the information included or not included in summary charts bears on the weight, not admissibility, of the exhibit. *See Rizk*, 660 F.3d at 1131 n. 2 (citing *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999) ("Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not to the admissibility of the evidence")).

regardless of what the signatory was thinking at the time. *Kepner-Tregnoe, Inc.*, 12 F.3d at 540. Therefore, the admission of these types of documents to prove their existence cannot be prevented by the hearsay rule.

5. *The Rule of Completeness*

A defendant may not rely on the "rule of completeness" codified in Fed. R. Evid. 106 to admit his own self-serving oral statements. *See United States v. Liera-Morales*, 759 F.3d 1105, 1110 (9th Cir. 2014); *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014); *United States v. Collicot*, 92 F.3d 973, 983 (9th Cir. 1996). When a writing or recorded statement (or any part thereof) is introduced by a party, Rule 106 allows for the admission by the adverse party of any other part or any other written or recorded statement which ought in fairness to be considered contemporaneously with it. Application of the rule of completeness is a matter of the trial court's discretion. *United States v. Dorrell*, 758 F.2d 427, 434 (9th Cir. 1985). The rule, however, is limited to writings and recordings and does not apply to oral conversations. *See* Advisory Committee's Notes on Fed. R. Evid. 106. The Ninth Circuit has held that the rule of completeness does not require admission of otherwise inadmissible hearsay where the prosecution played two excerpts from defendant's jail calls that were inculpatory, and the district court denied defendant's request to play two separate calls denying his guilt. *See United States v. Meraz*, 2016 WL 6407431 (9th Cir. Oct. 31, 2016) (unpublished). The Ninth Circuit reaffirmed that the self-inculpatory statements the government introduced were admissible by

47

a party-opponent and were not hearsay (Fed. R. Evid. 801(d)(2)), the non-self-incuplatory statements the defendant offered were inadmissible hearsay. *Id.* (citing *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (citations omitted)).

Here, the United States intends to introduce oral and written statements, including such statements made by defendants during prior hearings, depositions, testimony in various proceedings, and in written reports. Defendants cannot rely upon the rule of completeness to bootstrap other self-serving statements made by defendants in order to avoid exclusion under the hearsay rules.

### 6.     *Hostile Witness or Witness Identified with an Adverse Party*

Several of the witnesses called by the United States will be close friends and associates of the defendants. Many demonstrated hostility to the United States during the grand jury investigation. *See, e.g.,* Sealed ECF No. 288 (United States' response in opposition to defendants' prosecutorial misconduct motions). During the testimony of such witnesses, the United States may request permission to conduct the examination using leading questions, as permitted by Rule 611(c) of the Federal Rules of Evidence.

Rule 611(c) provides that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party; interrogation may be by leading question." The Rule "vests broad discretion in trial courts." *Miller v. Fairchild Industries*, 885 F.2d 498, 514 (9th Cir. 1989). Reversal on the basis of an exercise of discretion under the Rule will occur "only if the judge's action amounted to or

contributed to the denial of a fair trial." *Id.* "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to the opposing party." Glen Weissenberger, *Federal Evidence 1996 Courtroom Manual* 134 (1995).

Before the adoption of Rule 611(c), the use of leading questions on direct examination required either a showing of actual hostility or a determination that the witness being examined was an adverse party, or an officer, director, or managing agent of an adverse party. *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981). The drafters of the Rule decided that these limitations presented "an unduly narrow concept of those who may safely be regarded as hostile without further demonstration. Fed. R. Evid.611(c) Advisory Committee Notes. The new rule was thus designed to enlarge the categories of witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility." *Id.*

Rule 611(c) also states: "[O]rdinarily leading questions should be permitted on cross-examination." But as the Advisory Committee Notes make clear, the "right of a cross-examiner to employ leading questions is not absolute under Rule 611(c)." *Morvant v. Construction Aggregates Corporation*, 570 F.2d 626, 635, n.12 (6th Cir. 1978). "Generally, when a witness identified with an adverse party is called, the roles of the parties are reversed. Leading questions would be appropriate on direct examination but not on cross examination." *Alpha Display Paging v. Motorola*, 867

F.2d 1168,1171 (8th Cir. 1989).  The Advisory Committee Notes to Rule 611(c) state the use of the word "ordinarily" was meant to "furnish a basis for denying the use of leading questions when the cross examination is cross examination in form only and not in fact," giving the example of an insured defendant who proves to be friendly to the plaintiff.   In instances where the United States' witnesses are friendlier to Defendants, the United States would request that the Court require the defense to examine these witnesses by means of non-leading questions.

7.    *Use of Evidence in Opening Statement*

The United States anticipates that it will incorporate some exhibits (such as photographs, videos, and charts) in its opening statement. Courts have approved the use of visual aids in opening statement since "the purpose of the opening argument is to give a broad outline of the case and facts to be proved, a visual outline of a party's argument is not significantly different from an oral outline." *United States v. Fried*, 881 F.2d 1077 (6th Cir. 1989). The visual aids obviously "must avoid reference to matters that cannot be proved or would be inadmissible as evidence." *United States v. De Peri*, 778 F.2d 963, 978-79 (3d Cir. 1985), *cert. denied sub nom*, *Murphy v. United States*, 475 U.S. 1110 (1986) (the trial court did not abuse its discretion in allowing the government to use a visual aid in its opening statement).

The United States will confer with defense counsel regarding the use of exhibits in opening statement. Should defense counsel question the admissibility of an exhibit the United States intends to use during its opening statement, upon

identification of the exhibit and the basis for the objection, the United States will present the evidence to this Court for a pre-trial hearing to determine admissibility.

Dated: February 20, 2024.       Respectfully submitted,

                                MERRICK B. GARLAND
                                Attorney General

                                */s/ Joseph J.M. Orabona*
                                MICHAEL G. WHEAT
                                JOSEPH J.M. ORABONA
                                JANAKI G. CHOPRA
                                COLIN M. MCDONALD
                                ANDREW Y. CHIANG
                                Special Attorneys of the United States

# UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>   v.<br><br>KEITH MITSUYOSHI KANESHIRO (1),<br>DENNIS KUNIYUKI MITSUNAGA (2),<br>TERRI ANN OTANI (3),<br>AARON SHUNICHI FUJII (4),<br>CHAD MICHAEL MCDONALD (5),<br>SHERI JEAN TANAKA (6),<br><br>               Defendants. | CR. NO. 22-000048-TMB-NC<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED that:

I, Joseph J.M. Orabona, am a citizen of the United States and am at least eighteen years of age.  My business address is 880 Front Street, Room 6293, San Diego, CA 92101-8893.

I am not a party to the above-entitled action.  I have caused service of the foregoing on all parties in this case by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 20, 2024.

*/s/ Joseph J.M. Orabona*
JOSEPH J.M. ORABONA
